1  LARRY W. GABRIEL - Bar No. 68329
   JENKINS MULLIGAN & GABRIEL, LLP
2  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
3  Telephone:    (818) 827-9000
   Facsimile:    (818) 827-9099
4  Email: lgabriel@ebg-law.com

5  Special Litigation Counsel or Bradley D. Sharp,
   Chapter 11 Trustee, Estate of C.M. Meiers
6  Company, Inc.

7                UNITED STATES BANKRUPTCY COURT
                  CENTRAL DISTRICT OF CALIFORNIA
8                 SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| 9  In re | Case No. 1:12-bk-10229-MT |
| 10 C.M. MEIERS COMPANY, INC., | Chapter 11 |
| 11 | Adv. No. 2:14-ap-01042-MT |
| 12   Debtor. | |
| 13 _____ | **TRUSTEE'S REPLY TO DEFENDANT ESSEX INSURANCE COMPANY, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| 14 BRADLEY D. SHARP, CHAPTER 11 TRUSTEE, ESTATE OF C.M. MEIERS, COMPANY, INC., | |
| 15 | DATE:    December 3, 2014 |
| 16   Plaintiff, | TIME:    1:00 p.m. |
| 17   vs. | PLACE:  Courtroom 302 |
| 18 ESSEX INSURANCE COMPANY, INC. | United States Bankruptcy Court 21041 Burbank Blvd. |
| 19   Defendant. | Woodland Hills, CA 91367 |

20
21
22
23
24
25
26
27
28

1

I.    **INTRODUCTION**

The threshold issue of the Trustee's motion is whether the administration of an insurance trust account under California Ins. Code §1733 is a "Professional Service" as defined by the Essex Insurance Policy (the "Policy") that is the subject of this litigation. The Trustee's position – that administration of the Insurance Trust Account is a professional service - is supported by case law directly on point. See, *Utica Mutual Insurance Co. v. Miller*, ("*Utica*") 130 Md. App. 373 (2000) (insurance agent's acts of monitoring his business operations, maintaining records, and accounting to insurance company for premiums are "Professional Services" within the context of an broker's errors and omissions policy).

Essex contends the maintenance of the Trust Account is simply an accounting function and any claim regarding negligence in the administration of the Trust Account is not a Professional Service. In support of its position, Essex applies a strained analysis comparing the administration of an insurance trust account to that of an attorney's trust account or a medical service trust account, neither of which involve professional services directly related to the activities of their profession. The Insurance Trust Account is used to collect and pay premiums services that directly relate to the insurance broker's profession, in that premiums that are paid and collected are used to purchase or maintain the insurance policies, which is the very essence of the broker's business: the selling and maintenance of insurance policies. The broker's trust account requires a working knowledge of the insurance business, a knowledge of how commissions work and are to be deducted from the payments received and how refunds of policy premiums are to be allocated and paid, among many other payments and collections that are made from the Trust Account. Conversely, an attorney's trust account is simply a conduit for the receipt of monies which can be administered without the knowledge of the attorney's profession activities.

Without a meaningful response to the *Utica* decision, Essex simply rejects it as being wrongly decided, though the case has been cited with approval over 40 times by other courts. Essex cites to no case directly on point that supports its position. There are none. Having failed to distinguish *Utica,* Essex asserts a litany of insurance coverage fallback defenses, none of which are supported by the facts, as discussed below.

Moreover, having denied coverage and abandoned its policyholder, Essex is precluded by law from contesting the underlying factual basis of the claim.  Under California law, Essex's coverage denial leaves it with only two possible defenses.  The first is that there is no coverage under the Policy, because the claim does not fall within the scope of coverage under the terms of the Policy.  This defense is a simple matter of insurance contract interpretation, because  there is no factual dispute.  [See "Plaintiff's Reply to Defendants Response to Plaintiff's Statement of Facts and Statement of Genuine Issues In Dispute to Opposition To Motion For Summary Judgment" ("Trustee's Reply SF") #'s 1-14, facts regarding the administration of CMM's trust account, all of which are admitted by Essex ].

Essex's other potential defense is to claim  the settlement agreement was collusive, which also cannot be the case here.  First, the settlement was achieved after a series of settlement conferences and the use of an experienced District Court judge as the mediator.  Second the settlement and its terms were confirmed by the Bankruptcy Court as being fair, just and reasonable, and being in the best interests of the estate.  Third,  Essex was provided notice of the motion to approve the settlement, yet never made an appearance to object to the same.  Having failed to do so, Essex is precluded from contesting the bona fides of the settlement.

Finally, Essex fails to present any material facts that would preclude the Court from granting summary judgment.  Essex presents no expert testimony to support its contentions as to the administration of an insurance trust account, and as noted, has admitted all of the essential facts necessary to support a conclusion in favor of the Trustee.

## II.    DISCUSSION

### A.    The Undisputed Facts Submitted By Plaintiff Must Be Accepted As True In Accord With Rule 56, and Local Rule 7056-1(f).

Rule 56 of the Federal Rules of Civil Procedure pertaining to motions for summary judgment (made applicable to bankruptcy proceedings in Fed. Rules of Bankruptcy Procedure 7056) requires Essen  to make an affirmative showing on all matters placed in issue by the Trustee's Motion for which Essex would have the burden of proof at trial.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (citing former Rule 56(e)(Rule 56 requires opposing party to designate specific facts and

2

1   evidence beyond the pleadings to refute matters that it would have burden to prove at trial).  Essex

2   cannot "sit back and wait for the [Trustee] to negate claims or defenses raised by the opposing party."

3   Schwarzer, et al., *Cal. Practice Guide: Federal Civil Procedure Before Trial* (The Rutter Group 2011)

4   ¶ 14:145.  "To avoid summary judgment, the opposing party must demonstrate a 'genuine' dispute as

5   to any 'material' fact on all matters as to which it has the burden of proof." *Id*. (citing *Celotex Corp*.,

6   supra, 477 U.S. at 324). See also, Local Rule 7056-1 et seq.

7       "When the moving party has carried its burden ..., its opponent must do more than simply

8   show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd.*

9   *v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986). "The mere existence of a scintilla of evidence ...

10  will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing

11  party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

12      At the summary judgment stage in insurance coverage actions, "[o]nce a prima facie showing

13  is made [by the insured] that the underlying action fell within coverage provisions, <u>an insurer may</u>

14  <u>defeat a motion for summary judgment on the duty to defend only by producing undisputed extrinsic</u>

15  <u>evidence conclusively eliminating the potential for coverage under the policy</u>." *Anthem Elecs., Inc. v.*

16  *Pac. Emp'r Ins. Co*., 302 F.3d 1049, 1060 (9th Cir.2002) (citation omitted) (emphasis added).

17  "Evidence that merely place[s] in dispute whether [the insured's] action would eventually be

18  determined ... to fall within one or more of the exclusions contained in the polic[y] is insufficient to

19  defeat the insured's right to summary judgment." *Id*. (citations omitted).

20      Here, Essex failed to produce undisputed extrinsic evidence that conclusively eliminates the

21  potential for coverage.  Essex' entire defense is based upon its contention  that the Rothman's

22  intentionally and knowingly looted the "piggy bank" (the "Trust Account").  However, Essex fails to

23  produce any *undisputed extrinsic evidence* supporting its contentions.  Instead, Essex draws

24  conclusions of a willful and knowing default based upon the fact that the Rothman's paid money to

25  CMM to cover a Trust Fund shortfall, and evidence that CMM made payments on the Newport Beach

26  Mortgage and on a boat owned by the Rothmans.  There is no evidence (let alone undisputed

27  evidence) that the Rothman's knew, at the time of the payments, that the money being used was not

28  owed to them for commissions, or that the payments caused an overdrawn situation in the Trust

3

1  Account at the time the payments were made, or that the Rothman's intentionally, willingly and

2  knowingly abused the Trust Account, notwithstanding the facts demonstrate (as agreed to by Essex)

3  that the Rothman's really had no idea they were even out of trust, until November or December 2011.

4  [See Trustee's Reply SF #'s 15-17 ].    Moreover there has been no finding that the Rothman's

5  changing of the "house accounts" to their accounts, was a fraudulent practice.  To the contrary, this

6  Court determined that the practice was *not* prima facie wrongful.  [See Court's Memorandum of

7  Opinion re Preliminary Injunction, Adversary Case No. 1:12-ap-01118-MT ECF Docket No. 100; 15-

8  17:14-19 ]  Essex' contention that  there is no potential for coverage falls flat as Essex basically

9  admits that the evidence is not conclusive but rather argues that there is some evidence which must be

10  addressed before judgment can be entered.  However, as presented in the Trustee's Reply SF,  this

11  flies in the face of Essex's obligation to submit undisputed evidence to support its contention that

12  coverage does not exist.

13          **B.        Maintaining An Insurance Trust Account Is A Professional Service.**

14          Essex disputes whether the underlying claims, which relate to CMM's management and

15  administration of its statutory required trust account,  arise out of CMM's "performance of or failure

16  to perform professional services for others."  The Policy defines CMM's profession as "insurance

17  broker." Essex insists that the management and administration of the trust account is a simple

18  ministerial task that does not fall within the concept of professional services.

19          The term "professional" has "long ceased to be connected and restricted exclusively to those

20  so-called learned professions." *Hollingsworth v. Commercial Union Ins. Co*., 208 Cal.App.3d 800,

21  806–7, 256 Cal.Rptr. 357 (1989).  Instead, "professional services" generally include services "arising

22  out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill

23  ...."*Tradewinds Escrow, Inc. v. Truck Ins. Exch*., 97 Cal.App.4th 704, 713, 118 Cal.Rptr.2d 561

24  (2002). Applying California law, the Ninth Circuit has defined "professional services" broadly,

25  holding that "[t]o be considered a 'professional service' for insurance purposes, a liability 'must arise

26  out of the special risks inherent in the practice of the profession.'"  *PMI Mortg. Ins. Co. v. Am. Int'l

27  Specialty Lines Ins. Co.,* 394 F.3d 761, 766 (9th Cir.2005).  In *Bank of Cal., N.A. v. W.H. Opie*, 663

28  F.2d 997, 981 (9th Cir.1981), the Ninth Circuit rejected an insurance company's contention that a

4

1    claim against a mortgage banking corporation for violations of a loan agreement as to the proper

2    allocation of funds it had borrowed from a bank did not arise out of a "professional service", because

3    there was no "professional-service relationship" between the mortgage banker and the lending bank.

4    Rather, the court held that coverage was "dependent upon the nature of the insured's conduct, not the

5    status of the party harmed" and that "courts must look 'to the act itself' to determine whether the

6    insured's liability was predicated upon the faulty rendition of professional services." *Id*. at 982

7    (internal citations omitted).

8        The undisputed facts demonstrate that the management and administration of its statutorily-

9    required trust account was a central element in CMM's insurance brokerage business and is one of the

10    "special risks inherent in" the profession of insurance brokering. *PMI*, 394 F.3d at 766. See also,

11    *Utica*. The Trustee has presented expert testimony and supportive case law concluding that the

12    management and administration of its statutorily-required trust account is a professional service

13    essential to the business of obtaining insurance policies, collecting and paying premiums, financing

14    premiums and resolving issues pertaining to the cancellation of policies, etc. See e.g. Michelson

15    declaration, Trustee's RJN, Exhibit 11. Essex offered no evidence to the contrary and cites to no case

16    directly on point that addresses the issue presented by the Trustee's Motion.

17        Instead, Essex argues that "professional services" cannot refer to the act of management and

18    administration of its statutory required trust account. It argues that the such tasks do not require the

19    professional's "specialized knowledge, labor, or skill." However, as *PMI* makes clear, the test of

20    whether a liability arises out of a professional service is not what value was conveyed to the recipient

21    of the service. Rather, it is whether the liability arises out of a risk inherent in the practice of the

22    insured's profession. The complexity of the management and administration of its statutory required

23    trust account is well demonstrated by the evidence presented by the Trustee and by the conclusions

24    set forth in *Utica*. Essex presents no evidence to the contrary (as it cannot now do) and no authority to

25    support its position. Accordingly it must be concluded that the underlying claims, which all arise out

26    of CMM's insurance brokerage business, arise out of CMM's "performance of or failure to perform

27    professional services for others." See generally *Utica*. See also, Michelson Declaration, RJN 11.

28    ///

1    The Court should give substantial weight to Michelson's opinion, particularly since Essex

2  offers no evidence to the contrary. *Strickland v. Francis,* 738 F.2d 1542, 1552 (11th Cir.1984)

3  (holding that finder of fact can reject uncontested expert testimony provided some basis in record

4  exists for disregarding expert's opinion).  Here, Essex offers no evidence "in the record" that could

5  provide a basis for rejecting Michelson's opinion and there is nothing in the record that is contrary to

6  his opinion.

7    Moreover, as presented in the Trustee's opening brief, the court in *Utica* found: "Accounting

8  for premiums is generally a duty that an insurance agent owes to an insurance company, and is part of

9  the agent's business (professional services).   The insurance company may choose the agent, in part,

10  because of his ability to maintain accurate records of the premiums for policies sold on behalf of the

11  company."  *Utica* at p. 389.

12    Essex's failure to contest the Trustee's undisputed fact presentation compels a finding that the

13  maintenance of an insurance trust account is a professional service that falls outside the scope of a

14  typical trust account.  This factual finding is supported by the conclusion reached in *Utica*, a decision

15  which cannot be ignored as Essex would ask the court do to.

16    The undisputed facts establish that that the Rothman Parties failed to monitor C.M.M.'s

17  business operations, failed to maintain records, failed to account for premiums, and failed to properly

18  audit the Trust Account activities.  This is negligence, not an intentional misconduct as Essex would

19  portray.

20    Importantly, several courts have noted that regulated professional activities (such as the

21  practice of law or insurance brokering) have both professional and commercial components:[T]he

22  practice of law, as other similarly regulated professional activity in today's world, has two very

23  different and often overlooked components-***the professional and the commercial***.  The professional

24  aspect of a law practice obviously involves the rendering of legal advice to and advocacy on behalf of

25  clients for which the attorney is held to a certain minimum professional and ethical standards. ***The***

26  ***commercial aspect involves the setting up and running of a business, i.e., securing office space,***

27  ***hiring staff, paying bills and collecting on accounts receivable, etc.***, in which capacity the attorney

28  acting as businessperson is held to the same reasonable person standard as any other. *Harad v. Aetna*

1   *Cas. & Sur. Co.*, 839 F.2d 979, 984 (3d Cir. 1988); S*ee also St. Paul Fire & Marine Ins. Co. v. ERA*

2   *Oxford Realty Co. Greystone, LLC*  572 F.3d 893, 898 -899 (11th Cir. 2009) ("The majority of courts

3   to address the issue have concluded that the term 'professional services' . . . excludes the business

4   aspects of a professional practice that a professional happens to perform.") (citing *Med. Records*

5   *Assocs. v. Am. Empire Surplus Lines Ins. Co.,* 142 F.3d 512, 514 (1st Cir. 1998).  However, while the

6   management of a client trust account is a *commercial* component of running a law firm (that is, it is a

7   necessary part of the firm's own business operations), the management of an Insurance Trust Account

8   is a *professional service* of an insurance brokerage firm.  Clients hire attorneys to represent them with

9   respect to legal matters; not to manage the firm's own client trust account.  Conversely, one of the

10  reasons that insurance companies engage with insurance brokerage firms is to handle the collection

11  and management of insurance premiums paid by policyholders.  Payment premiums is an express,

12  ongoing condition of every insurance policy sold by the insurance company.  An essential role of the

13  broker to be a go-between for the insurance carrier and the policyholder, and the Insurance Trust

14  Account is a tool used in facilitating the monetary component of that relationship.  Part of the broker's

15  obligation is to manage the collection of premiums, so that if the policyholder fails or refuses to timely

16  pay its premiums, the carrier may follow the necessary statutory procedures to terminate the policy

17  and the carrier's risk thereunder.  Thus, management of the Insurance Trust Account is not merely a

18  commercial aspect of the broker's own operations, but is an inherent aspect of the professional

19  services the broker provides to its clients.  See e.g. Michelson Declaration, RJN 11.  Accordingly,

20  given the precedent established by *Utica*, it is unquestionable that the management of an insurance

21  broker's trust account is a professional act that is covered by the terms of the Essex policy.  As such,

22  Essex had no basis to deny coverage and in doing so it breached  the terms of its policy and its implied

23  covenant of good faith and fair dealing.

24      **C.      The Language of the Code and the  Policy Compels Coverage for the Loss**

25              **Sustained.**

26          Under California law, the maintenance of an Insurance Trust Account is not simply an

27  administrative act akin to the maintenance of an attorney trust account.  California Insurance Code

28  §1733 et seq.  Rather, it is a substantive element of an insurance broker's professional services.  As set

forth in the code, in addition to holding funds and then distributing them, the Broker (C.M.M.) may use the Trust Account "for the purpose of advancing premiums, establishing reserves for the paying of return commissions or for such contingencies as may arise in his business of receiving and transmitting premium or return premium funds, or…maintain[ing] such fiduciary funds pursuant to Section 1734.5." This is not simple accounting, but instead requires specialized knowledge of the duties and obligations of insurance brokers in the ordinary course of their business.

Essex's contends that the Court must look to the act itself that gives rise to the claim for coverage not the title or character of act itself. Essex then admits that to be considered a professional service the conduct must arise out of the insured's performance of his specialized vocation or profession. The Trustee does not dispute these legal tenants. Rather the dispute here is Essex's position that the maintenance of a broker trust account is merely an administrative function that does not require specialized knowledge. It is this premise that is in dispute, and Essex fails to offer any evidence contrary to the evidence presented by the Trustee, including the Michelson declaration, and further fails to offer any cases on point, as the Trustee did vis a vis *Utica*. As indicated in California Insurance Code 1734(b) , an insurance broker maintains a trust account "for the purpose of advancing premiums, establishing reserves for the paying of return commissions or for such contingencies as may arise in his business of receiving and transmitting premium or return premium funds." These functions require more than general accounting knowledge, they require in depth knowledge of the insurance business, how to calculate insurance premiums, commissions, and what factors to consider in establishing reserves – to wit; history of cancellations of policy, terminations, etc. The maintenance of an insurance trust account is, by definition, a professional service provided to another given the complexities of the same. See, Declaration of Larry Gabriel, Exhibit 1, Chris Marinescu and Emma Hart, "*From Concept to Practice: Insurance Trust Account Management*" Insurance Journal, August 6, 2012.

Further, Essex's assertion that the inclusion of "for others" in the "Professional Services" definition in the Essex policy distinguishes this case from *Utica* is misplaced. The Essex definition of "Professional Services" is far from a model of clarity. The term is merely defined by example: "the following services rendered for others", followed by an enumerated list of 16 items. One would

1   reasonably expect, given the prefatory language, that the list would include "services."  It does not.

2   Rather, it includes a list of 16 professions and occupations.  For example, item number 7, "Insurance

3   Broker", is not a service; it is an occupation.  The occupation of Insurance Broker includes a number

4   of services that one can provide to his or her client: the examination of risk, analysis of available

5   insurance policies; acquisition of insurance policies; management of premiums, reporting of claims,

6   etc.  These are substantive professional services that an Insurance Broker provides "for others" (that

7   is, for its clients) – they are not administrative services that the Insurance Broker performs for itself.

8        Moreover, the insuring agreement states that Essex shall pay all sums the Insured shall become

9   legally obligated to pay as Damages "by reason of a Wrongful Act or Personal Injury in the

10  performance of Professional Services rendered."  Neither the insuring agreement, nor the Wrongful

11  Acts or Personal Injury definitions require that the claimant be the party to whom "Professional

12  Services" were directly rendered.  If an insured is alleged to have provided Professional Services "for

13  others", and it is further alleged to have committed a Wrongful Act or caused Personal Injury, they are

14  entitled to a defense against such claims (and indemnification for all covered damages arising

15  therefrom), irrespective of the identity of the claimant.

16       To interpret the Policy otherwise would be to interpret into the Policy an implied exclusion

17  that is not found in the "conspicuous, plain, and clear" language in the Policy, as required by

18  California law.  See, *Certain Underwriters of Lloyd's, London v. Superior Court* (2001).21 Cal.4th

19  545.  Further, because of the declination of coverage, Essex is estopped from raising policy exclusions

20  or non-coverage as a defense in the Trustee's coverage action.

21       **D.    Essex Breached Its Obligation To Provide A Defense To The Trustee's Action**

22       The coverage obligations of Essex under California law are clear.  It is well established that a

23  liability insurer owes a broad duty to defend its insured against claims that create a potential for

24  indemnity." *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081; *Gray v. Zurich*

25  *Insurance Co.,* (1966) 65 Cal.2d 263, 275.  ("[T]he duty to defend arises whenever the lawsuit against

26  the insured seeks damages on any theory that, if proved, would be covered by the policy. Thus, a

27  defense is excused only when 'the third party complaint can by no conceivable theory raise a single

28  issue which could bring it within the policy coverage.' [Citation.] It is settled that 'the insured need

9

1   only show that the underlying claim may fall within policy coverage; the insurer must prove it

2   cannot.' [Citation.] Thus, an insurer may have a duty to defend even when it ultimately has no

3   obligation to indemnify, either because no damages are awarded in the underlying action or because

4   the actual judgment is for damages not covered by the policy. [Citation.] If coverage depends on an

5   unresolved dispute over a factual question, the very existence of that dispute would establish a

6   possibility of coverage and thus a duty to defend. [Citation.]" *Mirpad, LLC v. California Ins.*

7   *Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1068, orig. italics; *Montrose Chemical Corp. v.*

8   *Superior Court* (1993) 6 Cal.4th 287, 300; *Wausau Underwriters Ins. Co. v. Unigard Security Ins. Co.*

9   (1998) 68 Cal.App.4th 1030, 1036; *Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 454.)

10      Whether a duty to defend exists in a given case is determined by examining "the policy, the

11   complaint, and all facts known to the insurer from any source" *Montrose Chemical Corp. v. Superior*

12   *Court*, supra, 6 Cal.4th at p. 300; *Gray v. Zurich Insurance Co*., supra, 65 Cal.2d at pp. 276-277,

13   including those facts the insurer "might have ascertained had [it] diligently pursued the requisite

14   inquiry" into the details surrounding the tender of defense. *California Shoppers, Inc. v. Royal Globe*

15   *Ins. Co.* (1985) 175 Cal.App.3d 1, 36-37.  Here, Essex did not conduct any investigation into the facts

16   upon which the claim was brought.  Accordingly, the failure to do so is issue determinative of Essex's

17   coverage obligation.

18      Further, "in resolving whether the allegations in a complaint give rise to coverage under a

19   [commercial general liability] policy, the courts consider the occurrence language in the policy, as

20   well as the endorsements, if any, that broaden coverage included in the policy terms." *Pardee*

21   *Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1351. "The rules

22   governing policy interpretation require the court to look first to the language of the contract in order to

23   ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.]"

24   *Waller v. Truck Ins. Exchange, Inc*. (1995) 11 Cal.4th 1, 18. "If the meaning a layperson would

25   ascribe to insurance contract language is not ambiguous, then the courts will apply it regardless

26   whether legally trained observers would perceive the language as raising doubts as to coverage due to

27   sophisticated legal distinctions. In other words, whatever ambiguity may attach to contract language

28   due to a party's legal knowledge is resolved in favor of coverage." *Pardee Construction Co. v.*

10

*Insurance Co. of the West,* supra, 77 Cal.App.4th at p. 1352.

Here, the facts alleged in the claims tendered fall within the scope of coverage afforded under the Policy, triggering Essex's duty to defend. The Trustee's First Amended Complaint in Intervention alleges facts and claims potentially covered under the Policy, triggering Essex's duty to defend under the afore-outlined authorities.

**E.      Essex's Opposition Is Limited By Law To Two Issues, Whether  the Administration of the Insurance Trust Is A Professional Service; and, Whether The Settlement Between The Trustee And The Rothman  Parties Was Collusive.   Essex's Argument That The Rothman's Looted The Trust Account Is Irrelevant.**

Essex spends much of its brief in opposition accusing the Rothmans of stealing from the Trust Account, something vehemently denied by the Rothman's,  Opposition pps. 1, 4,6-8, 16-19.  Further exploiting this theme, Essex then claims that there is no coverage for the loss because of its conclusion that the Rothmans' committed dishonest acts.

These arguments may have been appropriate had Essex not denied coverage at the outset on the basic premise that the administration of the insurance trust account was not a Professional Service. See, Jacobson Declaration, Exhibits 1-3.  Moreover, Essex's assumption of dishonesty based upon the allegations of the complaint, cannot be a basis for denying coverage.  Because the Trustee resolved the litigation, Essex cannot challenge the factual underpinnings of the settlement and its theory and allegations that somehow dishonesty and not negligent mismanagement was involved is not a consideration for this litigation.

Courts that have generally examined the right of insurers to reopen and re-litigate the liability of their insureds for covered losses and resulting damages, which have already been established by third-party judgments, employ a distinct preclusion doctrine, which is more akin to the well-settled principles of contractual indemnity. *Burns v. California Fair Plan Assn.* (2007) 152 Cal.App.4th 646, 653, 61 Cal.Rptr.3d 809 (insurance contract is a contract of indemnity).

When discussing an insurer's right to re-litigate its insured's liability, a leading treatise states the black letter rule in these terms: "One who has undertaken to indemnify another against loss arising

11

1    out of a certain claim and has notice and opportunity to defend an action brought upon such a claim is

2    bound by the judgment entered in such action, and is not entitled, in an action against him for breach

3    of his agreement to indemnify, to secure a retrial of the material facts which have been established by

4    the judgment against the person indemnified." 17 Couch on Insurance (3d. ed.2005) § 239:73, pp.

5    239–88–239–89, fn. omitted.

6        California cases illustrating this proposition are legion, beginning with *Clemmer v. Hartford*

7    *Insurance Co.* (1978) 22 Cal.3d 865, 151 Cal. Rptr. 285, 587 P.2d 1098 ("*Clemmer* "). In *Clemmer,* an

8    individual who was insured by the Hartford Insurance Company (Hartford) killed Dr. Clemmer. Dr.

9    Clemmer's family sued Hartford's insured for wrongful death and obtained a default judgment of over

10   $2 million. *Id.* at pp. 871–872, 151 Cal.Rptr. 285, 587 P.2d 1098.  The family then sought to satisfy

11   the default judgment in a direct statutory action against Hartford under Insurance Code section 11580.

12   In finding that Hartford failed to protect its rights, the Supreme Court concluded: "Thus, under the

13   circumstances, we hold that Hartford had ample opportunity to seek an adjudication of the damages. It

14   knew or should have known that judgment against its insured would form the basis for a later claim

15   against it under Insurance Code section 11580." *Clemmer, supra,* 22 Cal.3d at p. 886, 151 Cal.Rptr.

16   285, 587 P.2d 1098.  Instead of protecting itself by seeking relief from default, Hartford "chose to

17   remain silent, resting on its claim of noncoverage.  Having failed to pursue remedies thus available to

18   it, it cannot now claim prejudice or lack of opportunity to litigate damages." *Ibid.*  Without any

19   discussion of privity, collateral estoppel, or the duty to defend, *Clemmer* established the simple rule

20   that an insurer with an opportunity to "assume control and management of the suit" is not entitled to

21   re-litigate damages as established by a valid third-party judgment against its insured. *Id.* at p. 885, 151

22   Cal.Rptr. 285, 587 P.2d 1098.

23       It is now considered "well-settled" that "an insurer who is on notice of an action against its

24   insured and refuses to defend on the ground the alleged claim is not within the policy coverage is

25   bound by a judgment in the action, absent fraud or collusion, 'as to all material findings of fact

26   essential to the judgment of liability [and damages] of the insured.' [Citations.]" *Schaefer/Karpf*

27   *Productions v. CNA Ins. Companies* (1998) 64 Cal.App.4th 1306, 1313, 76 Cal.Rptr.2d 42, italics

28   omitted.

12

1    Furthermore, to be enforceable against an insurer, a "judgment need not be based on a

2   contested or adversarial trial, but may rest upon a default hearing held following a settlement

3   [citations] or an uncontested trial where the insured settled with the claimant and thereafter presented

4   no defense. [Citation.]" *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 516–517, quoted in

5   *Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694.    This rule is illustrated in

6   numerous cases. See, e.g., *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 228, 236–242, 178

7   Cal.Rptr. 343, 636 P.2d 32 (an insurer that refused to defend was bound by a judgment entered after

8   its insured settled with the injured party); *Zander v. Texaco, Inc.* (1968) 259 Cal.App.2d 793, 799,

9   804–806, 66 Cal.Rptr. 561 (an insurer that renounced coverage and defense was bound by a default

10   judgment obtained after the insured did not appear at trial).    In other cases, courts have relied on the

11   express language of the insurance policy obligating an insurer to indemnify its insured, to trigger the

12   insurer's obligation to pay a valid third-party judgment, notwithstanding the fact that the insurer had

13   *no notice* of the underlying proceeding, thus depriving the insurer of any opportunity to defend the

14   claim. *Home Indemnity Co. v. King* (1983) 34 Cal.3d 803, 815–816, 195 Cal.Rptr. 686, 670 P.2d 340

15   (insurance company bound by stipulated judgment between injured person and insured even though

16   insured failed to give insurance company notice of the underlying litigation or opportunity to defend

17   the claim); *Kruger v. California Highway Indem. Exch.* (1927) 201 Cal. 672, 675–676, 258 P. 602

18   (default judgment binding on insurer in the absence of fraud and collusion even though insurer was

19   not a party to the action and had no notice of the action until after the judgment was rendered); *Belz v.*

20   *Clarendon America Ins. Co.* (2007) 158 Cal.App.4th 615, 620, 69 Cal.Rptr.3d 864 (absent a showing

21   of actual prejudice from the insured's failure to provide notice of a third-party claim, insurer not

22   allowed to avoid its obligation to indemnify its insured when default judgment was taken against

23   insured contractor.)  Although these insurers had no notice or opportunity to participate in the defense

24   of their insureds, courts have not allowed these insurers to avoid their contractual obligations based on

25   a lack of privity, nor have the courts forced their insureds to undergo a second trial to once again

26   determine liability and damages.

27    Thus, courts have sometimes found an insurer bound by the results of the third-party litigation

28   against its insured based on the fact that the insurer refused to defend without legal justification. See,

13

1  e.g., *Amato v. Mercury Casualty Co.* (1997) 53 Cal.App.4th 825, 839 (well established in California

2  that an insurer that wrongfully refuses defend is liable on the judgment); *Ceresino v. Fire Ins.*

3  *Exchange* (1989) 215 Cal.App.3d 814, (same); *Pruyn v. Agricultural Ins. Co., supra,* 36 Cal.App.4th

4  at p. 517 ("The insurer not only had a right to participate in and to control the litigation, it had a duty

5  to do so."). See also, *Diamond Heights Homeowners Assn. v. National American Ins. Co.* (1991) 227

6  Cal.App.3d 563, 580–583, 277 Cal.Rptr. 906 (an excess insurer with no duty to defend that is given

7  notice of a settlement that invades its excess coverage has the choice of either assuming the defense or

8  challenging the settlement on the grounds of unreasonableness, fraud or collusion—otherwise it is

9  bound); *Fuller– Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958, 988,

10  (primary insurer may negotiate a good faith settlement of a claim in an amount which invades excess

11  coverage, and " 'may enter into [such settlement that] is binding on the excess insurer without the

12  excess insurer's consent....' "); *Garamendi v. Golden Eagle Ins. Co., supra,* 116 Cal.App.4th at pp.

13  711–712, (insurance company could not re-litigate the issues it otherwise had a right to litigate had it

14  decided to intervene in third-party lawsuit after insured's corporate status suspended and insurer was

15  unable to defend in name of suspended corporation]; *Kaufman, supra,* 136 Cal.App.4th at pp. 224–

16  225, (insurance company that represents insured whose corporate status has been suspended and for

17  that reason cannot be defended in third-party litigation must intervene in the initial lawsuit if it wishes

18  to participate; otherwise, issues necessarily decided in that litigation are conclusively established

19  against the insurer).

20      The conduct of Essex in the handling of the claim falls in line with the case authority above

21  discussed.   Here, Essex, was (1) duly notified of the underlying claim against its insured (Jacobson

22  Declaration, Exhibits 1-3); and (2) given a full opportunity to protect its interests as it had notice of

23  the pendency of the action, and thereafter was given notice of the motions approving the settlements.

24  See Request for Judicial Notice, Exhibit 3, p.92 (showing service on Essex's coverage counsel,

25  Andrew J. Waxler,, Waxler, Carner & Brodsky.)  Had Essex wanted to contest the settlement or the

26  appropriateness of the same, it had ample opportunity to do so.   See generally, "*Consequences of*

27  *liability insurer's refusal to assume defense of action against insured upon ground that claim upon*

28  *which action is based is not within coverage of policy,*" 49 A.L.R.2d 694 (secs. 25, 26 superseded by

1   "Liability insurer's post loss conduct as waiver of, or estoppel to assert, "no-action" clause" , 68

2   A.L.R.4th 389.) See also *National American Ins. Co. of California v. Certain Underwriters at Lloyd's*,

3   1996 WL 459864 (carrier in breach of duty to defend may not subsequently assert policyholder's

4   breach of cooperation clause as coverage defense).

5        Notwithstanding Essex had no right to be advised as to the proceedings, it was at all times kept

6   apprised of developments, and even provided the opportunity to object to the settlement.  Having

7   waived that right, it cannot now complain that somehow it should have been provided greater notice of

8   events than were provided to Essex as a courtesy and not a right.

9        **F.    The Trustee's claim is not barred by the Policy's "insured vs. insured"**

10              **exclusion.**

11       Essex contends that the Policy's "insured v. insured exception precludes coverage for the

12  claims brought by the Trustee.  Policy Exclusion E states that "The policy does not apply to any

13  Claim:… by or on behalf of another Insured." [SSUF 51 (Policy Exclusions E.)] The Policy defines

14  "insured" as set for in insuring provision (f) as:

15          Insured either in the singular or plural means:

16          1.   the Named Insured herein defined as the person(s) or
        organization(s) stated in Item 1. Of the Declarations;

17          2. any Predecessor Organization of the Named Insured;

18          3. any past or current principal, partner, officer, director, trustee,
        shareholder or employee of the Named Insured or its Predecessor

19          Organization solely while acting on behalf of the Named Insured or
        its Predecessor Organization and within the scope of their duties as
        such;

20          4.  if the Named Insured stated in Item 1. Of the Declarations is
        limited liability company [remained not applicable];

21          5. any natural person who is an independent contractor of the Named

22          Insured or is Predecessor solely while acting on behalf of the Named
        Insured or its Predecessor Organization and within the scope of their

23          duties as such; and

24          6.   the spouses and legally recognized domestic partners of
        Insureds…;

25          7.   the heirs, executors, administrators, assigns and legal
        representatives of each Insured above in the event of death,

26          incapacity, or bankruptcy of such Insured but only for such Insured's
        liability as otherwise covered herein.

27

28       Thus, relevant to this Motion, the policy defines Insured by reference to six initial classes of

persons or organizations, and then a seventh class that includes various third parties who may, be way

of circumstance, come to stand in the shoes of an Insured.  It is readily apparent from a cursory review of the definition that a bankruptcy trustee does not qualify under any of the first six initial classes of Insureds.  Thus, in order for the Insured v. Insured exclusion to apply to this claim, the bankruptcy trustee must qualify under the seventh class of Insureds.  However, that seventh class has several notable limitations, and a careful examination of those factors demonstrates why the definition (and therefore the exclusion) does not apply under the facts of this claim.

First, to qualify as an Insured under subpart 7 of the definition, a person must be an heir, executor, administrator, assign or legal representation of an insured.  A bankruptcy trustee is none of these.

Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded on the rights of the debtor and to an extent, certain rights of the debtor's creditors. See e.g., 11 U.S.C. §§ 541, 544, 547.  Upon the filing of a petition for relief under the Bankruptcy Code, any claims belonging to the company pre-petition automatically, by operation of law, become property of the bankruptcy estate. See 11 U.S.C. § 541(a)(1) (providing that upon the filing of a petition a bankruptcy estate is created comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case"). *In re International Gold Bullion Exchange, Inc.,* 60 B.R. 261, 263 (Bankr .S.D.Fla.1986) ("... a trustee, like a debtor-in-possession, is conceptually separate for purposes of bankruptcy law; indeed, it is well established that even a debtor-in-possession which is, in actuality, the same entity as the debtor is nevertheless deemed to be separate and distinct from the debtor under bankruptcy law ...").

Pursuant to § 323, the trustee, and only the trustee, can sue and be sued on behalf of the estate. See 11 U.S.C. § 323.  When the trustee commences an action, he is doing so on behalf of the estate, the debtor entity, the shareholders and the creditors, in furtherance of his duty as defined by Congress. The debtor, shareholders and creditors are all barred from asserting the claims. *Gore v. Kressner,* 159 B.R. 428, 431–32 (Bankr.S.D.N.Y.1993); *In re Granite Partners,* L.P., 194 B.R. 318, 325 (Bankr.S.D.N.Y.1996).  The Ninth Circuit is in accord:  See *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.* (9th Cir. 2006) 457 F3d 1106, 1116–1117.  See also,  *Alstrin v. St. Paul Mercury Ins. Co.* (D DE 2002) 179 F.Supp.2d 376, 403–405; *In re Buckeye Countrymark, In*c. (BC SD OH 2000) 251 BR 835, 840 (contra)—bankrupt corporation and its trustee in bankruptcy are separate legal

1  entities and trustee's claims against officers and directors are therefore not barred by insured vs.

2  insured exclusion]

3      The issue presented in this case was addressed by the Florida Court of Appeals in the case of

4  *Rigby v. Underwriters at Lloyd's, London*, 907 So.2d 1187 (Fla. 3rd Dist.Ct.App.2005).  In *Rigby*, the

5  court held that an *insured vs. insured* exclusion contained in the liability insurance policy did not bar

6  coverage for an action against a former director of a corporation that was brought by a bankruptcy

7  trustee. T. Alec Rigby, was a former president and director of Atlas Environmental, Inc. ("Atlas"). See

8  id. at 1188. Atlas filed for Chapter 11 bankruptcy relief in 1999, the case was subsequently converted

9  to Chapter 7, and Soneet Kapila ("Kapila") was appointed permanent Chapter 7 Trustee. *Id*. Before

10  the bankruptcy filing, Underwriters at Lloyd's, London ("Lloyd's") issued a Directors and Officers

11  Liability and Company Reimbursement policy to Atlas, and continued to issue renewals of the policy

12  during the bankruptcy proceedings. Id.  After his appointment as Chapter 7 trustee, Kapila requested

13  that Lloyd's list him as an insured under the policy. Id. In response, Lloyd's for an additional premium,

14  issued endorsements to the policy, adding Kapila as an insured. *Id*.

15      In 2000, *Kapila*, specifically as trustee, filed an adversary complaint against Rigby on behalf

16  of Atlas' creditors in the bankruptcy proceeding for Rigby's negligence and breach of his fiduciary

17  duties as an Atlas officer. *Id*. Rigby sought defense and indemnification of the trustee's claims from

18  Lloyd's pursuant to the directors and officers liability policy. *Id*. In response, Lloyd's denied coverage

19  under the policy's insured vs. insured exclusionary clause. The clause provided "[Lloyd's] shall not be

20  liable to make any payment in connection with any Claim ... by, on behalf of, or at the direction of any

21  of the Assureds ..." *Id*. at 1188–89. The Rigby court rejected the argument that Rigby was excluded

22  from coverage under the policy pursuant to the insured vs. insured exclusion because Kapila is defined

23  as an officer or director under the policy. The court stated: "Kapila's endorsement as an officer or

24  director did not detract from his function as trustee. Kapila as trustee had filed suit against Rigby on

25  behalf of Atlas' creditors, based upon his statutory duties as trustee under 11 U.S.C. §§ 704(1) and

26  704(4) to collect and reduce to money the property of the estate for the benefit of the debtor's

27  creditors. Kapila did not bring the adversary action acting as an officer or director. As a result the

28  insured versus insured exclusion did not apply. *Id*. (footnote omitted). See also,  *In re Molten Metal*

*Technology, Inc.,* 271 B.R. 711, 729 (Bankr.D.Mass.2002) (holding that "the Chapter 11 Trustee is not the legal equivalent of the Debtor."); *In re County Seat Stores, Inc.* 280 B.R. 319, 325 (Bankr.S.D.N.Y.2002) (holding that "a bankruptcy trustee is a legal entity separate and distinct from the debtor."); *In re Buckeye Countrymark, Inc.,* 251 B.R. 835, 840 (Bankr.S.D.Ohio 2000) (a bankruptcy trustee is not the debtor's alter ego but a separate legal entity that neither represents the Debtor nor owes the Debtor a fiduciary obligation and whose responsibility is to the bankruptcy estate).

The Trustee is prosecuting those claims on behalf of the estate and for the benefit of those having valid claims against it, among whom the Debtor stands last in priority.  As noted in *Molten Metal Technology:* [W]hile it is certainly true that a trustee "stands in the shoes of the debtor" when prosecuting causes of action that arose in favor of the debtor before the commencement of the bankruptcy case, it also true that this doctrine does not mean that the trustee is the debtor. It only means that the trustee, despite his or her nonidentity with the debtor, is nonetheless subject to such defenses as the defendant has against the debtor. *In re Molten Metal Technology,* at 729–30.

Simply stated, a bankruptcy trustee charged with a statutory duty and endowed with special statutory powers, is an independent and disinterested entity, separate and distinct from the debtor, as well as the prepetition company, and as such does not strictly "stand in the shoes" of the debtor. Nor does he assume the identity of the debtor.  *In re County Seat Store,* at 326. Based on this reasoning, the debtor does not own the claims and cannot bring the claims in this action. Rather, the bankruptcy trustee is prosecuting the claims on behalf of the estate and for the benefit of creditors having valid claims against it and he is not prosecuting these claims "by, on behalf of, in right of the Insured Entity." In the very unlikely event that the Trustee's recovery pays all administrative expenses and creditors' claims in full and there remains a surplus in which the Debtor might have some interest, the insured vs. insured exclusion may come into play; but, by the very nature of the depth of insolvency in this case and in light of the fact that the Policy proceeds are limited to $5,000,000 in the aggregate, the Debtor will very likely receive nothing from the Trustee's recovery.  Thus, for all intents and purposes, under the terms of the Policy, the Trustee in this case is a legal entity separate and distinct from the Debtor, prosecuting claims that are not the Debtor's, therefore, the "insured vs. insured exclusion" in

1    the Policy does not apply.

2    It must also be noted that in contrast to the Policy in this case, there are liability policies that

3    explicitly exclude coverage when suits are brought by bankruptcy trustees or debtors in possession.

4    See *TIG Speciality Insurance Company v. Koken*, 855 A.2d 900, 909 (Pa.Commw.Ct.2004) (finding

5    that a director and officer liability policy that stated coverage "does not apply to any Claim made

6    against any Insured arising out of ... Any Claim brought by, on behalf of or at the behest of the

7    Company, its successor, its assignee, its trustee in bankruptcy, its debtor-in-possession, or its litigation

8    trustee" barred coverage).  Here, the plain language of the definitions and the exclusion do not include

9    the bankruptcy trustee *vis a vis* claims brought by the Trustee. As discussed herein, the bankruptcy

10   trustee is not asserting the claims "by, on the behalf of, or in the right of the Insured Entity" but has

11   instituted the claims on behalf of the estate and for the benefit of its creditors.

12   Finally, the omission of a bankruptcy trustee from the Policy exclusion language indicates the

13   exclusion does not apply. If Essex wanted to include the bankruptcy trustee, it could have expressly

14   provided so by plainly excluding claims brought by the "Insured Entity's trustee in bankruptcy."  This

15   finding is in keeping with California law that exclusionary provisions which are ambiguous or

16   otherwise susceptible to more than one meaning must be construed in favor of the insured." See e.g.

17   *Haynes v. Farmers Ins. Exch.,* 32 Cal.4th 1198, 1204, 13 Cal.Rptr.3d 68, 89 P.3d 381 (2004) (quoting

18   *Steven v. Fidelity & Casualty* Co., 58 Cal.2d 862, 878, 27 Cal.Rptr. 172, 377 P.2d 284 (1962)

19   (coverage may be limited by exclusionary clauses only to the extent that those clauses are

20   "conspicuous, plain and clear."); *MacKinnon v. Truck Ins. Exch.,* 31 Cal.4th 635, 648, 3 Cal.Rptr.3d

21   228, 73 P.3d 1205 (Cal.2003). ( "[I]nsurance coverage is interpreted broadly so as to afford the

22   greatest possible protection to the insured, [whereas] ... exclusionary clauses are interpreted narrowly

23   against the insurer.").

24   Even assuming that the bankruptcy trustee could qualify as a "legal representative", it would

25   still have to meet the remaining criteria of the definition to qualify as an Insured.  The second

26   condition dictates that, although a legal representative can be considered an Insured, it is and Insured

27   only "for such Insured's liability as otherwise covered herein."  Critically, the definition makes clear

28   that a legal representative who qualifies as an Insured under the 7th cause is an Insured "only for such

1    Insured's liability."   The purpose of this clause is self-evident:   if an Insured dies, becomes

2    incapacitated or files for bankruptcy, the party who steps in that Insured's  shoes is an Insured for the

3    purpose of responding to (and attaining coverage for) claims against that Insured.   Thus, while a legal

4    representative is an Insured under the definition when a claim is made *against* it for liabilities of the

5    primary Insured (so as to secure coverage under the Policy), the legal representative will never be an

6    Insured when it *pursues* affirmative claims against others, because that function does not involve the

7    primary Insured's liability.   Accordingly, under the language selected by Essex when it drafted the

8    Policy, the Insured v. Insured exclusion can never apply to a legal representative who pursues claims

9    against Insureds under the policy, as the Trustee has done here.

10        Essex contends that the capacity clause in the exclusion ("but only for such Insured's liability

11    as otherwise covered herein") is intended simply to carve out from coverage claims against the

12    Trustee completely unrelated to CMM (such as, related to his work at Development Specialists, Inc.).

13    While that certainly would be one effect of the exclusion, it is certainly not the only consequence.   To

14    the contrary, by defining a legal representative's status as an Insured with respect to "liability", the

15    Policy delineates a clear limitation as to the status of a legal representative as an "Insured", not just a

16    limitation as to the scope of coverage afforded to it.   If Essex' sole intention in drafting the definition

17    was to limit coverage to a legal representative to matters associated with the Named Insured, it could

18    have done so far more clearly by omitting the "but only for such Insured's liability as otherwise

19    covered herein" clause from the definition, and adding a separate exclusion addressing the desired

20    restriction.   Alternatively, Essex could have avoided this dispute entirely had it included a clearly-

21    worded exclusion barring coverage for all actions by a bankruptcy trustee for any Insured brought

22    against any other Insured, a practice that is very common in the insurance industry.   See *TIG*

23    *Speciality Insurance Company v. Koken*, 855 A.2d 900, 909 (Pa.Commw.Ct.2004).   Essex chose not

24    to do so.   Instead, the language of the Insured v Insured exclusion, applied strictly, reflects that it

25    cannot apply to the Trustee's claim here; because the Trustee is an Insured under the Policy "only for

26    [CMM's] liability," and not for the purpose of CMM's affirmative claims.   If Essex had desired a

27    different outcome, it should have drafted its exclusion accordingly.

28    ///

20

1    For the reasons set forth herein "insured vs. insured" exclusion in the Policy does not bar the

2 Trustee's claim for coverage.

3 **III.    <u>CONCLUSION</u>**

4    For the foregoing reasons, summary judgment should be entered in favor of the Trustee as

5 prayed for in the Moving Papers.

6

7

8 DATED:   October 7, 2014                    LARRY W. GABRIEL

9                                            JENKINS MULLIGAN & GABRIEL, LLP

10

11                                  By:   /s/ Larry W. Gabriel

                                          Larry W. Gabriel

12                                        Special Litigation Counsel for Bradley D. Sharp,
                                          Chapter 11 Trustee, Estate of C.M.Meiers

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>DECLARATION OF LARRY W. GABRIEL</u>

I, Larry W. Gabriel, declare as follows:

1.      I am an attorney at law, duly licensed to practice in the State of California and admitted to practice before this court. I am a partner of the law firm, Jenkins Mulligan & Gabriel, LLP. I am special litigation counsel to Bradley D. Sharp, the chapter 11 trustee, estate of C.M. Meiers, bankruptcy case no. 1:12-bk-10229-MT.    I know the contents declared herein to be true of my own personal knowledge and belief, and if called upon could and would competently testify thereto.

2.      Attached hereto is an article by Chris Marinescu and Emma Hart, "From Concept to Practice: Insurance Trust Account Management" Insurance Journal dated August 6, 2012 demonstrates the complexity of the administration of an insurance trust account management http://www.insurancejournal.com/magazines/ideaexchange/2012/08/06/257776.htm.    A true and correct copy of the article is attached hereto as Exhibit "1."

I declare under the penalty of perjury that the foregoing is true and correct. Executed this the 10th day of November, 2014 at Woodland Hills, California

_____

LARRY W. GABRIEL

22

. .





# From Concept to Practice: Insurance Trust Account Management

By Chris Marinescu and Emma Hart | August 6, 2012

Email This    Print    Newsletters

Recommend  6    Tweet  1    Share  4

| Article | 3 Comments |

The concept of trust account (TA) management has no meaning to many professionals, or they have no uniform understanding of it. There are no text books or college classes on insurance TA management, and insurance-based publications seldom organize discussions to debate TA management's critical importance to the P/C insurance agency business.

Most insurance agency owners interpret TA management as a simple process of receiving premium payments from insureds and writing checks to carriers or general agents. Agency commission income is not formally managed; most agencies transfer commission funds to the operating account based on what they need rather on what they "earn." Return premiums are treated as "negative receivables," and premium credit and refunds are managed outside the general accounting system.

A word from our sponsor:



Need top-rated markets for your agency? Smart Choice can help! We offer access to quality markets with no start-up or monthly fees, discounted E&O, and the chance to earn bonus and contingency shares. Plus you'll retain 100% ownership of your book of business! Click here to contact us today!

MOST POPULAR

| Now | This Week | Commented |

Premium payments and company remittance are indeed critical to any insurance agency. But is this all trust account management is about?

### Insurance Code Mandates

Insurance code requires agency owners to receive premiums in a "fiduciary" capacity, not as owners but "custodians" of funds. On this basis, insurance code requires agency owners to maintain separate "trust" bank accounts for premiums and return premiums so they can be separated from the agency's business operating funds. A separate trust bank account protects premium funds from agency creditors.

Any premium payment deposited in an agency's trust bank account becomes "fiduciary" fund subject to insurance code regulations. One is not permitted to take funds out of the trust bank account without proper documentation of the amount of commission "earned" and an audit trail.

### Premium and Commission Management

TA management can be suitably defined as "premium and commission management." Agencies receive premium payments, generally in small amounts, policy by policy, invoice by invoice. The invoice process and especially that of endorsements is tedious and frequently requires follow-up to avoid delinquencies. Mismanaging receivables is a major cause of TA insolvency. Receiving premiums on schedule and remitting them to carriers or general agents, net of commission, is an agency's primary focus.

No formal agency commission management procedure is provided by current agency management systems. Agencies lack the necessary financial tools to determine their "earned" commission, and most transfer commission funds based on what they need. The uncontrolled transfer of commission funds to the operating account has been a major cause of TA insolvency.

### Money Management

The "premium and commission management" characterization overlooks the financial character of the TA operation. An insurance agency's financial traffic in and out of the trust bank account can be significant, $5 million to $10 million a year in small agencies, and $50 million or more a year in large agencies. Tracking bank deposits and disbursements requires accurate accounting records and a reliable reporting system. Thus, it is only natural that TA management should be viewed as "money management."

### Premium Financial Management

TA management is, however, a lot more than money management. Premium funds are by law "earmarked" funds with a predetermined destination. They require tracking at the policy level. A $1,000 premium received by an agency for policy A underwritten by one carrier cannot be used to remit the premium of another policy B underwritten by a different carrier. Policy premium management requirements could be looked at as a comprehensive "financial management." Accounting procedures and especially the premium reporting system must be detailed and reliable, as premiums are not simply money but "fiduciary" funds.

### Financial Solvency Management

Insurance code requires the trust bank account balance to equal at least the amount of the net premium "due to the persons entitled thereto." Failure to meet this requirement is essentially proof of financial insolvency. On this basis, TA management can be defined as "premium solvency management."

Financial solvency is the ultimate management goal of insurance TA "custodians." Under the insurance code standard, licensed insurance brokers are personally responsible for insurance TA solvency.

In current practice, the amount of net premium "due to the persons entitled thereto" cannot be reliably determined, especially when the "cash solvency" is investigated. Current "trust position" or "trust ratio" indicators are somehow helpful, but they are unreliable. They cannot

Former UNC Football Player Sues College Over 'Sham' Education

CNA Offering 11,000 Former Employees Pension Buyouts

Lyft Rideshare Passenger Dies in California Crash

Blue-Collar Workers Priced Out as Rich Snap Up Jersey Shore Homes

States May Decide Fate of Obamacare Tax Subsidies After Supreme Court

**More Top Stories**



**FREE NEWSLETTERS**

Sign up to receive insurance news alerts!

☐ Daily Headlines
☐ Most Popular This Week

24

characterize the TA "cash solvency," and the accuracy of accounting records is highly questionable.

**Premium Liability Management**

The carrier-agent/broker agreement compels insurance retailers to remit transacted premiums to carriers, net of commission, whether or not they receive premium payments from insureds. To avoid earned premium liabilities in case of non-payment of premium, they are entitled to request the policy cancellation.

By virtue of the carrier-broker agreement, a $10,000 premium transaction automatically creates a $9,000 premium liability for the broker (10 percent commission assumed). The agency's concern should therefore be not only to realize a $1,000 commission but also to protect the broker against a $9,000 potential loss.

Considering the book of business of most agencies is multi-million dollar in size, one could justifiably define TA management as "premium liability management." To manage liability of this magnitude, insurance brokers need to set up a functional TA operation.

**Trust Account Management Concept**

A financially solvent insurance TA guarantees all transacted premiums and commissions, as well as transacted premium liabilities, are properly managed.

TA financial solvency is not uniformly understood primarily because insurance professionals seem unaware of insurance code mandates, and regulatory agencies fail to consistently enforce them. In today's high-tech age, insurance brokers should be able to review simple premium financial solvency reports daily. They are too important to be left to just a casual examination.

To comply with insurance code mandates, a reliable financial solvency reporting system should assure insurance brokers:

- Each policy is financially solvent;
- Premiums owned by each carrier are financially solvent; and
- An agency's entire TA is financially solvent.

These financial instruments are sufficient to monitor and report TA financial solvency:

- TA balance sheet;
- Solvency analysis reports;
- Cash solvency report;
- Cash and receivable solvency report;
- Premium float statement; and
- Statement of trust funds beneficiaries.

A TA balance sheet will demonstrate trust assets equal trust liabilities. This report is currently unavailable because general ledger accounting does not support it. The main reason why this report cannot be produced is the premium invoice format, which treats commission liability as "income."

Solvency analysis reports are produced by processing the balance sheet data. They will show either a "premium surplus" or "premium deficit" for each policy, carrier, and agency. Solvency analysis reports will be available on a "cash basis" to demonstrate an agency has sufficient cash and credit assets to meet "due and payable" liabilities.

A premium float statement is similar to the P&L statement available in general ledger accounting. By listing premium receipts and disbursements, this report determines the "premium float" at all three levels: policy, carrier and agency. A policy or the whole TA is solvent when the bank account cash balance equals the premium float.

The statement of trust funds beneficiaries is generated by processing the premium float statement data. This report will list the "owners" (beneficiaries) of the TA cash balance. A TA cash balance has potentially five beneficiaries: carriers (net premiums), general agents (net

☐ MyNewMarkets.com Daily

☐ Insurance Jobs Newsletter (weekly)

☐ Carrier Management (new)

Enter your email      [Subscribe]

Have a news tip? Tell us.



**CURRENT ISSUE**

Read Online

Download PDF

Subscribe

Available on the iPad

**FEATURED VIDEOS**


**Agency Aggregators, Clusters or Alliances**
Listen Now


**Swett & Crawford's New CEO: Thomas Ruggieri**
Watch Now

IJTV sponsored by      FOREMOST INSURANCE GROUP

**EDITORS AND CONTRIBUTORS**


DON JERGLER
**Elmo, Insurers Promote Literacy in Downtown Los Angeles**


ANDREA WELLS
**How to Navigate Today's Agency E&O Market**


CHRIS BURAND
**Should Agency Owners Find or Develop Salespeople?**


CHRISTOPHER J. BOGGS
**Understanding Condo Association & Unit Valuation**

**QUOTE OF NOTE**

It takes a certain amount of reverse engineering to get the plan to where it can respond to new, emerging threats.

**More Quotes**

**PARTNER CENTER**

25

premiums), agency (earned commission), insureds (return premiums, overpayments), and premium finance companies (return premiums).

**Trust Account Management Practice**

The practice of TA management is either scarce or entirely lacking mainly because TA operation is unusually complex. To manage it properly in accordance with insurance code mandates, insurance brokers need better accounting and a standardized financial solvency reporting system.

The "trust ratio" or "trust position" indicators are of limited help. Better reporting is required to monitor and control the TA financial solvency.

Automation and the Internet can now elevate the insurance TA management practice to the high standard of care insurance premium "custodians" need.

**About Chris Marinescu and Emma Hart**

Marinescu is president of Paulmar Group LLC. Hart is a director of insurance agency operations in Orange County, Calif. Email: chris@paulmargroup.com, emma@emmahart.com.

---

From This Issue



**August 6, 2012**
**Insurance Journal West Magazine**

View Issue  Subscribe

**Top 100 Retail Agencies; Homeowners & Condos; Autos**

✉ **Email This** 🖨 **Print** 📧 **Newsletters**

Recommend ⟨ 6 ⟩ Tweet 1  Share 4

Like 6 people like this. Sign Up to see what your friends like.

**Categories:** Idea Exchange, National Section

*Have a hot lead? Email us at newsdesk@insurancejournal.com*

**« PREVIOUS ARTICLE**
HOW NICHE MARKETING WORKED

**NEXT ARTICLE »**
ERNST & YOUNG'S TONY ANDERSON TO BE
HONORED BY CITY OF HOPE



3985 programs
429 companies
1 magazine

2014 PROGRAM DIRECTORY

coming december 1st subscribe get listed advertise

---

**Like this article?**
Subscribe to our free email newsletter.

**SUBSCRIBE**

**Advertisers**



P&C News App

Download Now

National News
International News

Agencies for Sale

**READ**

**Which of the following statement(s) do you AGREE with?**

☐ More commercial customers are showing interest in cyber insurance

☐ More commercial customers are buying cyber coverage

☐ More commercial customers are interested in cyber coverage but most are not yet buying it yet

☐ Current cyber policies do not meet the needs of commercial customers

☐ Most commercial customers are not very interested in cyber coverage

Other:

**Vote** View Results

---

**INSURANCE JOBS**

**Marketing Representative -** Sacramento, CA

**Personal Lines Account Manager -** Friendswood and Galveston, Texas

**Ground Level Business Opportunity -** GA

**Underwriter – General Commercial -** Kapolei, Hawaii

**Insurance Product Manager-Personal Lines Homeowners -** Carlsbad, CA

MyNewMarkets.com
POWERED BY INSURANCE JOURNAL

Multiple Insurance Lines Potentially Affected by Ebola

How States Rank in Workers' Compensation Premiums

BusinessFirst Offering Workers' Comp in South Carolina

Lack of Insurance Complicates San Francisco Quake Risk

**CLAIMSJOURNAL.COM**
A PRODUCT OF INSURANCE JOURNAL

Top Trending EPLI Claims

Whitfield Returns to Cunningham Lindsey

Target Names New Chief Risk and Compliance Officer

New Online Storm Surge Risk Map Unveiled

INSURANCE JOURNAL'S
**ACADEMY OF INSURANCE**

NOV 6: ISO's New CGL and AI's: Trap or Treat?

**Latest Comments**

*Chris Marinescu* says:                                                    SEPTEMBER 23, 2014 AT 3:26 PM

Azeem Ben Ysreal: Find my email address at LinkedIn and send me a message. I'll be glad to answer your questions. Chris

*Azeem Ben Ysreal* says:                                                    MARCH 30, 2014 AT 9:30 PM

What can i do if a Insurance Agency,never evaluated my policy to have proper notice i am Insolvent after i transfer my policy to my 501 c 25 and yet they still try to jack me ... *read more*

*Henry A. Bender* says:                                                    OCTOBER 16, 2012 AT 9:27 PM

Excellent article explaining the problems that insurance agencies are facing with regard to their Premium Trust Accounting. I have worked for over 38 years in eight agencies u... *read more*

**See all comments**

## Add a Comment                              ## See Comments (3)

*Your email address will not be published. Required fields are marked

Name*        [                    ]

Email*       [                    ]

Comment
[                                                    ]

[ Post Comment ]

Notify me of comments via e-mail ☐

**NOV 12: Tackling Tough Conversations**

**NOV 20: Navigating Through a Construction Defect Loss**

**ON-DEMAND: Understanding "Coinsurance"**

## More News



**Honeywell Blocks EEOC Move to Halt Wellness Penalties for**



**Insurers Win Case to Kill HUD Disparate Impact Rule**



**Hedge Funds Need to Be Wary of Push Into Catastrophe Risks: XL**



**It's Time to End Physician Dispensing in Workers' Comp**



**Mass. DOI Issues Bulletin on Policy Term Disclosure Rules**



**E&O Insights: How Important Is Your E&O Policy?**



**Ohio Workers' Comp Bureau: Rates for Local Governments**



**Business Moves**

**More News Features**

PROPERTY AND CASUALTY
INSURANCE CONCEPTS SIMPLIFIED
A NEW BOOK, BY CHRIS BOGGS

FREE DOWNLOAD
FIRST THREE CHAPTERS

| **Insurance News** | **Features** | **Connect with us** | **Insurance Journal** |
| --- | --- | --- | --- |
| News by Region | Insurance Markets Directory | Email Newsletters | Submit News |
| News by Topic | Forums | Magazine Subscriptions | Advertise |

Yesterday

**Site Search**

[          ]  Go

A.M. Best Company Ratings

Industry Events

Agencies Wanted / For Sale

Buyers Guide

Newswire

Ad Showcase

Insurance Jobs

For Your Website

RSS Feeds

Twitter

Facebook

LinkedIn

Subscribe

Reprints

Link to Us

Contact Us

**Wells Media Group Network**

Insurance Journal Online

MyNewMarkets.com

Claims Journal

Insurance Journal TV

Academy of Insurance

Carrier Management

© 2014 by Wells Media Group, Inc. Privacy Policy | Terms & Conditions | Site Map

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367

A true and correct copy of the foregoing document entitled **TRUSTEE'S REPLY TO DEFENDANT ESSEX INSURANCE COMPANY, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 10, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- United States Trustee (SV) ustpregion16.wh.ecf@usdoj.gov
- Daniel C. Streeter daniel.streeter@troutmansanders.com, cathe.zinn@troutmansanders.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On **November 10, 2014**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Maureen A. Tighe
United States Bankruptcy Court
San Fernando Valley Division
21041 Burbank Blvd., Suite 325
Woodland Hills, CA  91367-6606

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 10, 2014 | NIKOLA A. FIELDS | /s/ Nikola A. Fields |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |