1  LARRY W. GABRIEL - Bar No. 68329
   JENKINS MULLIGAN & GABRIEL, LLP
2  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
3  Telephone:    (818) 827-9000
   Facsimile:    (818) 827-9099
4  Email: lgabriel@ebg-law.com

5  Special Litigation Counsel or Bradley D. Sharp,
   Chapter 11 Trustee, Estate of C.M. Meiers
6  Company, Inc.

7              UNITED STATES BANKRUPTCY COURT
               CENTRAL DISTRICT OF CALIFORNIA
8             SAN FERNANDO VALLEY DIVISION

9  | | |
|---|---|
| In re | Case No. 1:12-bk-10229-MT |
| | Chapter 11 |
| C.M. MEIERS COMPANY, INC., | Adv. No. 2:14-ap-01042-MT |
| Debtor. | **PLAINTIFF'S REPLY TO:** |
| | **DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS AND STATEMENT OF GENUINE ISSUES IN DISPUTE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| BRADLEY D. SHARP, CHAPTER 11 TRUSTEE, ESTATE OF C.M. MEIERS, COMPANY, INC. | [**RULE 56, FED.RULES OF CIV. PROC.**] |
| Plaintiff, | DATE:    December 3, 2014 |
| vs. | TIME:    1:00 p.m. |
| ESSEX INSURANCE COMPANY, INC. | PLACE:  Courtroom 302 |
| Defendant. | United States Bankruptcy Court |
| | 21041 Burbank Blvd. |
| | Woodland Hills, California 91367 |

        Plaintiff,  Bradley D. Sharp, in his capacity as the duly appointed chapter 11 trustee  (the

"Trustee") of the bankruptcy estate of C.M. Meiers, Company, Inc., ("C.M. Meiers") debtor,  pursuant

to Central District of California Rule 56-1, as the moving party on the motion for summary judgment

submits this Reply to Defendant's Response to Plaintiff's "Statement of Uncontroverted Facts and

Conclusions of Law".

        In this pleading, the Trustee presents his Statement of Undisputed Facts, the Defendant's

Response as presented in his Response to Plaintiff's Statement of Facts and Statement of Genuine

1169957

1  Issues In Dispute In Opposition To Motion for Summary Judgment, and the Trustee's Reply to the

2  Defendant's filing.

3  I.    **STATEMENT OF FACTS**

4      A.    **BACKGROUND INFORMATION REGARDING DEBTOR, C.M. MEIERS**

5      1.    Before filing for bankruptcy on January 9, 2012, [*In re C.M. Meiers Company, Inc.,*

6  1:12-bk-10229- MT, ECF Docket No. 1]  C.M. Meiers was owned and controlled by Defendants

7  Herbert Rothman (CEO and 89% owner and director),  Rebecca Rothman ( officer and director) and

8  their adult son, Eric Rothman (Vice President and 11% owner and director) (collectively, the

9  "Rothman Parties").

10      a.  Evidence:  Request for Judicial Notice ("RJN") 7; Omnibus Declaration of

11          Eric Rothman in Support of Debtor's Emergency Motions et etc. , filed in

12          C.M. Meiers bankruptcy case, case no. 1:12-bk-10229-MT [ECF Doc. #11]

13          p.2: ¶¶ 2-3.

14      b.  Defendant's Position:

15          Undisputed for the purposes of this motion that, prior to filing bankruptcy,

16          C.M. Meiers Company, Inc. ("C.M. Meiers" or "CMM") was operated by

17          Herbert Rothman and Eric Rothman. The remaining statements in this

18          purported statement of "undisputed fact" are not supported by any of the

19          evidence cited by the Trustee.

20      c.  Trustee's Reply:

21          In the declaration of Eric Rothman (RJN # 7, p. 197; Dec. ¶ 3) Eric Rothman

22          states:

23          "Until the filing of the bankruptcy case, C.M. Meiers was operated by Herbert

24          Rothman as CEO, myself as Vice President, and corporate President Dianne

25          Ewing. Ms. Ewing resigned her position on January 10, 2011. The stock of the

26          Debtor is owned 89% by Herbert Rothman and 11% by myself."

27          Essex has produced no other evidence to the contrary to put this fact in issue.

28  ///

2

1169957

1    2.     C.M. Meiers had been in business since 1939, and had over 50 employees working for

2 the firm.  C.M. Meiers offered commercial insurance, personal insurance, health and life insurance,

3 special programs, high net worth insurance and entertainment insurance.  C.M. Meiers had satellite

4 offices in Torrance, California and Dallas, Texas.

5              a.    Evidence: *Id.* at p.2: ¶ 4.

6              b.    Defendant's Position:

7                  Undisputed for the purposes of this motion.

8    3.     Prior to its bankruptcy, C.M. Meiers acted both as an insurance broker and as an

9 agent for insurance carriers ("carriers").

10             a.    Evidence: *Id.* at p. 3-4: ¶ 7.

11             b.    Defendant's Position:

12                Undisputed for the purposes of this motion.

13    4.     C.M. Meiers acted as an agent for approximately 18 carriers and as a broker for

14 approximately  162 carriers.

15             a.    Evidence:  *Id.* at. p. 3-4: ¶ 7.

16             b.    Defendant's Position:

17                Undisputed for the purposes of this motion.

18    5.     In circumstances in which it was acting as broker, C.M. Meiers sold an insurance

19 product and billed the client for the premium.  C.M. Meiers delivered the policy to the client,

20 obtained the premium payment from the client and sent the premium, less the commission to the

21 carrier.

22             a.    Evidence: *Id.* at p. 3-4: ¶ 7.

23             b.    Defendant's Position:

24                Undisputed for the purposes of this motion.

25    6.     Where C.M. Meiers acted as agent, it was authorized to issue a binder on behalf of

26 the carrier.

27             a.    Evidence: *Id.* at p. 3-4: ¶ 7.

28 ///

3

b.  Defendant's Position:

Undisputed for the purposes of this motion.

7.      Depending on the policy, some of these policies were directly billed by the carrier, which paid C.M. Meiers its commission at a later date, while for others, C.M. Meiers billed the client and collected all premiums due. In such case C.M. Meiers was to deposit the collected funds into C.M. Meiers' trust account (the "Trust Account") to pay the Carrier the premium and retain its commission.

a.  Evidence: *Id.* at p. 3-4: ¶ 7.

b.  Defendant's Position:

Undisputed for the purposes of this motion.

8.      C.M. Meiers solicited business and transacted the sale of insurance policies either through the efforts of its owner/director/officers ("House Accounts") or through independent contractors and two employees (collectively referred to by C.M. Meiers as the "Producers").

a.  Evidence: *Id.* at p. 4-5: ¶¶ 8-11.

b.  Defendant's Position:

Undisputed for the purposes of this motion.

9.      The Producers were contracted to solicit insurance on behalf of themselves, which C.M. Meiers agreed to write pursuant to the Carrier Agreements in which case C.M. Meiers acted as the broker or agent of record.

a.   Evidence: *Id.* at p. 4-5: ¶¶ 8-11.

b.  Defendant's Position:

Undisputed for the purposes of this motion.

10.     C.M. Meiers would receive a percentage of the commission generated by the Producers and would receive the entire commission for all policies generated as House Accounts.

a.  Evidence: *Id.* at p. 4-5: ¶¶ 8-11.

b.  Defendant's Position:

Undisputed for the purposes of this motion.

///

4

1169957

11.    C.M. Meiers billed the client and collected all premiums due, and was to deposit the collected funds into C.M. Meiers' trust account (the "Trust Account") to pay the carrier the premium and retain its commission.

      a.    Evidence: *Id.* at p. 3-5: ¶¶ 6-11.

      b.    Defendant's Position:

          Undisputed for the purposes of this motion.

12.    The Trust Account is a required statutory trust account pursuant to California Insurance Code §§ 1733, 1734 and 1734.5 and its use is restricted as set forth in the Insurance Code.

      a.    Evidence: *Id.* at p. 7-9: ¶ 20; RJN 8; California Insurance Code §§ 1733, 1734 and 1734.5 [Exhibit 13]

      b.    Defendant's Position:

          Undisputed for the purposes of this motion.

13.    The Trust Account was to consist entirely of premiums due to insurance carriers for policies sold by C.M. Meiers and commissions due to C.M. Meiers (including the share of the commission due to each CMM Producer).

      a.    Evidence: *Id.*

      b.    Defendant's Position:

          Undisputed for the purposes of this motion.

14.    Throughout any given month, C.M. Meiers would withdraw money from the Trust Account to pay commissions, or to remit client premiums, less commissions to the carriers.

      a.    Evidence: RJN 7 at pp. 7-9: ¶ 20.

      b.    Defendant's Position:

          Undisputed for the purposes of this motion.

**B.    DISCOVERY THAT THE C.M. MEIERS TRUST ACCOUNT WAS OUT OF TRUST**

15.    In or around November 2011, the Rothman Parties first became aware that there was an issue with the administration of the C.M. Meiers Trust Account.

///

1169957

1    Evidence: RJN 7;    See also, Declaration of Bradley D. Sharp ("Sharp

2    Dec.") ¶ 20;    RJN 10, Supplemental Declaration of Eric Held.

3        a.    Defendant's Position:

4    Undisputed for the purposes of this motion that the Trust Account was "out

5    of trust" in November 2011. No other aspect of this purported statement of

6    "undisputed fact," however, is supported by the evidence cited by the

7    Trustee.

8        b.    Trustee's Reply:

9    See Declaration of Bradley Sharp, p. 122, Email from Melody to Jim Seth

10    dated December 12, 2011 in which she states:

11    (4)Reconciliation of Trust Bank Balance- Attached is a listing (let me know

12    if you need the detailed reports by insurance company to verify my totals}

13    of the insurance companies whereby the client has already paid their

14    invoice (money collected) and the insurance companies are due the net

15    premiums. The total of the premiums due is $1,294,929 (see page 2 of 2). In

16    addition if the client's account is in a credit balance, the client is due this

17    money out of the Trust Account as well. That amount is $164,513 (page 2

18    of 2). The total premiums to be paid out is a total of $1,459,442 (page 2 of

19    2}. The total in the Trust account is $168,325 (page 2 of 2 or Trial

20    Balance)1 which means there is a shortage in the Trust account of

21    $1,291,117 (page 2 of 2).

22        c.    Trustee's Reply:

23    Regardless of the testimony, in its Response No. 18 Essex admits that it is

24    "Undisputed for the purposes of this motion that the Trust Account was "out

25    of trust" in November 2011."

26    16.    On November 3, 2011, Herbert Rothman, Eric Rothman and Rebecca Rothman paid

27 to the order of C.M. Meiers checks and cashier checks totaling $272,032.40, which were deposited

28 into the C.M. Meiers Trust Account.

6

1169957

1                              a.   Evidence:  *Id.*

2                              b.   Defendant's Position:  "Undisputed for the purposes of this motion."

3        17.     The money was paid to C.M. Meiers to cover payments that needed to be made from

4 the Trust Account because the Trust Account was "out of trust."

5                              a.   Evidence: *Id.*.

6                              b.   Defendant's Position:

7                                    Disputed.  No aspect of this purported statement of "undisputed fact" is

8                                    supported by the evidence cited by the Trustee. In fact, the Trustee could

9                                    not testify as to why the Rothmans deposited funds into the Trust Account.

10                              c.   Trustee's Reply:

11                                    Essex's Position is interesting for number of reasons.  First, the statement is

12                                  an admission that the Rothman's conduct was done intentional and was

13                                  therefore, fraudulent.    Conceding this "fact" Essex cannot contest its

14                                  responsibility to supply a defense under the Essex Policy, based upon an

15                                  assertion that the Rothman' used the Trust Account as their personal piggy

16                                  bank.  Accordingly, Essex's admission can only lead to the conclusion that

17                                  it wrongfully failed to accept the tender of defense given there was

18                                  uncertainty was to why the Trust was "out of Trust."

19

20        18.     At the time it was estimated that C.M. Meiers may have been out of Trust by as much

21 as $ 1.2 million.

22                              a.   Evidence: *Id*.

23                              b.   Defendants Position:

24                                  "Undisputed for the purposes of this motion that the Trust Account was "out

25                                of trust" in November 2011."

26                              c.   Trusteed position;  agree.

27        19.     The "out of trust" situation was created due to the failure of the Rothman Parties,  as

28 directors and officers of C.M. Meiers, to supervise and administer the business affairs of the Debtor,

7

1169957

1  including their failure to properly account for and audit the Trust Account to insure that the Trust

2  Account would not become "out of trust".

3          a.  Evidence: *Id*; See also, Sharp Dec. ¶ 20.

4          b.  Defendant's Position:

5            Disputed.  No aspect of this purported statement of "undisputed fact" is

6            supported by the evidence cited by the Trustee, and the evidence shows that

7            the Rothmans funneled money out of CMM for their personal benefit.

8          c.  Trustee's Reply:  Defendant's admission in number 17 belies their position.

9            In fact, the evidence, as presented by the Defendant, indicates that no

10            determination has been made that the "Rothman's funneled money out of

11            CMM for their personal benefit.

12

13      20.  The administration and management of an Insurance Trust Account is not simple, and

14  is not merely a matter of taking in money and making payments as in the case of an Attorney's trust

15  account.

16          a.  Evidence:  RJN 11;  Declaration of Sanford Michelson submitted in support of

17            the Debtor's Opposition To Motion For Appointment of Chapter 11 Trustee,

18            filed in  C.M. Meiers bankruptcy case, case no. 1:12-bk-10229-MT [ECF Doc.

19            # 47]

20          b.  Defendant's Position

21            Disputed. No aspect of this purported statement of "undisputed fact" is

22            supported by the evidence cited by the Trustee. To the contrary, in the cited

23            declaration, Sanford Michelson discusses whether there is evidence that the

24            C.M. Meiers account was actually "out of trust," – he does not discuss whether

25            the management of a broker's trust account is "simple" and he does not refer to

26            the management of an attorney's trust account in any way.

27            Controverting Evidence:

28            Declaration of Sanford Michelson, filed in C.M. Meiers bankruptcy case no.

1169957

8

1   1:12-bk-10229- MT(Docket No. 47) ("Michelson Declaration"). [Attached as

2   Exhibit 11 to the Trustee's Request for Judicial Notice (Docket No. 15)]

3       c.   Trustee's Reply:

4   Essex's statement that Mr. Michelson "does not discuss whether the

5   management of a broker's trust account is "simply" wrong.  In his declaration,

6   at ¶ 5 (b) Mr. Michelson discusses the uniqueness of the broker's account.  For

7   convenience of the court, a copy of Mr. Michelson's declaration  is attached

8   hereto as Exhibit 1. At page 4 of his declaration Mr. Michelson describes the

9   complexity of an insurance broker's trust account:

10   Transaction Tracing: During the investigation, the CDOI investigators

11   "traced" 129 different policyholder transactions. At its conclusion, the CDOI

12   determined that fiduciary funds, as defined by the Insurance Code, were placed

13   into the trust account, but eventually the same funds either did not get sent to

14   the insurance company or returned to the policyholder. However, during trial a

15   sample of 68 of the 129 "traced" transactions were reviewed. It was

16   conclusively found and admitted by the CDOI investigators that they did not

17   conduct a proper "tracing", given the unique nature of broker trust accounts,

18   and that out of the 68 sample transactions, *100% of the transactions revealed*

19   *complete compliance and no violation of the trust account.*  A compelling

20   reason for the CDOI's *admission* that the alleged tracing was incorrect was that

21   policyholders often have multiple transactions (for example, in personal lines

22   insurance a policyholder may have an automobile policy, homeowners, and/or

23   roadside assistance. All three transactions must be reviewed as one transaction,

24   from inception until present day. The reason being is that return premiums

25   occur and are subsequently applied to renewal policies, policies are cancelled,

26   which results in return premiums, that are offset against debts owed a

27   brokerage for various forms of service fees, etc.)

28   ///

9

1169957

1

    **C.**      **THE C.M. MEIERS BANKRUPTCY**

2

    21.    On January 9, 2012, C.M. Meiers filed its Chapter 11 petition.

3

       a.  Evidence:  RJN 12;  C.M. Meiers Bankruptcy Petition Case no. 1:12-bk-

4

10229-MT, ECF Doc. # 1.

5

       b.  Defendant's Position:

6

       Undisputed.

7

    22.    Shortly thereafter, Mr. Sharp was appointed the Chapter 11 Trustee.

8

       a.  Evidence:  RJN 13; Motion and Orders re Appointment of Bradley M.

9

Sharp as chapter 11 trustee,  case no. 1:12-bk-10229-MT,  ECF Doc. #s 66,74.

10

       b.  Defendant's Position:

11

       "Undisputed for the purposes of this motion."

12

    23.    As of January 25, 2012, the Debtor's books and records disclose that C.M. Meiers had

13

a "net payable" to various insurance companies in the amount of $1,085,659.14.

14

       a.  Evidence:  RJN 10, Supplemental Declaration of Eric Held.

15

       b.  Defendant's Position:

16

       "Undisputed for the purposes of this motion."

17

    24.    As of January 25, 2012, C.M. Meiers' Trust Account had an account balance of

18

$11,783.20 and was "out of trust" by an amount in excess of $1 million.  The out of trust has been

19

determined to be the approximate amount of $1.2 million.

20

       a.  Evidence: Sharp Dec., ¶ 15; RJN 10, 16

21

       b.  Defendant's Position:

22

 Undisputed for the purposes of this motion that, as of January 25, 2012, C.M. Meiers' Trust

23

Account had an account balance of $11,783.20 and was "out of trust" by an amount in excess of $1

24

million.

25

    25.    The Trustee alleges as a direct and proximate cause of the Rothman Parties breach of

26

fiduciary duty in the administration of the C.M. Meiers trust account,  C.M. Meiers was damaged in

27

an amount in excess of  $4 million.

28

///

1169957

10

1    a.  Evidence:  Sharp Dec. ¶¶ 21-23.

2    b.  Defendant's Position:

3    Undisputed that the Trustee makes the stated argument in his Declaration, but

4    this argument is not a "fact," much less an undisputed one. As explained in

5    detail in Section V.D. of Essex's opposition brief the Trustee's argument has

6    no legal or factual basis.

7    c. Trustee's Reply:

8    Essex presents no testimony (expert or otherwise) to contest the damage claim

9    of the Trustee.

10    **D.    THE INSURANCE POLICY**

11    26.    Essex issued its Insurance Agents and Brokers Errors and Omissions Liability

12  Insurance Policy, Policy No. AB-351400, to C.M. Meiers and others for the June 1, 2011 to June 1,

13  2012 Policy Period ("the Essex E & O Policy").

14    a.    Evidence: Sharp Dec. ¶ 8, Exhibit 1.   See also, Complaint for

15    Declaratory Relief filed in this action, Adv. No. 2:14-ap-01042-MT [ECF Doc. # 1];

16    b.    Defendant's Position:

17    "Undisputed for the purposes of this motion."

18    27.    Subject to a $25,000 per Claim Deductible applicable only to Damages, the Policy has

19  $5,000,000 per Claim and $5,000,000 aggregate Limits of Liability.

20    a.  Evidence: *Id*.

21    b.  Defendant's Position:

22    The terms of coverage are not in dispute.

23    **E.    THE TERMS AND CONDITIONS OF THE INSURING AGREEMENT**

24    The terms and conditions of the Policy cannot be disputed.

25    28.    The Policy's Insuring Agreement provides:

26    A. Errors and Omissions Coverage:

27    The Company shall pay on behalf of the Insured all sums in excess of the Deductible

28    stated in Item 5 a & b of the Declarations which the Insured shall become legally

11

1169957

obligated to pay as Damages as a result of a Claim first made against the Insured and reported to the Company during the Policy Period, Automatic Extended Reporting Period, or Optional Extended Reporting Period, if exercised, by reason of a Wrongful Act or Personal Injury in the performance of Professional Services rendered or that should have been rendered by the Insured or by any other person or organization for whose Wrongful Act or Personal Injury happens during the Policy Period or on or after the Retroactive Date stated in 'Item 6. Of the Declarations and before the end of the Policy Period.

     a. Evidence: *Id.*

     b. Defendant's Position:

       "Undisputed for the purposes of this motion."

29. The term "Professional Services" is defined in the Policy and means the following services rendered for others:

    1. Insurance Wholesaler;

    2. Insurance Managing General Agent;

    3. Insurance General Agent;

    4. Insurance Underwriting Manager;

    5. Insurance Program Administrator;

    6. Insurance Agent;

    7. Insurance Broker;

    8. Insurance Surplus Lines Broker;

    9. Insurance Consultant:

    10 Insurance Claims Administrator;

    11. Insurance Appraiser;

    12. Insurance Premium Financier;

    13. Notary Public; and

    14. Life and/or Health Agent or Broker.

1169957

12

1        15.     Lecturer, speaker, instructor or teacher at any Insurance convention or at any

2 other meeting or course where approved Department of Insurance continuing education credits

3 may be earned.

4        16.     Expert witness concerning any Insurance related subject.

5       a. Evidence: *Id.*

6       b.  Defendant's Position:

7       Policy terms speak for themselves.

8   **F.     THE CLAIMS PRESENTED  AGAINST THE ROTHMAN PARTIES**

9     30.     On or about April 19, 2012, the Trustee filed  his Complaint In Intervention  against

10 Rothman Parties (*Sharp v. Herbert Rothman, et al.,* adversary case no. 1:12-ap-01118 MT .  The

11 complaint was amended  (the "FAC") on or about July 12, 2012.

12       a.  Evidence: RJN 1-2.

13       b.  Defendant's Position:

14       "Undisputed for the purposes of this motion."

15     31.     The FAC alleges claims against all or some of the Rothmans for, among other things,

16 breach of fiduciary duty  based on the shortfall in the trust account and in administering the business

17 affairs of CMM on its own behalf and on behalf of others (claim # 3).

18       a.  Evidence:  RJN 2; Exhibit 2.

19       b.  Defendant's Position:

20       Document speaks for itself.

21   **G.     THE ROTHMANS' TENDER OF DEFENSE AND DENIAL OF COVERAGE**

22        **BY ESSEX**

23     32.     On or about August 20, 2012, the Rothman's through their counsel, Lawrence M.

24 Jacobson, tendered defense of the Complaint and the FAC to Essex.

25       a.  Evidence:  Jacobson Dec. ¶ 2, Exhibit 1.

26       b.  Defendant's Position:

27       Undisputed

28

13

1169957

33.    On October 4, 2012, Essex, through its counsel, Waxler Carner Brodsky, LLP, issued its opinion letter that the acts alleged in the FAC were not covered by the Policy's insuring provisions, and based thereon, Essex refused to provide a defense for the claims presented in the Complaint and in the FAC.

          a.    Evidence:  Jacobson Dec. ¶ 4, Exhibit 3.

          b.    Defendant's Position:

**H.    THE SETTLEMENT BETWEEN THE TRUSTEE AND THE ROTHMANS AND ASSIGNMENT OF CLAIMS**

34.    On or about September 13, 2013, the Trustee and the Rothman Parties attended an all-day mediation of the Trustee's claims before the Honorable Dickran Tevrizian (Ret.)  The mediation resulted in a settlement of the claims between the Trustee and the Rothman Parties (Herbert Rothman, Eric Rothman and Rebecca Rothman), pursuant to which the Rothman Parties would pay the Trustee $500,000.00.  Further, the Rothman Parties agreed to assign their rights and claims as the same may exist against Essex Insurance Company in rejecting coverage and for its failure to provide a defense to the Rothman Parties for the claims presented in the FAC, including the claims for mismanagement of the Debtor's Trust Account, which claims the Trustee believes to be in excess of $ 4 million.  In addition, the Rothmans agreed to subordinate their $1.6 million unsecured claims to those of the estate's general unsecured creditors.  In turn, the Trustee agreed that (i) Herbert Rothman shall have an allowed administrative claim of $14,000.00; (ii) Eric Rothman shall have an allowed administrative claim of $14,000.00; and (iii) Wen-Er. LLC shall have an allowed administrative claim of $8,790 for post-petition taxes, insurance and association fees due under the lease between Wen-Er LLC and the Debtor, subject to a credit for any such post-petition taxes, insurance and/or association fees paid by the Trustee or the estate.

          a.    Evidence:  Gabriel Dec. ¶ 5; RJN 3-6.

          b.    Defendant's Position:

          Undisputed for the purposes of this motion that the Trustee and the Rothmans attended mediation on September 13, 2013 and that the mediation resulted in a settlement.

14

1169957

35.    The settlement agreement was first approved by the bankruptcy court as being in the best interests of the estate, and thereafter, pursuant to motion duly made, approved as being done in "good faith".

    a.  Evidence:  RJN 3-6.

    b.  Defendant's Position:

Unsputed that the Bankruptcy Court approved the Trustee's settlement with the Rothmans, but immaterial. See *Hamilton v. Maryland Casualty Co*., 27 Cal. 4th 718, 730 (2002) (explaining that good faith settlement determination does not bear on insurance coverage). Essex objects to the Trustee's characterization of any order from the Bankruptcy Court regarding the settlement as inadmissible hearsay. Fed. R. Evid. 802. Any such order speaks for itself. Fed. R. Evid. 1002.

    c.  **Trustee's Reply:**

Essex's position is based upon a mischaracterization of the law. *Hamilton v Maryland Casualty Co.*, 27 Cal. 4th 718, 730 is distinguishable from the instant case.  Hamilton involved a situation where the insurer provides a defense, and nonetheless the insured settles the claim and assigns it to the Plaintiff.  That is not the situation here, where Essex denied coverage from the very outset.  Under the circumstances presented in this case, Essex is bound by the settlement, particularly so having been given the opportunity to object to the same before approval. See, e.g.  *Risely v. Interinsurance Exchange of the Automobile Club,* 183 Cal.App.4th 196 (2010).(Where a liability insurer denies its insured a defense for covered claims, and the insured has made a reasonable, noncollusive settlement with the third party, without the insurer's consent, the insured may assign its claims against the insurer to the third party in exchange for a covenant not to execute on the settlement; the third party may then seek damages from the

15

1169957

insurer for breach of duties that the insurer owed to the insured, in a separate action for breach of contract and breach of the covenant of good faith and fair dealing).

I.      **ESSEX'S AND THE TRUSTEE'S COVERAGE POSITIONS**

36.    On or about September 11, 2013, counsel for the Trustee wrote to Essex's coverage counsel a letter expressing his opinion that the coverage position previously taken by Essex's was unjustified as a matter of law requesting that Essex reconsider its coverage decision.

a.   Evidence:  Gabriel Dec. ¶ 3, Exhibit 1.

b.   Defendant's Position:

Undisputed that counsel for the Trustee wrote a letter to counsel for Essex dated September 11, 2013. Essex objects to the Trustee's characterization of the September 11, 2013 letter as inadmissible hearsay. Fed. R. Evid. 802. The letter speaks for itself. Fed. R. Evid. 1002.

c.  Trustee's Reply:

Undisputed.

37.    On or about September 13, 2013, counsel for the Trustee again wrote to Essex's coverage counsel a letter setting forth additional support and argument for the Trustee's reason as to why coverage must be provided to the insured's, and expressing his opinion that the coverage position previously taken by Essex was unjustified as a matter of law.

a.   Evidence:  Gabriel Dec. ¶ 4, Exhibit 2.

b.   Defendant's Position:

Undisputed that counsel for the Trustee wrote a letter to counsel for Essex dated September 13, 2013. Essex objects to the Trustee's characterization of the September 13, 2013 letter as inadmissible hearsay. Fed. R. Evid. 802. The letter speaks for itself. Fed. R. Evid. 1002

c.  Trustee's Reply:

Undisputed.

16

1169957

38.    On or about September 13, 2013, the Trustee and I, together with Mr. Sharp's general counsel, David Gould, and the Rothman Parties and their counsel, attended an all-day mediation of the Trustee's claims using the services of the former Chief Judge of the United States District Court, Central District of California, the Honorable Dickran Tevrizian (Ret.) The mediation resulted in a settlement of the claims between the Trustee and the Rothman Parties (Herbert Rothman, Eric Rothman and Rebecca Rothman). Among other things, the Rothman Parties were to pay the Trustee $500,000.00, and assign their rights and claims as the same may exist against Essex Insurance Company in rejecting coverage and for its failure to provide a defense to the Rothman Parties for the claims presented in the FAC, including the claims for mismanagement of the Debtor's Trust Account, which claims the Trustee believes to be in excess of $ 4 million. In addition, the Rothmans agreed to subordinate their $1.6 million unsecured claims to those of the estate's general unsecured creditors. In turn, the Trustee agreed that (i) Herbert Rothman shall have an allowed administrative claim of $14,000.00; (ii) Eric Rothman shall have an allowed administrative claim of $14,000.00; and (iii) Wen-Er. LLC shall have an allowed administrative claim of $8,790 for post-petition taxes, insurance and association fees due under the lease between Wen-Er LLC and the Debtor, subject to a credit for any such post-petition taxes, insurance and/or association fees paid by the Trustee or the estate.

     a.    Evidence: Gabriel Dec. ¶ 5-6.

     b.    Defendant's Position:

Undisputed for the purposes of this motion that the Trustee and the Rothmans attended mediation on September 13, 2013 and that the mediation resulted in a settlement. Essex objects to the Trustee's characterization of any settlement agreement with the Rothmans as inadmissible hearsay. Fed. R. Evid. 802. Any such agreement speaks for itself. Fed. R. Evid. 1002. Essex disputes that the Rothmans agreed to pay the Trustee $500,000 as part of the settlement. The evidence shows that the Rothmans agreed to pay only $25,000 in the settlement.

///

///

17

1169957

1           c.  Trustee's Reply:

2              The Trustee objects to Essex's characterization of the settlement agreement.

3              It's dispute as to the interpretation of its terms is irrelevant.  As noted by Essex

4              the agreement speaks for itself.

5        39.     Although invited to attend, albeit with short notice, Essex and its counsel were unable

6    to attend the mediation.

7           a.  Evidence: *Id*

8           b.  Defendant's Position:

9              Undisputed that, less than two days prior to the September 13, 2013 mediation,

10             counsel for theTrustee notified counsel for Essex of the mediation. Also

11             undisputed that neither Essex nor its counsel attended the mediation, although

12             counsel for Essex informed counsel for the Trustee he would be available by

13             phone.

14       40.     On or about October 30, 2013, Essex, through its coverage counsel, responded to the

15   Trustee's counsel's letters of September 11, 2013 and September 13, 2013, reiterating Essex's

16   position that given the facts alleged in the FAC, no coverage would be afforded to the insureds.

17          a.  Evidence:  Gabriel Dec. ¶ 7, Exhibit 3.

18          b.  Defendant's Position:

19             Undisputed that counsel for Essex wrote a letter to counsel for the Trustee

20             dated October 30, 2013. Essex objects to the Trustee's characterization of the

21             October 30, 2013 letter as inadmissible hearsay. Fed. R. Evid. 802. The letter

22             speaks for itself. Fed. R. Evid. 1002.

23           c. The statements made in the letter are party admissions.  Further the letterwas

24             written by Essex's counsel and therefore is a business record.

25       41.     On or about November 27, 2013, trustee's counsel sent another letter to Essex's

26   counsel in furtherance of the Trustee's position that coverage should be afforded given the facts

27   alleged in the complaint, the law, and the terms and conditions of the Policy.

28          a.  Evidence:  Gabriel Dec. ¶ 8, Exhibit 4.

1169957

1             b.  Essex Position:

2                Undisputed that counsel for the Trustee wrote a letter to counsel for Essex

3                dated November 27, 2013. Essex objects to the Trustee's characterization of

4                the September 13, 2013 letter as inadmissible hearsay. Fed. R. Evid. 802. The

5                letter speaks for itself. Fed. R. Evid. 1002

6             c.  Agree

7       42.      Neither Essex nor its counsel responded to the letter of November 27, 2013.

8             a.  Evidence:  Gabriel Dec.  ¶ 9

9             b.  Essex Position:

10              Undisputed.

11      43.      Essex was served with copies of the Motion to Approve the Settlement between the

12 Trustee and the Rothmans, and was also served with a copy of the Good Faith Settlement Motion.

13             a.  Evidence:  Gabriel Dec. ¶ 10; RJN 3 and 5.

14             b.  Essex Position:

15                Undisputed that counsel for Essex received a copy of the Trustee's motion to

16                approve the settlement with the Rothmans and the motion for a good faith

17                settlement determination, but immaterial. *See Hamilton v. Maryland Casualty*

18                *Co*., 27 Cal. 4th 718, 730 (2002) (explaining that good faith settlement

19                determination does not bear on insurance coverage).

20             c.  Trustee's Reply:

21                Essex's is wrong in its contention that somewhat *Hamilton* protects Essex from

22                the claims assets.   As previously noted *Hamilton* is distinguishable and does

23                not support Essex's Position.

24       44.      Essex did not file an objection to the approval of the motion or to the good faith

25 settlement motion.

26             a.  Evidence: Gabriel Dec.  ¶ 11.

27             b.  Essex Position:

28

1169957

1    Undisputed that counsel for Essex did not file an objection to the motion for

2    good faith settlement determination, but immaterial. See *Hamilton v. Maryland*

3    *Casualty Co.,* 27 Cal. 4th 718, 730 (2002) (explaining that good faith

4    settlement determination does not bear on insurance coverage).

5    c.  Trustee's Reply:

6    Essex's is wrong in its contention that somewhat *Hamilton* protects Essex from

7    the claims assets.   As previously noted *Hamilton* is distinguishable and does

8    not support Essex's Position.

9

10   Trustee's Response to Essex's Undisputed Facts:

| No. | Essex's Contention re Undisputed Facts | Trustee's Response |
|---|---|---|
| 45. | CMM is a privately held insurance brokerage firm headquartered in Woodland Hills, California. | Undisputed |
| 46. | Prior to its bankruptcy, CMM was operated by Eric and Herbert Rothman. | Undisputed |
| 47. | CMM acted both as an insurance broker and as an agent for carriers, and for certain accounts, CMM would bill the policyholder and deposit the collected funds in the CMM Trust Account. | Undisputed |
| 48. | The amounts in the Trust Account were to consist of only premiums due to insurance carriers for the policies sold by CMM and commissions due | Undisputed |

20

1169957

| | | | |
|---|---|---|---|
| 1 | | to CMM, including the share owed to | |
| 2 | | the brokers or "producers" under | |
| 3 | | contract with CMM. | |
| 4 | 49. | CMM is allowed to withdraw money | Undisputed |
| 5 | | from the Trust Account only to pay | |
| 6 | | premiums to the carriers and to pay | |
| 7 | | commissions. | |
| 8 | 50. | Essex issued Insurance Agents and | Undisputed |
| 9 | | Brokers Errors and Omissions | |
| 10 | | Liability Insurance Policy Number | |
| 11 | | AB 3514 00 to C.M. Meiers, Inc. for | |
| 12 | | the June 1, 2011 through June 1, 2012 | |
| 13 | | Policy Period (the "Essex Policy"). | |
| 14 | 51. | A true and correct copy of the | Undisputed |
| 15 | | declarations, policy form and | |
| 16 | | endorsements of the Essex Policy is | |
| 17 | | attached as Exhibit 1 to Declaration of | |
| 18 | | Bradley Sharp (Docket No. 13). | |
| 19 | 52. | As of December 31, 2000, CMM was | Undisputed |
| 20 | | insolvent. | |
| 21 | 53. | In June 2011, CMM lost an | Undisputed |
| 22 | | arbitration with a former producer – | |
| 23 | | Capital Financial Services ("Capital") | |
| 24 | | – based, in part, on CMM's failure to | |
| 25 | | pay under the terms of a contract. | |
| 26 | 54. | CMM was ordered to pay Capital | Undisputed |
| 27 | | approximately $445,000 as damages, | |
| 28 | | as well as $350,000 in punitive | |

1169957

| | | | |
|---|---|---|---|
| 1 | | damages, $786,865.58 in attorney | |
| 2 | | fees and costs, and $78,291.88 for | |
| 3 | | Capital's arbitration fees. | |
| 4 | 55. | CMM retained bankruptcy counsel to | Undisputed |
| 5 | | explore a potential bankruptcy in or | |
| 6 | | around July 2011. | |
| 7 | 56. | In September 2011, CMM began to | Undisputed |
| 8 | | discuss a sale of assets to Affinity | |
| 9 | | Global Insurance Services | |
| 10 | | ("Affinity"), while attempting to | |
| 11 | | negotiate a settlement with Capital. | |
| 12 | 57. | As part of the potential sale of | Undisputed |
| 13 | | CMM's assets to Affinity, Jason | |
| 14 | | Adelman of Affinity took over the | |
| 15 | | operations of CMM. | |
| 16 | 58. | In September 2011, CMM stopped | Undisputed |
| 17 | | paying creditor and former producer, | |
| 18 | | Jeff Kleid, under the terms of a Stock | |
| 19 | | Repurchase Note. | |
| 20 | 59. | An appraisal of CMM by Strategic | Undisputed |
| 21 | | Equity Group, updated on November | |
| 22 | | 7, 2011, placed the value of CMM at | |
| 23 | | negative $1.4 million. | |
| 24 | 60. | An appraisal report from Strategic | Undisputed |
| 25 | | Equity Group determined that, as of | |
| 26 | | August 31, 2011, the equity value of | |
| 27 | | the CMM as a going concern was | |
| 28 | | $900,000, and that the debt free | |

1169957

| | | | |
|---|---|---|---|
| 1 | | working capital of the company was | |
| 2 | | negative $1.8 million. | |
| 3 | 61. | As CMM was preparing to file | Undisputed |
| 4 | | bankruptcy in November 2011, | |
| 5 | | CMM's internal analysis revealed that | |
| 6 | | is was "out of trust." | |
| 7 | 62. | As a result of the "out of trust" | Undisputed |
| 8 | | situation in November 2011, CMM's | |
| 9 | | bankruptcy attorney informed CMM | |
| 10 | | that bankruptcy was "out." | |
| 11 | 63. | Following the discovery of the "out of | Undisputed |
| 12 | | trust" situation and the decision not to | |
| 13 | | file bankruptcy, Adelman and the | |
| 14 | | Rothmans began working on a plan | |
| 15 | | for a sale of CMM to Affinity through | |
| 16 | | an assignment for the benefit of | |
| 17 | | creditors ("ABC"). | |
| 18 | 64. | Both Kleid and Capital filed suit | Undisputed |
| 19 | | against CMM and threatened to | |
| 20 | | enjoin the proposed ABC. | |
| 21 | 65. | As a result of the threats by Kleid and | Undisputed |
| 22 | | Capital, Affinity withdrew from the | |
| 23 | | planned ABC, which necessitated | |
| 24 | | CMM's bankruptcy filing. | |
| 25 | 66. | The Trustee was appointed on | Undisputed |
| 26 | | January 20, 2012. | |
| 27 | 67. | The Trustee's investigation of CMM | Undisputed |
| 28 | | confirmed that the Trust Account was | |

1169957

| | | | |
|---|---|---|---|
| 1 | | deficient by over $1 million, *i.e.* the | |
| 2 | | records showed that the amounts | |
| 3 | | CMM owed to the insurance | |
| 4 | | companies and producers exceeded | |
| 5 | | the amounts in the Trust Account by | |
| 6 | | over $1 million. | |
| 7 | 68. | The Trustee has testified that the | Undisputed |
| 8 | | deficiency in the Trust Account led to | |
| 9 | | claims by various producers that they | |
| 10 | | had not been paid by CMM on | |
| 11 | | commissions they were owed. | |
| 12 | 69. | Beginning in 2005, CMM paid | Undisputed that legal title in the |
| 13 | | $685,011.79 for rent, mortgage | property describe #69 was held in the |
| 14 | | payments and a boat slip for a house | name of Herbert Rothman. |
| 15 | | in Newport Beach, California that was | |
| 16 | | owned by the Rothmans – not CMM. | |
| 17 | 70. | The Trustee's investigation indicated | Undisputed |
| 18 | | that the Rothmans used up to | |
| 19 | | $400,000 in funds from CMM to | |
| 20 | | furnish the Newport Beach house. | |
| 21 | 71. | The day that CMM filed for | Undisputed |
| 22 | | bankruptcy, the Rothmans approved | |
| 23 | | the transfer of ownership of a life | |
| 24 | | insurance policy from CMM to | |
| 25 | | Herbert Rothman, damaging the | |
| 26 | | estate by $80,331.54. | |
| 27 | 72. | CMM rented office space in a | Undisputed that CMM paid rent to |
| 28 | | building owned by a company that | an entity owed by the Rothmans. |

24

1169957

| | | | |
|---|---|---|---|
| 1 | | was owned by the Rothmans, but | Disputed as to the characterization |
| 2 | | CMM paid excessive rent for the | that Rothman were effecting |
| 3 | | space, effectively funneling "rent" | funneling rent paid by CMM to the |
| 4 | | paid by CMM to the mortgage on the | mortgage on the Rothman's |
| 5 | | Rothmans' building. | building. Disputed that the rent was |
| 6 | | | in excess of market. |
| 7 | 73. | Prior to CMM filing for bankruptcy, | Deny. The issue of the ownership of |
| 8 | | the Rothmans converted a number of | the trust accounts has yet to be |
| 9 | | accounts from "House Accounts" | determined by the Court. The Court's |
| 10 | | belonging to CMM to accounts | preliminary decision on this issue was |
| 11 | | belonging to Herbert Rothman. | that there was no conversion.  Court |
| 12 | | | Decision and Order (ECF #: 100 |
| 13 | | | 1:12-bk-10229-MT).  A true and copy |
| 14 | | | of the Memorandum of Opinion re |
| 15 | | | Preliminary Injunction as Against |
| 16 | | | Jason Adelman, Affinity Global |
| 17 | | | Insurance Services, Herbert Rothman, |
| 18 | | | and Eric Rothman is attached hereto |
| 19 | | | as **Exhibit "1."** |
| 20 | 74. | The Trustee's analysis indicated the | Undisputed as to the Trustee's view. |
| 21 | | Rothman's transfers of "House | |
| 22 | | Accounts" from CMM took nearly $2 | |
| 23 | | million of value from CMM prior to | |
| 24 | | the bankruptcy. | |
| 25 | 75. | Brokers left CMM after the Rothmans | Admit that the accounts had |
| 26 | | ceded control of CMM to Adelman, | approximately $2 million in |
| 27 | | resulting in an estimated $2 million in | commissions attached to them.  Deny |
| 28 | | damage to CMM. | as to other allegations. |

25

1169957

| | | | |
|---|---|---|---|
| 1 | 76. | A true and correct copy of the | Undisputed |
| 2 | | Response of Bradley D. Sharp | |
| 3 | | Chapter 11 Trustee Estate of C.M. | |
| 4 | | Meiers Company, Inc. to Defendants | |
| 5 | | Jason Adelman and Affinity Global | |
| 6 | | Insurance Services' Corrected First | |
| 7 | | Set of Interrogatories to Plaintiff-in- | |
| 8 | | Intervention Bradley D. Sharp is | |
| 9 | | attached as Exhibit C to Essex's | |
| 10 | | Appendix of Exhibits. | |
| 11 | 77. | A true and correct copy of the | Undisputed |
| 12 | | Response of Bradley D. Sharp | |
| 13 | | Chapter 11 Trustee Estate of C.M. | |
| 14 | | Meiers Company, Inc. to Defendant- | |
| 15 | | in- Intervention Herbert Rothman's | |
| 16 | | First Set of Interrogatories to | |
| 17 | | Plaintiff-in-Intervention Bradley D. | |
| 18 | | Sharp is attached as Exhibit B to | |
| 19 | | Essex's Appendix of Exhibits. | |
| 20 | 78. | After his appointment, the Trustee | Undisputed |
| 21 | | joined in an adversary action against | |
| 22 | | the Rothmans and Jason Adelman, | |
| 23 | | among others. | |
| 24 | 79. | The Trustee joined in a motion for a | Undisputed |
| 25 | | temporary restraining order to prevent | |
| 26 | | the Rothmans from transferring | |
| 27 | | CMM's "House Accounts" to Herbert | |
| 28 | | Rothman and out of the company. | |

26

1169957

| | | | |
|---|---|---|---|
| 1 | 80. | On or about August 20, 2012, counsel | Undisputed |
| 2 | | for the Rothmans tendered the | |
| 3 | | Trustee's lawsuit against the | |
| 4 | | Rothmans to Essex under the Policy. | |
| 5 | 81. | By letter dated October 4, 2012, | Undisputed |
| 6 | | Essex denied coverage for the Trustee | |
| 7 | | Action. | |
| 8 | 82. | A true and correct copy of the | Undisputed |
| 9 | | October 4, 2012 letter from Andrew | |
| 10 | | Waxler to Lawrence Jacobson is | |
| 11 | | attached as Exhibit 3 to the | |
| 12 | | Declaration of Lawrence Jacobson | |
| 13 | | (Docket No. 12). | |
| 14 | 83. | CMM's Directors and Officers | Disputed. |
| 15 | | ("D&O") carrier, Scottsdale Insurance | Scottsdale originally denied coverage |
| 16 | | Company ("Scottsdale"), accepted the | and then agreed to pay defense costs, |
| 17 | | defense of the Trustee Action. | subject to a reservations of rights. |
| 18 | 84. | A true and correct copy of the | Undisputed |
| 19 | | September 11, 2013 letter from Larry | |
| 20 | | Gabriel to Andrew Waxler is attached | |
| 21 | | as Exhibit 1 to the Declaration of | |
| 22 | | Larry Gabriel (Docket No. 11). | |
| 23 | 85. | On September 13, 2013, the | Undisputed |
| 24 | | Rothmans and the Trustee attended | |
| 25 | | mediation. | |
| 26 | 86. | The Trustee and the Rothmans | Undisputed |
| 27 | | reached a settlement agreement | |
| 28 | | totaling $4.3 million plus an | |

1169957

| | | | |
|---|---|---|---|
| 1 | | assignment of rights under the Policy, | |
| 2 | | and the "cash component" of the | |
| 3 | | settlement was only $500,000 with | |
| 4 | | $475,000 paid by Scottsdale and | |
| 5 | | $25,000 paid by the Rothmans. | |
| 6 | 87. | The Rothman Agreement expressly | Undisputed |
| 7 | | provided that the settlement involves | |
| 8 | | "a variety of different matters that the | |
| 9 | | Trustee alleges caused CMM and the | |
| 10 | | CMM bankruptcy estate, monetary | |
| 11 | | loss," including: (i) having CMM pay | |
| 12 | | for the rental and then purchase of a | |
| 13 | | residence located in Newport Beach, | |
| 14 | | California; (ii) transferring a life | |
| 15 | | insurance policy from the Debtor to | |
| 16 | | Herbert Rothman; (iii) the repurchase | |
| 17 | | of corporate stock; (iv) failure to | |
| 18 | | properly manage and maintain | |
| 19 | | CMM's premium "Trust Account" in | |
| 20 | | CMM's capacity as both an insurance | |
| 21 | | agent or insurance broker for those | |
| 22 | | policies it accepted payment of | |
| 23 | | premiums on; (v) failure to properly | |
| 24 | | maintain corporate books and records; | |
| 25 | | (vi) the transfer of CMM's "house" | |
| 26 | | accounts to Herbert Rothman | |
| 27 | | individually, (vii) abandonment of | |
| 28 | | their management responsibilities | |

28

| | | | |
|---|---|---|---|
| 1 | | over CMM; and (viii) failing to | |
| 2 | | preserve CMM's assets after it | |
| 3 | | became insolvent. | |
| 4 | 88. | The Trustee testified that the "primary | Undisputed |
| 5 | | issue" facing CMM at the time of the | |
| 6 | | bankruptcy was the judgment in favor | |
| 7 | | of Capital. | |
| 8 | 89. | The Trustee testified that, at the time | Undisputed |
| 9 | | CMM announced it would file for | |
| 10 | | bankruptcy, the "out of trust" issue | |
| 11 | | were "rumors." | |
| 12 | 90. | In his deposition, the Trustee could | Undisputed |
| 13 | | not explain why the Rothmans placed | |
| 14 | | funds in the Trust Account. | |
| 15 | 91. | In conjunction with filing for | |
| 16 | | bankruptcy, Eric Rothman, on behalf | |
| 17 | | of CMM, stated that CMM was filing | |
| 18 | | bankruptcy to address the Capital | |
| 19 | | judgment and the obligation to Kleid. | |

20

21                                        Respectfully Submitted,

22  DATED:   November 7, 2014                LARRY W. GABRIEL
23                                        JENKINS MULLIGAN & GABRIEL, LLP

24

25                          By:  /s/ Larry W. Gabriel
                                        Larry W. Gabriel
26                                        Special Litigation Counsel for Bradley D. Sharp,
                                        Chapter 11 Trustee, Estate of C.M.Meiers

27

28
                                        29
1169957

FILED & ENTERED

JUN 06 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | CHAPTER 11 |
| C.M. Meiers Company, Inc. | Case No.:  1:12-bk-10229-MT<br>Adv No:   1:12-ap-01118-MT |
| Debtor(s). | **MEMORANDUM OF OPINION RE PRELIMINARY INJUNCTION AS AGAINST JASON ADELMAN, AFFINITY GLOBAL INSURANCE SERVICES, HERBERT ROTHMAN, AND ERIC ROTHMAN** |
| BTJ Insurance Services, LLC | Date:      May 11, 2012<br>Time:      8:00 a.m.<br>Courtroom: 21041 Burbank Blvd., CTRM 302<br>             Woodland Hills, CA 91367 |
| Plaintiff(s), | |
| v. | |
| Jason Adelman,  Affinity Global Insurance Services, Herbert Rothman, Eric Rothman | |
| Defendant(s). | |

//

//

//

**EXHIBIT  "1"**

-1-

30

This motion for preliminary injunction raises the difficult intersection of a sale of a bankruptcy estate's interest in all assets, tangible and intangible, and the rights of former officers of the debtor corporation to continue pursuing their trade after their employment with the debtor ceases.  Here, Liberty Company Insurance Brokers, Inc. purchased the ongoing business of the debtor on an "as is, where is" basis, only to discover that some of the accounts it thought it had purchased were leaving to join the departed principals of the debtor at a new brokerage business.  The question presented is whether there is a clear showing that a preliminary injunction is warranted where: 1) former officers and a once stalking horse bidder of the debtor corporation are pursuing their profession in the same industry as the debtor; and 2) former clients of the debtor are leaving to follow the former officers and stalking horse bidder.  While legitimate concerns have been raised, the evidence does not warrant a preliminary injunction against those former officers and their new employer.

**Background**

On April 5, 2012, BTJ Insurance Services, LLC ("Plaintiff") filed an adversary complaint in C.M. Meiers Company, Inc.'s ("Debtor" or "CMM") chapter 11 bankruptcy case (the "Complaint").  The Complaint alleges: 1) unfair competition under common law and California Business and Professions Code § 17200; 2) misappropriation of trade secrets; 3) intentional interference with contractual relations; and 4) intentional interference with prospective economic advantage.  Complaint, April 5, 2012, ECF No. 1.

//

//

-2-

31

Simultaneously, Plaintiff filed a Motion for Temporary Restraining Order and

Order to Show Cause re Preliminary Injunction (the "Motion") as against Jason Adelman

("Adelman"), Affinity Global Insurance Services ("Affinity"), Herbert Rothman ("Herbert"),

and Eric Rothman ("Eric") (collectively the "Defendants").  Motion, April 5, 2012, ECF

No. 2.[1]  On April 16, 2012, the Court denied the request for a temporary restraining

order, and set a continued date for an evidentiary hearing on the preliminary injunction.

Plaintiff requests that the Court issue a preliminary junction enjoining

Defendants, their agents, employees, employers, corporations, partnerships, attorneys,

and all other persons acting under, in concert with, or for them:

1) From using or disclosing any confidential, proprietary information, and trade
   secrets formerly owned by Debtor, including without limitation Debtor's list of
   its clients' names, addresses, contact information, insurance policy renewal
   dates, insurance history, insurance needs and insurance policies (collectively,
   the "Confidential Information");

2) To deliver to Plaintiff all original and copied records Defendants have of
   Confidential Information, and Debtor's pricing and quote information, client
   communications, information pertaining to clients, vendor communications,
   and any other documentation that is a business record of Debtor, and to
   prohibit Defendants from making any copies or destroying any such records;
   and

3) To place in constructive trust all monies they have received on or after
   February 8, 2012, from insurance carriers and other persons and entities, to
   the extent such funds arise from insurance policies placed with customers
   who were Debtor's customers as of January 9, 2012, the date Debtor filed its
   chapter 11 petition.

Motion, April 5, 2012, ECF No. 2.

On April 12, 2012, the Chapter 11 Trustee, Bradley Sharp (the "Trustee") filed a

Trustee's Joinder to Plaintiff's Motion and Application for Motion to Intervene (the

"Joinder").  Joinder, April 12, 2012, ECF No. 15.  The Trustee contends that the

---

[1] The Motion is brought on the grounds of unfair competition under common law and the California
Business and Professions Code § 17200 ("Section 17200"), and misappropriation of trade secrets under
the Uniform Trade Secrets Act (the "UTSA") (Cal. Civ. Code § 3426, et seq.).

adversary action may "(a) impact the value of the proceeds from the sale of Debtor's

assets and the value of the estate; and (b) may represent a basis for additional claims

by the Trustee against the party defendants, arising out of and relating to their fiduciary

obligations owed to the Debtor, the Debtor's estate and to the creditors of the Debtor."

Joinder, 7:13-7, April 12, 2012, ECF No. 15.  Defendants filed oppositions.  Adelman

and Affinity Opposition, April 16, 2012, ECF No. 17; Rothman Opposition, April 16,

2012, ECF No. 27.

The Court held five days of testimony on the Motion.  The following individuals

filed declarations: 1) Thomas Leach; 2) Russell Hugenberger; 3) Jason Adelman; 4)

Sonia Lee; 5) Carol Dooley; 5) Charlene Hill; 6) James Jackson; 7) David Osterman; 8)

Sheldon Goldman; 9) Herbert Rothman; 9) Eric Rothman; 10) Eric Held; 11) Larry

Gabriel; 12) Dave Winnert; 13) Richard McLeod; 14) Virginia Scardina; 15) Jerry

Pickett; and 16) Marjorie Segale.  The following individuals were examined at the

hearing: 1) Thomas Leach; 2) Russell Hugenberger; 3) Charlene Hill; 4) Eric Held; 5)

Jason Adelman; 6) Eric Rothman; and 7) Herbert Rothman.  Cross examination of all

other declarants was waived.  Having considered all the testimony and admitted

exhibits, the Court makes the following findings of facts and conclusions of law under

Federal Rule of Civil Procedure 52, applicable in this bankruptcy proceeding under

Federal Rule of Bankruptcy Procedure 9014.[2]

//

//

---

[2] To the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  To the extent any party should later assert that this Court may not hear and determine this matter, that party is required to file written objections pursuant to Fed. R. Bankr. P. 9033, and the following shall be considered proposed findings of fact and conclusions of law should the District Court find this Court lacked authority to enter a final ruling.

33

1    **Findings of Facts**

2        1.  <u>The Bankruptcy and Sale of Assets</u>

3        Debtor was a privately held insurance brokerage California corporation operated

4

5   by Herbert Rothman as CEO, Dianne Ewing as President and Eric Rothman as Vice

6   President.  Debtor filed for relief under chapter of 11 of Title 11 of the United States

7   Code on January 9, 2012.  On the same day, Debtor also filed a motion requesting

8   approval of a management agreement between Debtor and Affinity (the "Management

9   Agreement").  The Court approved the Management Agreement on an interim basis, but

10  left final approval of the Management Agreement to a later date.

11      On January 17, 2012, Debtor filed an Emergency Motion for Order (1) Approving

12  Sale Procedures for the Sale of Estate Property and (2) Setting a Hearing on Motion for

13  Sale of Assets of the Estate.  On that same day, creditor Gensar Saleigh and Capital

14  Financial ("Saleigh") filed a Motion for Appointment of Chapter 11 Trustee under § 1104

15  (the "Trustee Motion"). [3]  In the Trustee Motion, Saleigh made allegations about Debtor

16  being out of trust approximately $1.4 million, in violation of the California Insurance

17  Code.  <u>Trustee Motion</u>, 8:15, January 17, 2012.  Saleigh contended that the out of trust

18  issue warranted the appointment of a chapter 11 Trustee.  Saleigh also alleged that

19  Debtor had "lied by omission" on several topics, including the nature of the relationship

20  between it and Affinity.[4]

21      On January 20, 2012, the Court heard six hours of testimony concerning the

22  appointment of a trustee.  William Russ testified that he assisted in determining whether

23  Equitable Solutions, Inc. ("Equitable") would undertake the responsibility of assignee in

24  the pre-petition Assignment for the Benefit of Creditors ("ABC").  His testimony indicated

25

26

27

28

---

[3] Unless otherwise stated, all section references are made to Title 11 of the United States Code.
[4] Adelman is Affinity's principal; Adelman's sister is married to Eric.

that Debtor was in all likelihood out of trust.  Evidence on the actual amount out of trust

presented at the hearing was speculative, but it was estimated to be at least $1 million.

The Rothmans insisted there was no trust account problem and the accounting of

various items was being misconstrued.  Although the evidence was preliminary and an

audit had not yet been completed, it was clear that no sale would be credible without

independent oversight.  At the conclusion of that hearing, the Court appointed a chapter

11 Trustee under § 1104(a)(2).  Bradley Sharp was then selected.

Before resolution of the Trustee Motion, Debtor filed its Motion for Approval of

Sale Procedures (the "Sale Procedures Motion") and Motion for Sale of Property under

§ 363(b) (the "Sale Motion").  The Sale Procedures Motion proposed to sell all of "the

Debtor's and Debtor's estate's right, title and interest in the Assets."  Sale Procedures

Motion, 49:2-3, January 17, 2012, ECF No. 34.  Debtor could not continue operating its

business because of a lack of cash flow.  The financial concerns were also affecting the

continued employment of producers; Debtor feared that too many producers would

leave.  In fact, in the Sale Motion, Debtor alleged that over half of its producers had

already left, mainly as a result of the failed ABC.  Sale Motion, 5:12-5, January 19,

2012, ECF No. 54.  If no sale transpired, those that remained, it was alleged, would be

without employment within weeks.  See Sale Motion, 5:4-7.

The Sale Motion listed Affinity as the stalking horse bidder.  Saleigh expressed

concern about alleged collusion and family connections between Adelman and the

Rothmans.  Decl. of Jason Adelman, 4:4-5, April 16, 2012, ECF No. 19.

After his appointment, the Trustee concurred and requested a sale within days.

H'rg, February 1, 2012.  There was no showing by any party that Debtor would be able

to continue operating much longer.  The Trustee had met with Affinity, and was willing to

proceed with a sale, with Affinity serving as the stalking horse bid.  A sale on a going

concern basis was necessary to best preserve the bankruptcy estate for the interest of

the creditors.  The existing accounts also needed to be serviced and would have to be

switched immediately to another broker if Debtor were shut down.  Although it still

needed to be determined which accounts belonged to Debtor and which to individual

producers, Debtor clearly had valuable interests in many house accounts.  There was

no time for the Trustee to litigate various producers' claims before the sale had to occur.

On February 1, 2012, the Court set a continued hearing date on the Sale Procedures

Motion and the Motion for Sale for February 3, 2012.  There was very little time for

bidders to conduct due diligence, and Affinity agreed to share any and all due diligence

it had completed as a result of the ABC with any potential bidders.  No allegations were

raised at the sale that Affinity failed to share such due diligence or that there was lack of

access to conduct due diligence.

On February 3, 2012, the Court sold substantially all of the assets of the

bankruptcy estate.  The winning bid went to Liberty Company Insurance Brokers, Inc.

("Liberty").  During the approval of the sale procedures, a great deal of time was spent

clarifying what was, and was not, being sold.  H'rg, February 3, 2012.  All bidders,

including Liberty, were on notice prior to the sale that the actual assets being

purchased, i.e., books of business, customer lists and commissions, were yet to be

defined; any identification of assets purchased would be determined after the sale.  The

Trustee represented that he was only selling Debtor's "right, title and interests."  H'rg,

February 3, 2012.  The Trustee elaborated, "[i]f ultimately it is determined that either

through agreement or through a process in this Court that C.M. Meiers did not have a

right, title or interest, then I did not sell it."  H'rg, February 3, 2012.  The Trustee also

stated that he needed to review each individual producer employment contract to

determine what books, customers and commissions were actually assets of the

bankruptcy estate.  H'rg, February 3, 2012.  Finally, the Trustee made clear that the

successful buyer would be required to replenish the out of trust deficit according to the

terms of the Asset Purchase Agreement.  H'rg, February 3, 2012.  A review of the

docket also made clear that several producers were contesting CMM's right to their

respective books of business.  These objecting producers were present at the sale

hearing and discussed their objections immediately preceding the sale itself.  H'rg

1:27:22; H'rg 1:38:56.

The bidders were on notice, then, that what they were bidding on was an

amorphous set of assets that was to be defined post-sale.  Following approval of the

sale procedures, three bidders were willing to proceed: 1) Affinity; 2) Saleigh; and 3)

Liberty.  At least one previous potential bidder chose not to bid.  Having qualified all

three bidders as required under the sale procedures,[5] the Trustee conducted the

auction.  As stated earlier, Liberty was the winning bidder, and no one chose to be a

back-up bidder.

Liberty, as the successful bidder, elected to have the purchased assets

transferred to its nominee/designee, Plaintiff.  To date, Liberty has paid $850,000 to the

Trustee, as required under the Sale Order entered by the Court on February 8, 2012.

Liberty has also paid $650,000 into escrow to be paid out in the future, as measured by

the first year revenue amount.  Under the Sale Order, Debtor is entitled to 45% of the

first year's revenue, up to $650,000.  It is this amount that is alleged to be at risk to the

estate as a result of Defendants' purported wrongful conduct.  At the time the Motion

---

[5] The sale procedures involving overbids were approved by the Court's Order entered on February 8,
2012.  Order Approving Sale Procedures, 2:11-18, February 8, 2012, ECF No. 104.

1    was filed, it was alleged that $250,000 in first year post-closing revenues had already

2    been lost, because of Defendants' alleged wrongful conduct.  Motion, 7:15-6.

3            On February 8, 2012, the Court entered the Order Granting Motion for Order

4    Approving the Sale under § 363 (the "Order").  The Order approved the "sale of the

5    Estate's right, title and interests in and to the Purchased Assets, as defined in that

6    certain asset purchase agreement."  Order 2:7-9, February 8, 2012, ECF No. 105.  The

7    warranty provision of the Asset Purchase Agreement was incorporated within the Order

8    and reads as follows:

9

10           4.2    Warranty The Purchased Assets will be sold to Buyer at the Closing as is,
             where is, without any warranty or representation of any nature whatsoever as to
11           the suitability of the Purchased Assets for any intended use, any projection,
             result or outcome of any business operation by Buyer using the Purchased
12           Assets or any profit loss, expense or income that might result from Buyer's use or
             acquisition of the Purchased Assets.
13

14   Notice of Final Forms of Asset Purchase Agreement, February 2, 2012, ECF No. 91.

15   Exhibit 1 detailed the "purchased assets" in part as: "(2) All telephone numbers,

16   directories, customer[ ] lists that C.M. Meiers has the right to use or otherwise owns…"

17   Notice of Final Forms of Asset Purchase Agreement, ECF No. 91.

18           The Order and Asset Purchase Agreement each reiterate what was discussed for

19   over forty minutes at the sale procedure hearing.  Mainly, the assets of the estate that

20   were subject to the sale were yet to be clearly defined.  The customer list was to be

21   defined as the Trustee examined each individual producer contract and book of

22   business, either by agreement or through further litigation.  With that knowledge, Liberty

23   assented to the purchase of the assets on an "as is, where is" basis.

24

25   //

26   //

27   //

28

2. <u>Eric and Herbert Rothman's Employment</u>

Eric and Herbert Rothman (collectively the "Rothmans") were the two principals of Debtor on the day of relief under chapter 11. Eric was an 11% shareholder and Herbert was an 89% shareholder in Debtor. Herbert began his employment with Debtor in 1963. Eric commenced his employment with Debtor in 1997 as a producer. Despite their history of actual employment, the earliest employment agreement, for both, did not make it to paper until January 1, 2009. <u>See</u> <u>Exhibit 22</u>; <u>Exhibit 47</u>.

a. <u>Herbert's Employment Agreement</u>

On January 1, 2009, Herbert executed a Producer Employment Agreement with Debtor. <u>Exhibit 22</u>. The Agreement contained an exclusivity provision, requiring Herbert to devote his services solely to CMM, which did not survive termination of the employment. <u>See</u> <u>Exhibit 22</u>, ¶23.5. What did survive termination, are the following pertinent provisions:

8. <u>Confidential Information</u>. "Confidential Information" means information belonging to C.M Meiers, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and that is the subject of reasonable efforts under the circumstances to maintain its secrecy. **Confidential information does not include identities, contact information, contracts, and pricing of, or relating to, clients originated and/or serviced by Employee before or after the Effective Date of this Agreement ("Non-Confidential Information"). Employee may use Non-Confidential Information for any lawful purpose after the Employment Relationship ends.**

9. <u>Non-Disclosure</u>. Employee acknowledges and agrees that all Confidential Information is maintained as a trade secret and is the sole and exclusive property of C.M Meiers or C.M Meier's clients, as applicable. Employee agrees to hold in strict confidence and trust all Confidential Information, and not to reveal, report, published, disclose or transfer, directly or indirectly, any Confidential Information to any person or entity, and not to acquire or utilize any Confidential Information for any purpose other than the Employment Relationship.

. . .

-10-

39

11.    <u>Return of Property and Confidential Information</u>.  Upon the request of C.M Meiers, Employee will promptly deliver all originals and copies of Confidential Information.  Employee will not keep any materials containing Confidential Information following termination of employment.  Employee will return all equipment, software, keys, access cards, files and other property belonging to C.M Meiers promptly upon termination of the Employment Relationship or at any time at C.M Meiers'[ ] request.

. . .

13.    <u>Restrictions on Competition</u>.  Employee acknowledges that (i) the identities of, and other information regarding, past, current, and prospective clients and business partners of C.M Meiers are confidential and proprietary and may constitute trade secrets under applicable law[;] (ii) their identities and such information are not generally known[;] (iii) C.M Meiers uses reasonable efforts to maintain the confidentiality of such identities and information; (iv) C.M Meiers expends substantial time and resources to obtain and maintain relationship with its past[,] current, and prospective clients and business partners and (v) due to the unique nature of C.M Meiers[ ] business relationships, contracts, and industry, the restrictive time periods in this Agreement are reasonable and necessary.  Accordingly, Employee agrees, to the extent permitted by applicable law, that Employee **will not**, at any time, without the prior written consent of C.M Meiers, **solicit** any of the past, current, or prospective clients or business partners of C.M Meiers to do business with any person or entity whose business competes with the business of C.M Meiers, **to the extent that the identity of, or other information regarding, such client or business partner constitutes a trade secret of C.M Meiers under applicable law or to the extent that such solicitation involves acquisition, disclosure, or use of Confidential Information.**

<u>Exhibit 22</u> (emphasis added).

b.    <u>Eric's Employment Agreement</u>

Eric had a similar Producer Employment Agreement drafted, which was examined during his testimony.  Eric's Producer Employment Agreement contained identical provisions 8, 9, 11, 13, and 23.5.  Although this agreement was never signed, it provides context for what CMM and Eric considered trade secrets or confidential information.

c.    <u>Termination</u>

On February 4, 2012, the Trustee informed the Rothmans that their employment with Debtor was terminated, effective February 6, 2012.  <u>Decl. of Herbert Rothman</u>, 5:5-7, April 16, 2012, ECF No. 28; <u>Decl. of Eric Rothman</u>, 4:26-8, April 16, 2012, ECF No.

40

29.  On February 13, 2012, both joined Affinity as independent consultants.  Decl. of Herbert Rothman, 2:26-7; Decl. of Eric Rothman, 2:22-3.  Both were also subsequently offered employment by Liberty, but both declined.  Decl. of Herbert Rothman, 6:20; Decl. of Eric Rothman, 6:10.

Following his termination, Eric testified that he deleted the Outlook files that had been created with Dave Winnert's help in early January 2012.  H'rg, May 8, 2012.  Dave Winnert, employed at CMM as the Network Administrator for information technology, declared that he assisted Eric and Herbert in creating copies of all of their CMM emails and contacts in their CMM Outlook computer program ("Outlook files").  Decl. Dave Winnert, 2:9-11, April 19, 2012, ECF No. 48.  Winnert declared that this information was copied to an external hard drive.

Eric testified that although he did not return the Outlook files themselves, because they were located on his personal computer, he did in fact delete them upon termination.  H'rg, May 8, 2012.  When asked about the return of other property, such as equipment, software, keys, access cards, files, other property belonging to Debtor, Eric testified that he returned files and his key card, and that other things were later mailed to him by the Trustee.  H'rg, May 8, 2012.  Plaintiff did not present any evidence contradicting Eric's testimony about deleting the Outlook files upon his termination.  Eric's testimony, however, was not persuasive in all respects as it is a rare professional who would purposefully delete a contact list that may also contain many personal contacts.  The Court finds only that the Outlook files were not used to solicit clients.

One final piece of property was left unexplained.  Herbert had a cell phone at CMM, and CMM paid the phone bill each month.  Herbert took that phone with him and put that phone number on the tombstone announcement he sent out after his move to

41

Affinity.  This is potentially a diversion of CMM's property, because BTJ purchased "all telephone numbers…that C.M Meiers has the right to use or otherwise own. . .."  Who purchased the phone and whether it or the phone number was CMM's property was never shown.  Herbert was a credible witness and returned all CMM property when he left on February 6, 2012.  Although CMM paid the monthly phone bill, there was no indication whether this was an employment benefit or whether it was paid because CMM owned the phone number.  Nobody appears to have asked Herbert to return the phone, and he seems to consider it his personal phone and number.  Should further investigation show otherwise, the diversion of the phone number can still be pursued.  See, e.g., In re Aqua Clear Technologies, 361 B.R. 567, 575 (Bankr. S.D. Fla. 2007).

    3.  Back-up Tapes

    Certain back-up Tapes of the AMS 360 system, containing confidential information about certain customers and policy information, were in Eric's possession.  Russell Hugenberger, IT Manager for CMM through March 15, 2012, testified about his involvement in the maintenance, and backing up, of the AMS 360 system used by Debtor.[6]  H'rg, April 20, 2012.  The AMS 360 system is a customer database that allowed Debtor to maintain personal information, correspondence and policies for all of its customers.  H'rg, April 20, 2012.  Hugenberger explained that there are two different kinds of AMS 360 systems, an online and in-house version.  H'rg, April 20, 2012.  The online version is stored at Vertafore's data centers and the in-house is stored locally at the respective company.  H'rg, April 20, 2012.  CMM used an in-house version.  H'rg, April 20, 2012.  Affinity uses the on-line system.  Decl. of Eric Rothman, 10:3-4.  Data from the AMS in-house system at CMM was extracted and backed up on tapes.  H'rg,

---

[6] Hugenberger also was involved with maintenance and back up of the AFW system, the precursor to the AMS system.

42

April 20, 2012.  External hardrives would be sent to Vertafore whenever a producer left

and wanted the account information that was part of that producer's book of business.

Vertafore would then extract the information on the hard drive so that the producer

could take the information with them.  H'rg, April 20, 2012.

Back-up tapes were prepared regularly at the end of the year.  H'rg, April 20,

2012.  The back-up tapes were regularly taken off-site to ensure the AMS 360 system

and data was retrievable in the event of any destruction of the system.  H'rg, April 20,

2012.  Additionally, weekly back-up tapes were prepared and also taken off-site.  H'rg,

April 20, 2012.  On December 31, 2011, Hugenberger gave Eric a burgundy tape and

about four or five blue tapes.  H'rg, April 20, 2012.  The burgundy tape contained the

AMS 360 system back-up and the blue tapes contained the file server back-ups.  H'rg,

April 20, 2012.  Hugenberger testified that there was nothing out of the ordinary in the

back-up tapes that were prepared on December 31, 2011 and handed to Eric.  H'rg,

April 20, 2012.

On January 3, 2012, the first work day of the new year, the storage array, i.e. the

server, crashed.  H'rg, April 20, 2012.  Two of the eight drives failed.  H'rg, April 20,

2012.  At that point, and as a result of the failed server, Hugenberger contacted Eric so

that he could return the back-up tapes.  H'rg, April 20, 2012.  These tapes were then

used to restore the server.  H'rg, April 20, 2012.  The information saved on the back-up

tapes remained on the tapes after they were used to restore the server.  H'rg, April 20,

2012.  They were returned to Eric on or about January 9, 2011.  H'rg, April 20, 2012.

Eric testified that after the back-up tapes were back in his possession, he did not

return them to storage because of the bankruptcy.  H'rg, April 20, 2012.  In short, the

bankruptcy preoccupied his time and efforts.  Eric had the motive and opportunity to

43

copy or use the information on the back-up tapes to solicit CMM customers.

Hugenberger testified that the back-up tapes could have been converted to comport

with Affinity's database, but Eric credibly testified that he only became aware of this fact

while listening to Hugenberger testify.  H'rg, April 20, 2012.  There was no evidence

showing that Eric, or any other Defendant, remains in possession of these back-up

tapes or that these tapes were used to create a new client list by Defendants.

Although it is still a mystery where the back-up tapes are, Vertafore was never

subpoenaed to show the tapes were converted to be compatible with Affinity's AMS

system.  To the contrary, the back-up tapes appear to have been a regularly planned

data protection system that ended up being necessary a few weeks later when the

system failed.

4.  Recoded House Accounts

On December 30, 2011, Eric asked Hugenberger to re-code all Debtor house

accounts for active customers to accounts in Herbert's name, as the executive in charge

of and producer thereof.  Eric also instructed Hugenberger to recode around 900

accounts in Cathy Kerhulas' name to house accounts.  Cathy Kerhulas was the Senior

Vice-President of Commercial and Entertainment at CMM.  H'rg, April 20, 2012.  Plaintiff

presented these allegations as further evidence of an intent to take CMM clients from

Debtor's estate to Affinity.

Hugenberger declared that Debtor put codes on its customers' insurance policies

and accounts.  Motion, 2:6.  This coding was used in part to determine whether a

specific person, i.e., producer, was entitled to a portion of the commissions Debtor

received from insurance carriers on the related insurance policy.  Motion, 2:6-9.  One

set of accounts was coded as "house accounts."  Hugenberger's understanding about

44

the house accounts was that they represented a general account for the company that belonged to the "house" or that were not credited to a specific producer or employee, although the purpose for the coding was outside of Hugenberger's responsibility and duties. H'rg, April 20, 2012. Hugenberger declared that at the end of 2011 Debtor had "thousands of accounts coded as 'house' accounts." Decl. of Russell Hugenberger, 2:9-10. On December 31, 2011, Hugenberger conducted a global re-coding. H'rg, April 20, 2012. In January 2012, Hugenberger conducted a second re-coding due to computer problems with the first round. H'rg, April 20, 2012.

Eric testified that certain accounts were re-coded as a "house keeping matter" so that Equitable would know what was being assigned through the ABC. H'rg, May 8, 2012; Decl. of Eric Rothman, 15:7-11. Eric testified that CMM's attorney, during the planning for the ABC, informed him that everything had to be "clean" going forward on the ABC. H'rg, May 8, 2012. On this instruction, Eric testified that he instructed Hugenberger to re-code all "house accounts" to his father's name and all of Cathy Kerhulas accounts to house accounts. H'rg, May 8, 2012. Cathy Kerhulas had resigned sometime in November 2011 and those accounts should have been recoded to house accounts at that time, per common practice at CMM. Decl. of Eric Rothman, 15:19-22. Eric further testified that, but for the bankruptcy filing, they would have ultimately re-coded some accounts that were in Charlene Hill's name, but that she did not "own." H'rg, May 8, 2012.

Eric was adamant, while testifying, that re-coding did not establish or change ownership. H'rg, May 8, 2012. Eric was credible in his testimony, but was evasive when addressing whether coding established or somehow helped determine ownership. Although Eric was vague about the effect re-coding had on ownership, no evidence was

presented showing that Debtor lost ownership of these accounts or customers in late

2011 or early 2012.  Although certain customers left post-sale, no evidence was

presented showing that the re-coding had anything to do with the change in brokers.

Thomas Leach ("Leach"), Liberty's President and manager for Plaintiff, admitted

that this coding was also a potential management system and that most of the accounts

remained at Liberty, or Plaintiff.   Leach testified that he had not checked on what

revenue was still with Plaintiff or Liberty as part of these recoded accounts.  He also

agreed that just because an account is recoded does not mean that the account has

been taken.

It is unclear whether the recoding was an attempt to maintain commissions once

Affinity took over the assets in the ABC or whether it was truly an accounting correction

to "clean things up."  This lengthy list of customers has not left, and the Rothmans have

not claimed them as their book of business.  To the extent there was even any

preparation for a diversion of CMM house accounts, it was not completed.  As an ABC

had been planned, and preparations were underway for some time until the ABC was

suddenly aborted, the motive behind preparation activities is harder to define.

5.  Deleted Emails

While doing routine file maintenance, Hugenberger discovered that Herbert

deleted emails from his Outlook files.  All deleted incoming emails, received between

August 29, 2011 and December 29, 2011, were permanently deleted at some point after

December 29, 2011.  All sent emails for that same period were not deleted.

Hugenberger normally had been the one to clean up Herbert's Outlook files, and he had

not deleted any 2011 files for Herbert.  Based on Hugenberger's past interactions with

Herbert, Hugenberger did not think that Herbert had the expertise to permanently delete

-17-

46

the deleted files himself.  The deletion of this huge swath of emails all at once was not

adequately explained, but the sent folder was shown to still be available and none of

that information was presented to the Court.  There was no evidence illustrating that

these deleted Outlook files indicate anything in particular.

   6.  <u>Transferred Life Insurance</u>

   The Trustee introduced evidence that the board of directors transferred a life

insurance policy that CMM held on Herbert into his name on the day the bankruptcy

was filed.  H'rg, May 11, 2012.  The transfer resolution was signed by Eric.  Herbert

testified that it had not been cashed in, and was still in force.  H'rg, May 11, 2012.  Eric

defended this action by stating that CMM was not the owner of the policy because it

was not a beneficiary.  Eric testified that the beneficiary for the last nine years was the

Rothman Revocable Trust.  The Trustee contended that although CMM was not a

beneficiary, it was the owner of the policy.  The life insurance policy had a total gross

accumulation value of $78,540.61; no consideration was given in exchange for the

transfer of the policy.

   This issue may indicate a plan to salvage assets of CMM for personal gain, but

the nature of the transfer and the value to CMM was not clear enough from the

evidence to draw any firm conclusions at this time.  This evidence, combined with the

re-coding of accounts, deletion of emails and Outlook Files copied could indicate

planning for an eventual transfer of CMM assets to the Defendants personally.  Had

there actually been evidence of improper transfers post-petition or post-sale, the

probative value of these actions would be greater; without such evidence, the Court

cannot, at this point, determine what these actions show.

//

1    7. Events Post-Sale

2    Plaintiff argued that Defendants were soliciting CMM customers, and that these

3    customers were changing brokers to Affinity in response to the solicitation.

4    a. Broker of Record Letters

5    On March 2, 2012, Plaintiff BTJ alleged that it received twenty-one letters, all

6    from CIBA Insurance Services. Motion, 9:17-8. These letters, dated February 13,

7    2012, stated that certain specific customers were changing their insurance broker of

8    record from CMM to Affinity, effective immediately. Motion, 9:18-9; Exhibit 40. The

9    letters all related to insurance policies that were up for renewal on March 31, 2012.

10   Motion, 9:25-6. Written notice of a broker change was due by February 15, 2012.

11   Motion, 9:26-7. This information was generally known in the insurance industry.

12   About 20 broker of record letters ("BORs") were introduced as evidence in an

13   attempt to show the solicitation and taking of certain CMM customers. Exhibit 40. On

14   February 13, 2012, Eric assisted some of these clients in drafting the BORs. H'rg, May

15   8, 2012. He stated that each of these accounts and customers were accounts and

16   customers "originated or served by [him] while [he] was employed by [Debtor]." Decl. of

17   Eric Rothman, 8:19-22. He also testified that his assistance was provided after the

18   customers had contacted him expressing an interest in changing brokers. H'rg, May 8,

19   2012.

20   Three former CMM clients filed declarations: 1) Sheldon Goldman; 2) David

21   Osterman; and 3) James Jackson (the "Declarants"). Decl. of James Jackson, April 16,

22   2012, ECF No. 23; Decl. of David Osterman, April 16, 2012, ECF No. 24; Decl of

23   Sheldon Goldman, April 16, 2012, ECF No. 25. These former CMM customers declared

24   //

-19-

48

that they reached out to the Rothmans upon discovering that they had left CMM. They

also stated that they were not solicited by the Rothmans.

In fact, when asked about the BORs, and where those addresses were obtained,

Eric testified that he obtained the addresses from a list of his fraternity brothers, his

2002 wedding list, his father's square dancing roster from 1997, or from Herbert and his

wife's personal address book. Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 56. After a few

specific examples of cross-referencing between the BORs and the alleged source, e.g.,

Exhibit 53-55, the parties stipulated that certain addresses on the BORs were also

found on the summary chart submitted as Exhibit 57. H'rg, May 11, 2012. The

summary chart listed certain customers, the customer representative and the customer

relationship. The customer relationship column listed the source from which the

address and contact information was obtained. Upon review, the Court confirmed that

all but two customers could be found within the lists of the Rothmans' personal

contacts.[7] The representative for these two customers is Valerie Hillas. Eric testified

that she was an associate of his father's and that she was not solicited. The Rothmans

have long standing relationships with many of the customers, or their representatives,

that have now chosen to follow them.

One customer by the name of Doc Johnson was actually owned by the

Rothmans. When asked on cross-examination, Leach testified that he had not known

that the Rothmans were the owners. It is unclear why Plaintiff chose to include Doc

Johnson as a customer that had been wrongfully solicited by Defendants.

Finally, not all customers left for Affinity or the Rothmans. Many customers

followed producers to other brokerage firms.

---

[7] This conclusion excludes three customers. These three customers filed the declarations discussed
above.

b. <u>Liberty Letter</u>

Sometime after the Court entered its orders approving the sale procedures and

the Sale Motion on February 8, 2012, Liberty sent out a letter to certain customers and

carriers letting them know that they had purchased Debtor's assets and were now the

coded producer.  They also stated that there were certain covenants imposed as

against former Debtor's owners and employees preventing them from soliciting their

business.  <u>Exhibit 3</u> to <u>Decl. of Eric Rothman</u>, April 16, 2012, ECF No. 30.  Defendants

allege the following statements evidence wrongful conduct on Plaintiff's part:

> It has come to [Liberty's] attention that the past owners and employees [of
> Debtor] are in direct violation of [covenants forbidding them from possessing or
> using any trade secret or confidential information of Debtor's] and have been
> contacting carriers and clients to secure broker of record letters, using data that
> was absconded from [Debtor].
> The previous owners of [Debtor] have contacted numerous carriers
> attempting to get new appointments for Affinity Global, in spite of the fact that
> they left behind an agency estimated to be $1 million out of trust and are
> currently under investigation by the Enforcement Branch of the California
> Department of Insurance.

Eric states that there is no basis for these allegations on Liberty's part, and that

this is contradicted by their offer of employment.  Liberty having offered him, and his

father, employment might go to show Liberty's interest in preserving Rothmans'

reputation, name and perhaps even contacts.  The Court cannot make a finding as to

the underlying motives behind Liberty's employment offer, and it appears that this may

have been part of settlement negotiations.

The letter was not approved by the Trustee.  There is no evidence that there is

an actual investigation underway by the Department of Insurance.  Whether the

statements in the letter were true must be left for another day.

//

//

-21-

50

c.  Tombstone Announcement

On April 12, 2012, "tombstone" announcements were sent to various customers that were listed in the CMM base purchased by Liberty.  The Rothmans each sent out tombstone announcements.  Exhibit 60; Exhibit 61.  Charlene Hill also sent out tombstone announcements after commencing her employment with Affinity.  Decl. of Charlene Hill, 4:4-5, April 16, 2012, ECF No. 22.  Her tombstone announcement is not dated, but simply states that she "has joined the team at Affinity Global Insurance."  A telephone, mobile and fax number, and her email are also listed.  Affinity's logo and name also are prominently displayed.  On all of the announcements, there is no language discussing business, or a change in broker.  The tombstone announcement is a generic flyer and does not appear to be addressed to one specific customer.

Plaintiff did not show that the tombstone announcements were soliciting business.  Although they were sent out to former CMM customers, there was no evidence indicating that the tombstone announcements were discussing anything other than a change in employment.  It was undisputed that tombstone announcements are common practice in the insurance industry.

d.  Composition of Client List While Working at Affinity

The Rothmans began their employment at Affinity on February 13, 2012.  Decl. of Eric Rothman, 11:3.  When they joined, they were instructed not to "take, bring or use" any confidential or trade secret information belonging to Debtor.  Adelman explained that he had them sit down with Melody Schwartz and run through a checklist and orientation to ensure that no property, confidential information or trade secrets of CMM were brought to Affinity.  This was done with each person that was hired by Affinity.  A checklist, entitled Affinity Global Insurance New Hire Screening Checklist –

Confidential Information and Trade Secrets, was included as Defendant's Exhibits 12 and 15.  Items on the checklist included:

- Ensure that employee/contractor does not possess any property of former employer;

- Review documents from former employment relating to confidentiality, trade secrets, competition, and solicitation; and

- Discuss extent to which confidential information from former employer may qualify for trade secret protection.

Defendant's Exhibit 12; Defendant's Exhibit 15.

Eric stated that he had not solicited any of Debtor's clients, nor undertaken acts to have them move their business.  Decl. of Eric Rothman, 10:22-27.  Eric clarified later that he did not initiate any communication with CMM clients, but once contacted and prompted by CMM clients he would begin to discuss business and a change in broker.  No evidence was presented showing that Eric initiated any business communication with any of CMM's, now BTJ's, former clients.  Eric did, however, testify that upon his employment at Affinity he began to compile a list of potential clients using the white pages, a fraternity contact list, his wedding guest list, his father's square dancing roster and Herbert's and his wife's personal address book.  Exhibit 59; Exhibit 53; Exhibit 55; Exhibit 54; Exhibit 56.  Eric also testified, and Adelman confirmed, that cold calls were made in efforts to compile a new client list.

Despite the belief held by Thomas Leach – that customer lists, contact information and policy information are confidential – there was testimony addressing the fact that information found via public resources can not, and is not, considered confidential.  H'rg, May 1, 2012.  Certain information, e.g., renewal dates, appears to be

common knowledge or readily available via public resources within the industry.  H'rg,
May 1, 2012.  There was credible testimony by Adelman stating that all information
acquired during the due diligence by virtue of the ABC was destroyed after the sale of
the assets to Liberty.  H'rg, May 1, 2012.

Leach seemed to believe that Defendants could not contact CMM's clients,
because "they should not be speaking to the clients that [Plaintiff] purchased…pretty
much ever."  H'rg, April 20, 2012.  Upon further cross examination, however, Leach
admitted that Plaintiff did not purchase any clients in perpetuity.  H'rg, April 20, 2012.
He admitted that the client is free to decide to leave CMM, or Plaintiff, but that
Defendants should not be reaching out to them.

After admitting that just because the AMS files were re-coded, they were not
necessarily stolen, and that certain policy renewals are well known to people in the
industry, Leach surprisingly admitted that he had no evidence that Affinity obtained
CMM clients through unlawful means.  H'rg, April 20, 2012.  He also admitted that he
was only guessing that some of the CMM business he saw leaving in the last two
months went to Affinity.  H'rg, April 20, 2012.  Despite any proof that there was improper
solicitation, or any guarantee any client would stay with Plaintiff after the purchase,
Leach insisted that, "[w]e just know that they took the business."  H'rg, April 20, 2012.

**Conclusions of Law**

1. Legal Standard

In order to obtain a preliminary injunction under Fed. R. Civ. P. 65 ("Rule 65"),
incorporated by reference in Fed. R. Bankr. P. 7065, Plaintiff must establish that: 1) it is
likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of
preliminary relief; 3) the balance of equities tips in its favor; and 4) that an injunction is

in the public interest.  <u>Winter v. Natural Resources Defense Counsel, Inc.</u>, 555 U.S. 7,

20 (2008); <u>Munaf v. Geren</u>, 553 U.S. 674, 689-90 (2008).  A preliminary injunction is an

"extraordinary and drastic remedy" that should not be awarded as of right.  <u>Munaf v.

Geren</u>, 553 U.S. 689; <u>Winter</u>, 555 U.S. 26.

The moving party bears the burden of persuasion to show that it is entitled to

relief by a clear showing.  11A Federal Practice and Procedure § 2948 (Wright, Miller

and Kane 2d 1995); <u>Winter</u>, 555 U.S. 22.  The burdens at the preliminary injunction

stage track the burdens at trial.  <u>Gonzales v. O Central Espirita Uniao de Vegetal</u>, 546

U.S. 418, 429 (U.S. 2006).  Once the moving party has carried its burden of showing a

likelihood of success on the merits, the burden shifts to the non-moving party to show a

likelihood that its affirmative defense will succeed.  <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>,

508 F.3d 1146, 1158 (9th Cir. 2007).

a.  <u>Likely to Succeed on the Merits</u>

Likelihood of success has been defined as "more likely than not."  <u>Tital Tire Corp.

v. Case New Holland, Inc.</u>, 566 F.3d 1372, 1379 (8th Cir. 2009).  The underlying merits

at issue here are unfair competition under common law and § 17200, and

misappropriation of trade secrets under the UTSA.  In short, Plaintiff must show that it is

more likely than not to succeed on the merits of an unfair competition or

misappropriation of trade secrets cause of action under California law.

1)  <u>Misappropriation of Trade Secrets</u>

Under the UTSA, a trade secret is defined as "information, including a formula,

pattern, compilation, program, device, technique, or process, that: (1) derives

independent economic value, actual or potential, from not being generally known to the

public or to other persons who can obtain economic value from its disclosure or use;

and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal Civ. Code. § 3426.1.  A customer list has been held to have economic value when the secrecy of the information provides a business with a 'substantial business advantage.'" Morlife, 56 Cal. App. 4th 1522.

The first question here is whether the Confidential Information purchased by Liberty from Debtor constitutes a trade secret.  Presently, the customer list itself remains to be enumerated as individual producers still seem to be filing objections.  At this point, and solely for purpose of the preliminary injunction, the Court will limit its analysis to the customers specifically addressed in the papers filed in this case, and will assume that any other customers in the CMM database not already specified as belonging to a departed producer belong to CMM.

California courts have been "reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories. Morlife, Inc. v. Lloyd Perry, 56 Cal. App. 4th 1514, 1525 (Cal. Ct. App. 1997); American Paper & Packaging Products, Inc. v. Kirgan, 183 Cal. App. 3d 1318, 1326 (Cal. Ct. App. 1986).  Such readily obtainable information is distinguished from customer lists that have been compiled by an employer who has "expended time and effort identifying customers with particular needs or characteristics." Morlife, 56 Cal. App. 4th 1521.  Courts will prohibit an employee from using the latter to solicit and enter the market.

There was credible testimony and evidence showing that Defendants compiled a new customer list from sources not attributed to "expended time or efforts" on the part of CMM.  Here, Defendants relied on Eric's wedding lists, Eric's fraternity list, Herbert's
//

square dancing roster, Herbert's and his wife's personal address book, white pages, and cold calls.

Even assuming the information utilized by Defendants to pursue their future venture constituted a trade secret, there still would need to be misappropriation of this information.  The evidence failed to demonstrate that Defendants misappropriated trade secrets.[8]

The argument is that by re-coding accounts, sending out tombstone announcements, assisting in broker of record letters, and by using the customer lists and policy information to contact previous customers, Defendants have solicited Liberty clients in violation of UTSA.  To solicit means to "appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving…" Morlife, 56 Cal. App. 4th 1525.  Courts have held that, "merely informing customers of one's former employer of a change of employment, without more, is not solicitation." Morlife, 56 Cal. App. 4th 1525; Hilb, Rogal and Hamilton Insurance Services of Orange County, Inc. v. Stanley R. Robb, 33 Cal. App. 4th 1812, 1821 (Cal. Ct. App. 1995).

---

[8] Under the UTSA, misappropriation is defined as the:
(1) [a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) [d]isclosure or use of a trade secret of another without express or implied consent by a person who:
    (a) Used improper means to acquire knowledge of the trade secret; or
    (b) At the time of disclosure or use, knew or had reason to know that his or her knowledge or the trade secret was:
        (i) Derived from or through a person who had utilized improper means to acquire it;
        (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
        (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    (c) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
Cal Civ. Code. § 3426.1.

Upon invitation by another, a defendant's willingness to discuss business does not constitute solicitation. Id. An employee, who has left his employer, is within his right to send out notices of changed employment or, as in this case, tombstone announcements. California courts have held that, "the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition." This has been held to be true even in cases involving non-compete clauses. See Morlife, 56 Cal. App. 4th 1514.

Plaintiff alleged that Defendants misappropriated the customer list and policy information in order to solicit business that is allegedly rightfully Plaintiff's by virtue of the sale. Plaintiff needed to show that Defendants improperly took assets of the estate and that the assets constituted trade secrets.[9] Although Plaintiff showed an opportunity to misappropriate, and possibly the preparation for misappropriation, the evidence presented is also consistent with actions necessary for the preparation of an ABC. Also, although the Court finds that Eric was in possession of the AMS back-up tapes around the time of the bankruptcy filings, and that accounts were re-coded, Plaintiff did not show that Defendants used the back-up tapes during the compilation of the customer list or during the change in brokers. There was no evidence showing that the information on the back-up tapes was converted to be compatible with Affinity's online AMS system. Finally, there was no evidence showing that the Outlook files were used to contact the customers that eventually switched brokers.

Thus, even if the Court were to find that that the customer list and policy information constitutes confidential information, i.e., trade secrets, Defendants, have the

---

[9] Whether former officers of the debtor breached any fiduciary duties before they left debtor's employ is a question not directly raised by the terms of the injunction sought, and no finding on that issue is made. See, e.g., In re D.C. Sullivan & Co. 685 F.2d 729, 737 (1st Cir. 1982) (breach of fiduciary duty to bring customer accounts to competitor to save officer's job)

right to send out tombstone letters, use public resources to contact customers, and

discuss business upon invitation by a customer.  Most of the evidence presented

showed that former CMM customers contacted the Rothmans upon discovering that

they had left CMM.  Upon discovery of this news and upon explanation by the

Rothmans of the bankruptcy, the sale and their new employment, customers then

expressed their interest in following them.  The uncontroverted evidence was that

clients are likely to stay with the same producer, especially where there has been a long

relationship.  Leach admitted this at the hearing.  Eric and Herbert have been in the

insurance industry for 15 and 49 years respectively.  Each has long standing

relationships with many of the accounts – as is evidenced by the use of Eric's wedding

list and fraternity list to compile a new customer list.

The tombstone announcements also did no more than simply announce the

employee's changed employment.  The parties were entitled to send these

announcements to their former customers utilizing information that is readily available to

the public.  Any initiation of business discussions by Defendants would constitute

solicitation in violation of UTSA, but that generally was not proven.  The testimony of

Eric and Adelman that they did not initiate any business discussions or solicitation was

credible.  Any evidence in the future of actual solicitation of former CMM clients would

still be actionable.

2)  Unfair Competition – Section 17200

Under the Business and Professions Code § 17200, unfair competition is defined

as any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive,

untrue or misleading advertising and any act prohibited by Chapter 1 of Part 3 of

Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200.  For

58

the reasons discussed above, the Court concludes that there has been no clear

showing of a likelihood of success on the merits on an unfair competition action.

> b.  Likely to Suffer Irreparable Harm in the Absence of Relief

Plaintiff must also demonstrate that irreparable harm is likely in the absence of

an injunction.  Winter, 555 U.S. 22.  A preliminary injunction will not be issued simply to

prevent the possibility of some remote future injury.  11A Federal Practice and

Procedure § 2948.1.  In other words, there must be an "existing actual threat."  Id.

Monetary loss, i.e., loss of income, alone is not enough.  "The possibility that adequate

compensatory relief will be available at a later date, in the ordinary course of litigation,

weighs heavily against a claim of irreparable injury."  Sampson v. Murray, 415 U.S. 61,

90 (U.S. 1974) (citing Virginia Petroleum Jobbers Assoc. v. Federal Power Com., 259

F.2d 921, 925 (D.C. Cir. 1958)).

Plaintiff portrays irreparable harm from Eric and Herbert working for Affinity.

There is no doubt that Plaintiff will find, and has found, it harder to renew accounts

without the people who originally obtained the accounts.  But this alone does not entitle

Plaintiff to an injunction as against CMM former employees acting lawfully to pursue

their own future ventures in the insurance industry, especially when the only harm

appears to be monetary loss.  Plaintiff seeks an extraordinary remedy, to restrict former

employees from pursuing a livelihood.  This should only be granted upon clear evidence

that such an injunction is warranted.

Plaintiff assumed the risk that clients and producers would not stay with it after

the sale.  Plaintiff did not purchase the right to keep all the accounts no matter what;

instead, Plaintiff purchased access and an opportunity.  The value of the customer

accounts was the access and opportunity to renew them, but no customer is bound to

stay.  That is the nature of a free and fluid market place.  Under the standard for a

preliminary injunction, the harm must be tied to some wrong doing by Defendants, the

taking from the estate improperly.  Plaintiff assumed the risk when it bid and now seeks

to change the terms of the sale *ex post facto*.

The Court recognizes that central to the concept of a free market is the right to

have the "ingenuity and industry" that one invests in protected from the gratuitous use of

that "sweat-of-the-brow" by others.  <u>Morlife</u>, 56 Cal. App. 4th 1520 (1997).  The non-

compete clause in the employment agreements is intended to protect CMM's ingenuity

and industry, but its applicability and scope is better suited to be defined and examined

at a hearing on the merits.  The harm to Debtor, or Plaintiff, is slight when measured

against the Defendants' inability to make a living.[10]

       c.  <u>Balance of Equities</u>

The third factor is the balance of the hardship to the respective parties.  "A

bankruptcy court must identify the harms which a preliminary injunction might cause to

defendants and . . . weigh these against plaintiff's threatened injury."  <u>In re Excel

Innovations, Inc.</u>, 502 F.3d 1086, 1097 (9th Cir. 2007).  As a matter of law, Defendants

may not solicit a client or take assets of the estate.  Without a clear showing that the

relief requested is warranted, the Court will not issue an injunction merely to restate

existing law.  The balance is equal where the likelihood of success on the merits has not

been shown.  While Plaintiff should be able to enjoy the results of its purchase,

Defendants should be able to legally pursue their trade.

//

//

---

[10] The non-compete clause omits any details as to duration or scope.  The lawful nature of the non-compete clause and the extent to which it will be enforced cannot be fully ruled on at this stage.

-31-

60

d.  Injunction is in the Public Interest

Finally, in determining whether to grant a preliminary injunction the Court must "pay particular regard for the public consequences in employing the extraordinary remedy..."  Winter, 555 U.S. 26.  This final factor, however, is not always implicated; the facts of each case and the legal issues implicated will control.  In re Excel Innovations, Inc., 502 F.3d 1089.  This final factor is neutral.  This Motion involves a business dispute between certain identified parties and no others, and does not impact larger public interest issues.  See Stormans, Inc. v. Selecky, 586 F.3d 1109 (9th Cir. 2009).

**Conclusion**

Plaintiff failed to show that a preliminary injunction should issue.  Defendants have been trying to comply with post-CMM employment restrictions and still pursue the business in which they had been engaged for many years.  Leach testified at the outset of the hearing that the norm in the insurance industry is for the clients to follow the producer.  He appears to have fully realized the risk Liberty took when it bid on CMM's assets, especially with the little due diligence it conducted.  Liberty does not appear to have anticipated the amount of business that would follow former CMM producers as has actually left.  Leach seems to have captured Plaintiff's buyer's remorse when he insisted on cross-examination that the Rothmans simply should not be speaking to any CMM clients, because Plaintiff "purchased those clients."  H'rg, April 20, 2012.  Unfortunately, an emergency "as is, where is" sale of assets was not that simple.

Despite these findings, Defendants are not free to solicit clients of CMM.  They were officers and directors of CMM until the Trustee was appointed and owed a fiduciary duty throughout to CMM's creditors.  Defendants risk liability at a full trial if they breached that duty.  The Court recognizes that this was an early hearing, and that

1  limited to no discovery or investigation has been done.  To the extent that any improper

2  solicitation of CMM customers results in future diversion of funds that were otherwise

3  property of the estate, the Trustee and Plaintiff are still permitted to pursue it.

4

5      The Trustee raised allegations of the transfer of life insurance immediately pre-

6  petition and is still looking into the out of trust situation.  Adelman, Affinity and the

7  Rothmans have alleged improper statements about them to former CMM clients.  All of

8  these issues are irrelevant and resolution is unnecessary for purposes of the request for

9  a preliminary injunction.  At this time, no findings or conclusions whatsoever are made

10 as to those issues.

11

12     Based on all the reasons discussed herein, the Motion for a Preliminary

13 Injunction as against Defendants is **DENIED**, without prejudice.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28     DATED: June 6, 2012

_____
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled MEMORANDUM OF OPINION RE PRELIMINARY INJUNCTION AS AGAINST JASON ADELMAN, AFFINITY GLOBAL INSURANCE SERVICES, HERBERT ROTHMAN, AND ERIC ROTHMAN was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of 6/6/12, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

- Larry W Gabriel    lgabriel@ebg-law.com
- James A Hayes    jhayes@cwlawyers.com
- Randal Ivor-smith    rivorsmith@raineslaw.com
- Lawrence M Jacobson    lmj@gfjlawfirm.com
- John C Keith    jck@vrmlaw.com
- Sonia Y Lee    slee@raineslaw.com, tfukutomi@raineslaw.com
- Marcy Railsback    , marcy@bovinolaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐  Service information continued on attached page

**2.   SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

Bradley D. Sharp (TR)
Development Specialist, Inc.
333 So. Grand Ave., Suite 4070
Los Angeles, CA 90071-1524

BTJ Insurance Services, LLC
21045 Califa Street
Woodland Hills, CA 91364

Affinity Global Insurance Services
Alston & Bird LLP
Diane C. Stanfield
333 S. Hope Street
Sixteenth Floor
Los Angeles, CA 90071

☐  Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                            **F 9021-1.1.NOTICE.ENTERED.ORDER**

**3.** <u>**TO BE SERVED BY THE LODGING PARTY**</u>: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐    Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    F 9021-1.1.NOTICE.ENTERED.ORDER    64

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367

A true and correct copy of the foregoing document entitled **PLAINTIFF'S REPLY TO:  DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS AND STATEMENT OF GENUINE ISSUES IN DISPUTE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 10, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- United States Trustee (SV) ustpregion16.wh.ecf@usdoj.gov
- Daniel C. Streeter daniel.streeter@troutmansanders.com, cathe.zinn@troutmansanders.com

☐   Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On **November 10, 2014**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Maureen A. Tighe
United States Bankruptcy Court
San Fernando Valley Division
21041 Burbank Blvd., Suite 325
Woodland Hills, CA  91367-6606

☐   Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 10, 2014 | NIKOLA A. FIELDS | /s/ Nikola A. Fields |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |