# FOR PUBLICATION

1

2

3

4

FILED & ENTERED

OCT 28 2016

5

6

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY Fisher    DEPUTY CLERK**

7

8

## UNITED STATES BANKRUPTCY COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

## SAN FERNANDO VALLEY DIVISION

11

12 | In re:

13 | C.M. Meiers Company, Inc.

14

15 |                         Debtor(s).

16 | Bradley D Sharp

17 |                       Plaintiff(s),

18 |    v.

19 | Evanston Insurance

20

21 |                       Defendant(s).

CHAPTER 11

Case No.: 1:12-bk-10229-MT
Adv No:   1:14-ap-01042-MT

**MEMORANDUM OF DECISION RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

Date:        September 13, 2016
Time:        10:00 a.m.
Courtroom:  302

22

23

24      This Memorandum addresses cross motions for summary judgment in an adversary

25 proceeding seeking to resolve coverage under an errors and omissions policy issued to the debtor in this chapter 11 case. These motions were filed on July 28, 2016. <u>Bradley Sharp v. Evanston</u> <u>Insurance Company</u>, 1:14-bk-01042-MT, ECF No. 135-1, 136.[1]

26

27

28 [1] On September 30, 2016, the Court entered Order Granting Stipulation and Order thereon to Substitute Evanston Insurance Company in the place and stead of Essex Insurance Company. As Essex was the name of the insurer during the relevant time period for this case, this memo will still refer to Defendant as Essex.

## I. **FINDINGS OF FACT**

1.  C.M. Meiers Company, Inc. ("C.M. Meiers" or "Debtor"), a commercial and personal insurance firm, was owned and controlled by Herbert Rothman (CEO and 89% owner and director), Rebecca Rothman (officer and director), and Eric Rothman (Vice President, director, and 11% owner)(collectively, the "Rothmans").   Trustee's Statement of Undisputed Facts ("TSUF"), ¶1; In re C.M. Meiers, Case No. 1:12-bk-10229-MT.

2.  C.M. Meiers acted as an insurance agent for approximately 18 carriers and as a broker for approximately 162 carriers.  Id. at ¶4.  In circumstances in which it was acting as broker, C.M. Meiers sold an insurance product and billed the client for the premium; C.M. Meiers delivered the policy to the client, obtained the premium payment from the client and sent the premium, less the commission to the carrier.  Id. at ¶5. Where C.M. Meiers acted as agent, it was authorized to issue a binder on behalf of the carrier. Id. at ¶6. Depending on the policy, some of these policies were directly billed by the carrier, which paid C.M. Meiers its commission at a later date, while for others, C.M. Meiers billed the client and collected all premiums due. In such case C.M. Meiers was to deposit the collected funds into C.M. Meiers' trust account (the "Trust Account") to pay the carrier the premium and retain its commission. Id. at ¶7.

3.  In any given month, C.M. Meiers would withdraw money from the Trust Account to pay commissions, or to remit client premiums, less commission to carriers. TSUF, ¶14. The Trust Account was "out of trust" by November 2011. Id. at ¶15.

4.  On November 3, 2011, the Rothmans paid to the order of C.M. Meiers checks and cashier checks totaling $272,032.40, which was deposited into Trust Account.  Id. at ¶16.  At the time, it was estimated that C.M. Meiers may have been out of trust by as much as $1.2 million. Id. at ¶18.  It is disputed whether the "out of trust" situation was due to the Rothman's intentional wrongdoing or their failure to supervise and administer the business affairs of C.M. Meiers, including their failure to properly account for and audit the Trust Account.  Id. at ¶19; Essex's Response to Plaintiff's Statement of Undisputed Facts, ¶19.

     A.  The Bankruptcy

5.  On January 9, 2012, C.M. Meiers filed for chapter 11 bankruptcy. TSUF, ¶21; In re C.M. Meiers, 1:12-bk-10229-MT, ECF No. 1.  Bradley Sharp ("Plaintiff" or "Trustee") was appointed the Chapter 11 Trustee. TSUF, ¶22.

6.  As of January 25, 2012, C.M. Meiers had a "net payable" to various insurance companies totaling $1,085,659.14.  Id. at ¶23.  As of January 25, 2012, the Trust Account had a balance of $11,783.20 and was "out of trust" by an amount in excess of $1 million. Id. at ¶24.

     B.  The Rothman Lawsuit

7.  On April 5, 2012, BTJ Insurance Services, LLC. ("BTJ") filed an adversary proceeding against the Rothmans asserting (1) common law unfair competition; (2) unfair competition under Business & Professional Code §17200; (3) misappropriation of trade secrets; (4) intentional interference with contractual relations; and (5) intentional interference with

prospective economic advantage. BTJ Ins. Servs., LLC. v. Rothman et al., Case No. 1, 1:12-ap-01118-MT, Complaint, ECF No. 1.

8. On April 19, 2012, Trustee filed a complaint-in-intervention against the Rothmans, Adelman, Affinity, and Wen-Er Farms, LLC. ("Wen-Er"). TSUF, ¶37; BTJ Ins. Servs., LLC. v. Rothman et al., Case No. 1:12-ap-01118-MT; Complaint in Intervention for Injunctive Relief, ECF No. 52.

9. On July 10, 2012, Sharp filed a first amended complaint in intervention ("First Amended Complaint"). The First Amended Complaint alleges (1) injunctive relief, (2) breach of fiduciary duty, (3) recovery of fraudulent conveyance under 11 U.S.C. §548(a)(1)(A), §544, and §550 and (4) recovery of fraudulent conveyance under Cal. Civ. Code §3439.04(a)(1), §3439.04(a)(2), and §3439.05. Id. at ECF No. 210.

10. Trustee's allegations in the First Amended Complaint focus on the Rothmans' handling of the Trust Account and improper use of Debtor's assets. It alleges:
   a. (1) Herbert and Rebecca's use of Debtor's Trust Account assets to rent and later buy a Newport Beach house;
   b. (2) The Rothmans transferred Debtor's key-man life policy to Herbert Rothman;
   c. (3) Herbert Rothman used corporate funds to put a down payment on a building purchased by Wen-Er;
   d. (4) The Rothmans repurchased stock from Herbert Rothman's son in law (Jeff Kleid) in a "sweetheart" deal;
   e. (5) The Rothmans paid $272,032.40 into the Trust Account in November 2011;
   f. (6) Herbert and Eric Rothman gave Adelman control of C.M. Meiers, including confidential information after proposed asset sale to his company, Affinity;
   g. (7) Affinity sent letters to insurance carriers and agencies without disclosing that Affinity would assume C.M. Meiers' book of business and agency appointments and directing insurers to issue payments to Affinity; and
   h. (8) Herbert and Eric Rothman transferred C.M. Meiers' "house accounts" to themselves.

Id.

11. On November 3, 2011, the Rothmans paid to the order of C.M. Meiers checks and cashier checks totaling $272,032.40, which were deposited in to the Trust Account. Id. at ¶16. By November of 2011, the Trust Account was "out of trust," – the cause of which is disputed. Id. at ¶18, 19. Trustee asserts that this situation was caused by the Rothmans' failure as directors and officers to supervise and administer the business affairs. Id. at ¶19.   As of January 25, 2012, C.M. Meiers had an account balance of $11,783.20 and was "out of trust" by an amount in excess of $1 million. Id. at ¶24.

C.   Insurance Coverage

12. The Rothmans were insured by Scottsdale Insurance Company ("Scottsdale") for the policy period between October 27, 2011 to October 27, 2012 under the "Business and Management Indemnity Policy, Policy No. EKS3050577" (the "Scottsdale Policy") with a $1 million limit per claim. Trustee's Request for Judicial Notice, Ex. 5.

-3-

13. On May 29, 2012, the Rothmans tendered the complaint to Scottsdale. Essex's Statement of Undisputed Facts ("ESUF"), ¶22.

14. On June 28, 2012, Scottsdale denied coverage. Id. at ¶23. During July and August of 2012, the Rothmans, through their counsel Lawrence Jacobson, contested Scottsdale's coverage declination. Id. at ¶24.

15. Jacobson shared with Trustee's counsel the communications exchanged with Scottsdale regarding insurance coverage. Id. at ¶25.

16. For the period between June 1, 2011 through June 1, 2012, the Rothmans were also insured by Essex Insurance Company ("Essex") under the "Insurance Agents and Brokers Errors and Omissions Liability Insurance Policy AB35140-00 (the "Essex Policy") with a $5 million limit per claim and subject to a $25,000 deductible. TSUF, ¶26, 27.

17. Markel Services, Incorporated ("MSI") is a separate entity solely owned by Essex; it is responsible for claims management. Id. at ¶30. Glenn Fischer is a Claims Manager of MSI, with previous experience at the American Bar Association. Id. at ¶31, 34. He is an attorney, licensed to practice in Illinois. Id. at ¶33.

18. On August 20, 2012, the Rothmans tendered the First Amended Complaint and the Rothmans' defense to Essex. Id. at 39. The claim was initially assigned to Cathy Daly, a claims adjuster for MSI. TSUF, ¶40. Daly is not an attorney. Id. Daly reviewed Jacobson's letter tendering defense of the Trustee's complaint, a review of the policy, a review of the allegations of the First Amended Complaint, and had a brief conversation with Jacobson, and a conversation with Fischer. Id. at ¶42. While the extent of Daly's review of the policy and the complaint is disputed, it is undisputed that she did not conduct any legal research regarding the claim. Id. at ¶36, 43. Daly retained Waxler, Carner, Brodsky, LLP ("WCB") as outside coverage counsel on the matter. ESUF, ¶55. Andy Waxler and colleagues of WCB communicated with the Rothmans' counsel. Id. at ¶56.

19. On October 4, 2012, WCB submitted a coverage letter (the "October 4, 2012 Letter") stating that the Trustee's lawsuit against the Rothmans does not fall within the Essex Policy's language. TSUF, ¶45. It is disputed whether Essex reserved its rights to review coverage upon further investigation. Id. at ¶47.

20. On the same day, in an email, the Rothmans' counsel shared Essex's coverage declination with Trustee's counsel. ESUF, ¶30.

21. On or about August 24, 2013, Essex, by its claims examiner, Emily Lukes, received a copy of the Trustee's First Amended Complaint from Trustee's counsel, Larry Gabriel. TSUF, ¶49.

22. On September 11, 2013, Gabriel wrote to Waxler a letter (the "September 11, 2013 Letter") requesting Essex to reconsider its coverage decision. Id. at ¶50.

23. On September 13, 2013, Gabriel again wrote to Waxler a letter (the "September 13, 2013 Letter"), with argument and support for why Essex's coverage position was unjustified as a

matter of law, including a reference to a Maryland court decision – <u>Utica Mut. Ins. Co. v. Miller</u>, 130 Md. App. 373 (2000)("Utica"). <u>Id</u>. at ¶51.

24. Fischer did not read <u>Utica</u>; But Fischer was not the only claim personnel involved on this matter; Essex also retained WCB to address this issue.  <u>Id</u>. at ¶53.

25. Herbert Rothman consulted Jason White of Swett & Crawford, an insurance intermediary, regarding the coverage declinations of both Scottsdale and Essex.  ESUF, ¶34. Rothman testified at deposition that he considered Jason White as "my expert in the field of D &O and E & O who I feel is the foremost authority" and that White advised Rothman that Scottsdale "owed a duty of defense" under the policy. ESUF, ¶35.

26. On July 31, 2013, Scottsdale withdrew its coverage declination. <u>Id</u>. at ¶39.

### D.   The Mediation

27. On September 13, 2013, Trustee and the Rothmans attended a mediation conducted by the Honorable Dickran Tevrizian (Ret.).  TSUF, ¶54.  Essex did not participate. <u>Id</u>. at ¶55. The mediation ended with Trustee and the Rothmans reaching a settlement (the "Settlement"), resolving Trustee's claims for $4.3 million with an assignment of Rothman's rights under the Essex Policy to Trustee.  The Settlement covered eight causes of action.  <u>Id</u>. at ¶56, 57. Scottsdale paid $475,000 toward the Settlement and the Rothmans paid $25,000, leaving a balance of $3.8 million. <u>Id</u>. at ¶117.

28. During his deposition, Herbert Rothman, in response to a question of when he became aware of the $4.3 million number, responded, "I guess when Gabriel typed it up and sent it over to our counsel." ESUF, ¶53.

29. It is disputed when the Rothmans and Trustee first agreed to attend mediation; Essex was not advised of the mediation until September 6, 2013. <u>Id</u>. at ¶43.

30. On October 30, 2013, Essex, through its coverage counsel, responded to the September 11, 2013 Letter and the September 13, 2013 Letter, reiterating its decision to deny coverage in a letter (the "October 30, 2013 Letter"). <u>Id</u>. at ¶51.

31. On November 27, 2013, Trustee's counsel sent another letter ("November 27, 2013 Letter") to Essex's counsel in furtherance of the Trustee's position that coverage should be afforded. The letter also presented a settlement offer by Trustee to Essex.

### E.   Adversary Case

32. Trustee filed this adversary proceeding on March 4, 2014 against Essex for its denial of coverage to the Rothmans, asserting claims for (1) declaratory relief that Defendant was obligated to provide coverage to the Rothmans, (2) breach of contract, (3) tortious breach of implied covenant of good faith and fair dealing, (4) bad faith administration, (5) "Brandt fees," and (6) punitive damages. <u>Compl.</u>, ECF No. 1.

F.    First Motion for Summary Judgment

33. On March 20, 2015, the Court issued its Memorandum of Decision on the Trustee's Motion for Summary Judgment (the "MOD"). TSUF, ¶64; ECF No. 57.  The motion was granted in part as to the Trustee's claims for breach of contract, granting declaratory relief that Essex had a duty to defend the Rothmans; it was denied in part without prejudice as to (1) Essex's duty to indemnify the full settlement amount, (2) Trustee's claim for breach of the implied covenant of good faith and fair dealing, and (3) Trustee's request for attorney's fees. ECF No. 57.

34. On Essex's duty to indemnify, the Court left open the question of allocation of covered and uncovered claims in the Settlement:

> Although Essex cannot challenge the amount or reasonableness of the damages in the stipulation, Essex is possibly not liable for the full amount of the settlement agreement. Thus, given the range of claims covered by the settlement, there are issues of fact regarding the amount of the settlement covered by the Policy. Further information is necessary to resolve the delineation of damages to be paid. Further briefing and perhaps a trial are needed to determine the full damages amount covered under the Policy.

MOD, 16:28-17:3.

These cross motions for summary judgment followed discovery and the first summary judgment ruling. This Memorandum addresses the following issues not addressed in the first MOD:

1.  Whether Essex Breached the Implied Covenant of Good Faith and Fair Dealing;

2.  Whether Trustee is Entitled to Punitive Damages and "Brandt Fees"; and

3.  Whether Essex has a Duty to Indemnify the Rothmans for the Full Amount of the Settlement. If Not, Whether Essex Can Apportion That Settlement Into Covered and Uncovered Causes of Action. If Apportionment is Allowed, Whether Either Side Has Presented Sufficient Undisputed Facts to Support a Judgment at This Time.

G.    Evidentiary Objections

35. "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Block v. City of Los Angeles, 253 F.3d 410, 418–19 (9th Cir. 2001). Moreover, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all

duplicative of the summary judgment standard itself" and thus need not be considered on a motion for summary judgment. <u>Burch v. Regents of Univ. of California</u>, 433 F.Supp.2d 1110, 1120 (E.D.Cal. 2006).

36. At the September 13, 2016 hearing, the Court made rulings on numerous evidentiary objections.  Essex's objections included: (a) Motion to Strike Sharp's Declaration and Gabriel's Declaration, (b) Objection to Declaration of Larry Gabriel, and (c) Response to Plaintiff's Statement of Additional Facts.  Trustee's objections included: (a) Objection to Declaration Report of Charles G. Ehrlich, and (b) Objection to Declaration of Sean Hanifin. Each side raised both factual and evidentiary objections to the other's Statement of Undisputed Facts.

37. "Findings and Evidentiary Rulings for the Submission of Undisputed Facts" was entered on October 26, 2016. <u>See</u> ECF No. 196.  The facts relied on for this ruling are detailed therein, along with the ruling on each of the evidentiary objections. Those facts are incorporated herein and will only be repeated where necessary to the discussion. The facts ruled on in the attachments to those orders constitute the Court's Findings of Fact.

## I.  <u>CONCLUSIONS OF LAW</u>

### A.  <u>Law of the Case</u>

1. Trustee has argued that many statements in the MOD are established "facts" and that various statements made in the ruling on the first summary judgment motion are now "law of the case."  While certain rulings were made in the MOD, there were not as many as the Trustee alleges. The MOD granted summary judgment only as to specific claims as stated in the order:

> 1.  As to Trustee's first claim for Declaratory Relief , the Court finds that Essex had a duty to defend the Rothmans given the allegations contained in the Trustee's First Amended Complaint (FAC); and
>
> 2.  As to Trustee's second claim for Breach of Contract, the Court finds that Essex breached its obligations under its insuring agreement to provide a defense for the claims presented in the FAC.

Order Granting Partial Judgment on Plaintiff's Motion for Summary Judgment, ECF No. 61, 2-8.

It did not decide all causes of action.  Plaintiff's Motion for Summary Judgment was denied as to (1) Trustee's request for attorney's fees; (2) the amount of damages sustained by Essex's breach of contract; (3) whether Essex breached its Implied Covenant of Good Faith and Fair Dealing; and (4) whether Trustee may recover punitive damages for Essex's conduct in administering the claim submitted by the Insureds and the amount of those damages.  <u>Id</u>. at 11-17.

2. Under the law of the case doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court or an appellate court. The application of the doctrine is discretionary, and not an "inexorable command." United States v. Smith, 389 F.3d 944, 949 (9th Cir. 2014). Rulings of a trial court are subject to revision at any time before entry of final judgment. Belli v. Temkin, 268 B.R. 851, 857 (B.A.P. 9th Cir. 2001). There was no Rule 54(b) certification permitting an appeal. See Fed. R. Civ. P. 54(b). Until such time as all causes of action are resolved, the court remains free to revise its ruling when presented with new law or facts. Cameo Dev. Co. v. Lakin, 2005 U.S. Dist. Lexis 22311, 22 (D. Az. 2005)(subject to Rule 54(b), all orders are subject to reopening at the discretion of the judge absent an express entry of final judgment.)

3. The Court has no reason to revise its ruling as to the two claims where partial summary judgment was granted. As to the causes of action where there was a denial of summary judgment, it is even more inappropriate to construe statements made in the course of that ruling as "law of the case." See Greene v. Virgin Islands Water & Power Authority, 2016 V.I. Lexis 109, 14 (Sup. Ct Virgin Islands, 2016), citing Dessar v. Bank of Am Nat'l Trust & Sav. Ass'n, 353 F.2d 468, 470 (9th Cir. 1965).

4. Trustee properly points out that he has relied on the earlier summary judgment ruling. He correctly relies on the matters that were actually ruled on and contained in the order. Rescinding a ruling is not appropriate where it would cause undue harm to a party that had benefitted from the ruling. Moore's Federal Practice §134.21[1], (3d ed. 2003). The court will not revisit decisions actually made in the earlier ruling such as that there was a duty to defend. See MOD, 13:26-28. The earlier MOD explicitly left open the question of how much of the settlement is covered by the policy since not all claims in the FAC are covered under the policy. Id. at 17:1-3.

5. The statements made as part of the discussion of undecided issues were *dicta* informed by what was briefed at that point in the case. The current round of memoranda of law and proposed statements of undisputed facts follows extensive discovery and is more detailed on these undecided issues than with the earlier motion, where the focus was heavily on the duty to defend issue. Where appropriate, the Court has gone back and looked at what supported any statements in the undecided causes of action and will revise where additional facts or law have been submitted with this motion. This may not be construed as a motion for reconsideration as the Court will not reconsider issues that were decided in the last ruling.

        B.   Summary Judgment Standard

6. As each party has brought a cross motion for summary judgment, the issues will be discussed jointly and the relevant burden of proof for each side will be kept in mind, depending on the issue and the cross motion.

7. Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c)(incorporated by Fed. R. Bankr. P. 7056).

8. The moving party has the burden of establishing the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. <u>Id</u>. at 324. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. <u>Hector v. Wiens</u>, 533 F.2d 429, 432 (9th Cir. 1976). The inference drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Valadingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. <u>Sankovich v. Insurance Co. of N. Am.</u>, 638 F.2d 136, 140 (9th Cir. 1981). The dispute about a material fact is "genuine," … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

9. Rule 56(d), however, empowers the court to continue or deny a motion for summary judgment if the opposing party needs time to discover facts essential to justify the opposition. <u>Hall v. Hawaii</u>, 791 F.2d 759, 761 (9th Cir. 1986); Fed. R. Civ. P. 56(d). To prevail, a party opposing a motion for summary judgment must make clear what information is sought and how it would preclude summary judgment. <u>Hall</u>, 791 F.2d at 761.

## C. Attorney's Fees to Defend Underlying Complaint

10. In the MOD, the Court found there was an issue of material fact as to whether the Trustee is entitled to attorney's fees based on the assignment of the Essex Policy or whether those fees were already covered and owed to Scottsdale Insurance. MOD, 14:16-18. This issue has been explained more thoroughly in the most recent motions. Per the Settlement, Rothmans' rights to recover defenses costs, including attorney's fees and expenses expended by the Rothmans in defense of the adversary proceeding, were assigned to the Trustee. Trustee's Request for Judicial Notice, Ex. 5. 3.1. Regardless of how the indemnity issue is determined, Essex is liable for unpaid attorney's fees expended in the underlying action. <u>See</u> Cal. Civ. Code §2778. Trustee asserts that the Rothmans incurred $461,486.64 in attorneys' fees in defense and settlement of Trustee's E & O lawsuit. Scottsdale paid $65,000 of the Rothman's attorneys' fees. The Rothmans have $396,486.64 in outstanding fees.

11. California law clearly provides for payment of the insured's defense costs where the duty to defend has been breached. <u>Hogan v. Midland National Ins. Co.</u>, 3 Cal. 3d. 553, 558 (1970). Essex correctly states that this payment will only come due upon a final ruling on the duty to defend issue. Essex also clarifies that it has not received from Trustee a detailed breakdown of the attorney fees to determine which fees were for defense of the lawsuit and which may be attributable to other charges. The amount of fees is still an open question. The motion for payment of defense costs is granted with a procedure to be established to evaluate the amount following resolution of all issues to determine the amount due.

## D. Implied Covenant of Good Faith and Fair Dealing

12. Trustee asserts that Essex's (1) wrongful denial of an insurance defense, (2) wrongful denial of coverage, (3) failure to properly investigate the claim, and (4) failure to respond to a settlement offer constitute breaches of the implied covenant of good faith and fair dealing –

thereby entitling Trustee to "Brandt fees." Essex's cross motion for summary judgment requests that the Court dismiss Trustee's claims on these same issues.

13. "As in every other contract, an implied covenant of good faith and fair dealing is implicit in an insurance contract." <u>Major v. Western Ins. Co.</u>, 169 Cal. App. 4th 1197, 1208 (2009). The fundamental purpose of this covenant is to ensure that "neither party will do anything which will injure the right of the other to receive the benefits of the agreements." <u>Id</u>. at 1209.  "Bad faith" does not require a finding of "positive misconduct of a malicious act or immoral nature; it simply means that the insurer acted deliberately." <u>Id</u>. at 1208-09.

14. To prevail, the insured must show that the insurer has (1) withheld benefits due under the policy, and (2) that such withholding was "unreasonable" or "without proper cause." <u>Guebara v. Allstate Ins. Co.</u>, 237 F.3d 987, 992 (9th Cir. 2001)(citing <u>Love v. Fire Ins.</u>, 221 Cal. App. 3d. 1136, 1151 (1990).  An insurer's decision to deny coverage is not unreasonable if there is a "genuine dispute." <u>Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.</u>, 90 Cal. App. 4th 335, 347 (2001)(holding that an insurer's denying or delaying payout of an earthquake policy does not constitute bad faith because of a genuine dispute as to the existence of coverage even though it might be liable for breach of contract); <u>see also</u> <u>Dalrymple v. United Services Auto. Assn.</u>, 40 Cal. App. 4th 497, 519, 520 (1995).  "The ultimate test of bad faith liability is whether the refusal to pay policy benefits or the alleged delay in paying was unreasonable." <u>Chateau Chamberay</u>, 90 Cal. App. 4th at 346.  The determination of reasonableness, however, must be made as of the time of the coverage decision. <u>Id</u>. at 347 ("The reasonableness of the insurer's decision and actions must be evaluated as of the time that they were made").

15. The duty to defend is contractual; it is an exchange of considerations: premium for a defense. The remedies from a breach of that duty should therefore stem from the contract itself unless some independent tortious act justifies tort remedies. "Bad faith" requires a showing of more than "honest mistake, bad judgment, or negligence" but rather a "conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectation of the other party [...]." <u>Id</u>. at 18-19 (citing <u>Careau & Co. v. Security Pacific Business Credit, Inc.</u>, 222 Cal. App. 3d. 1371, 1395 (1990)).

16. The undisputed record shows that (1) the claim was originally sent by the Rothmans to MSI, the claim management arm of Essex. TSUF, ¶30; (2) the claim was assigned to claims adjuster Cathy Daly.  <u>Id</u>. at ¶40; (3) Daly reviewed: (a) the letter from the Rothmans' counsel, Lawrence Jacobson, regarding defense of the Trustee's complaint, (b) the policy, (c) the allegations of the First Amended Complaint. <u>Id</u>. at ¶42.  She then held two separate conversations – with Jacobson and with Fischer, her supervisor. <u>Id</u>. Thereafter, she retained WCB as outside coverage counsel on the matter. ESUF, ¶55; (4) WCB then sent the October 4, 2012 letter stating that the Trustee's lawsuit against the Rothmans is not covered by the Policy.  TSUF, ¶45.

17. In that letter, Waxler analyzed BTJ's complaint and Sharp's amended complaint-in-intervention. He questioned whether the Rothmans qualified as "Insureds" under the policy, whether the alleged acts were done in performance of "Professional Services," whether the acts fell under Exclusion A, E, G, or M, and whether the damages were covered.

18. A year later, Trustee re-tendered the claim.  In two letters (dated September 11 and 13, 2013), Larry Gabriel contended that the Rothmans' actions fell within the scope of "Professional Services" as defined in Essex's E & O policy and also notified Essex of the mediation, scheduled with Judge Tevrizian.  Id. at Ex. 6 and 7.  Putting Essex's arguments regarding inadequate notice of the mediation aside, Essex did not attend the settlement.

19. Trustee's letter focused on Essex's failure to consider Utica – a Maryland appellate court case. As discussed in the MOD, Utica analyzed whether an insured; day-to-day business operations as a mortgage banker were "Professional Services" within the meaning of the underlying policy.  Utica, 130 Md. App. at 746.

20. On October 30, 2013, Waxler responded to Gabriel.  Declaration of Larry Gabriel, Ex. 8. The letter clearly considered Utica and distinguished it from California cases, most notably, Inglewood Radiology Medical Group, Inc. v. Hospital Shared Services, Inc., 217 Cal. App. 3d 1366, 1370 (1989). Waxler also defended Essex's position at length by presenting facts to distinguish Utica, questioning whether the Rothmans could be defined as "insured," and whether the claims fell under Exclusions E and M under the policy. Declaration of Gabriel, Ex. 8. While the undisputed record is that neither Daly nor Fischer reviewed the Utica case, Trustee provided no law requiring a claims administrator to review every case.  Further, neither Daly nor Fisher's failure to assess case law cited by a claimant can be imputed to the company as a whole when the company retained outside counsel to review the matter. The Court must look at the totality of the circumstances and the chronology of Essex's review from the initial tender to Essex's declination letter, the request to reconsider coverage and the second declination letter.

### i.  Charles Ehrlich Declaration

21. Essex has filed a declaration of an insurance coverage expert, Charles Ehrlich. Trustee has objected to its consideration on a number of grounds. The objection is sustained for the purposes of this motion and the Court has not considered the Ehrlich declaration in reaching any conclusions on this motion. As stated at the hearing with respect to evidentiary objections, the declaration seeks to relitigate the duty to defend decision which has already been resolved. To the extent Ehrlich opines on what was proper to consider in declining coverage, the testimony of those actually involved in the claims adjustment process was sufficient for the Court to consider in evaluating whether Trustee has shown a lack of good faith, even if the facts are disputed. In addition, to the extent that the late turnover of coverage counsel's file precluded Trustee from deposing Waxler, any reference to coverage counsel communications in Ehrlich's declaration should not be considered. The Court has considered Trustee's citations to the Waxler file to see if they raise sufficient grounds in support of Trustee's position. If any portions of the opinion are still relevant at trial, they will be considered then.

### ii.  Considering Settlement Offers

22. Citing to White v. W. Title Ins. Co., 40 Cal. 3rd 870, 887 (1985), Trustee argues that communications regarding settlement discussion or the failure to enter into settlement discussions are admissible on the issue of breach of the duty of good faith and fair dealing. There, the court upheld a bad faith judgment based on evidence that the insurer made two

low-ball settlement offers to the insured. Id. at 889. Trustee argues that Essex's failure to settle is an independent breach of the duty of good faith and fair dealing. He asserts that even where an insurer decides not to defend, the refusal to even engage in settlement discussions is a breach of this duty because there is an implied continuing duty despite the earlier determination of no coverage.

23. White does not support Trustee's theory on these facts, even considering disputed ones and making inferences in favor of Trustee. White does hold that insureds may introduce settlement communications even after commencement of litigation for the purpose of establishing a breach of the covenant of good faith and fair dealing. White, 40 Cal. 3d 870 at 888. Putting aside subsequent cases questioning the vitality of White, see, e.g. California Physicians' Service v. Superior Court, 9 Cal. App. 4th 1321, 1328 (1992), neither White nor any other authority cited by Trustee supports his position that the failure to enter into settlement discussions alone shows a breach of duty of good faith and fair dealing. White concerned "nuisance-value settlement" offers where the underlying course of conduct showed that the insurer was not evaluating and seeking to resolve the claim fairly and in good faith. White, 40 Cal. 3d at 889.

24. Essex's decision not to change its coverage decision and not to participate in settlement discussions following Trustee's counsel's letter on September 11, 2013, does not demonstrate a lack of good faith and fair dealing. Essex's coverage counsel responded in detail to Trustee's coverage arguments and explained the reasonable difference in their view of coverage under the contract. See Declaration of Larry Gabriel, Ex. 7, "October 30, 2013 Letter." Where there is a reasonable difference of opinion and the insurer is simply relying on its reasoned interpretation of the insurance contract, the failure to engage in settlement discussions does not show a lack of good faith. To require such discussion is to elevate a breach of contract action to a tortious breach of the duty of good faith and fair dealing every time there is a reassertion of the difference of opinion by the insured. The covenant of good faith requires that the insurer reevaluate its coverage decision when new law or facts are presented which could change its earlier analysis. A repeated request with the same legal and factual situation it had earlier determined not to be covered does not trigger an increased level of scrutiny.

25. Trustee also argues that Essex showed bad faith by failing to thoroughly investigate the facts underlying the complaint since its determination was based solely on an examination of the complaint, calls with Rothman and Trustee's counsel, and the terms of the policy. This level of review satisfies Essex's duty to investigate in a claim of this nature. Baroco West, Ins. v. Scottsdale Ins. Co., 110 Cal. App. 4th 96, 103 (2003)("the insurer satisfies its duty to investigate by considering the complaint and the terms of the policy. Although extrinsic facts may also give rise to a duty to defend, such facts must be known at the time of tender and must reveal a potential for liability.")(footnote omitted); Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th 1076, 1081 (1993)("The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy.") Trustee has also not identified any facts Essex should or would have uncovered if it conducted any additional investigation.

iii.   Advice of Counsel

26. Trustee seeks to preclude Essex from invoking any advice of counsel defense because of Essex's previous assurance that it would not do so and its opposition to any inquiry into any discussions between its employees and coverage counsel.

27. On June 5, 2015, Trustee served Essex with a request for production of documents. Declaration of Larry Gabriel in Support of Motion to Compel, Ex. 3. Essex responded by asserting the attorney-client privilege to Request numbers 6-8, which sought all communications between Essex and its outside counsel – Andrew Waxler. Opposition to Motion to Compel, Ex. F, "Essex's Objection and Response for Production."  On or about July 1, 2015, Trustee served Waxler with a Notice of Deposition.  Waxler did not attend the deposition.  On July 14, 2015, Hanifin responded in a letter:

> Essex's position remains unchanged: coverage counsel's file is clearly protected by the attorney-client privilege. Essex has not asserted an advice-of-counsel defense, nor has it waived its privilege at any point during discovery. As such your client is in no way entitled to any of the
> documents in coverage counsel's file.

Id. at Ex. J, "Letter from Hanifin to Gabriel."

28. On August 26, 2015, Trustee filed a Motion to Compel Production of Documents by Defendant and to Compel Further Testimony of Essex's Designee. ECF No. 70.  On October 22, 2015, after notice and hearing, the Court denied Gabriel's motion to compel discovery as to communications between Essex and coverage counsel on the basis of attorney-client privilege. ECF No. 79.  About two months thereafter, Essex presented Trustee with its coverage file, including communications between its coverage counsel and Essex with no explanation for why it suddenly waived privilege. Essex later stated that it turned over all documents because it wanted to obviate the issue of advice of counsel. Transcript of Record, 153:14-24, Sep. 13, 2016, ECF No. 191. Trustee asserts that he has been prejudiced by the assertion of the attorney-client privilege followed by a sudden waiver of the privilege as to coverage counsel's file.

29. Reasonable reliance on the advice of counsel is a defense for bad faith as it demonstrates that the insurer had "proper cause" for its failure to defend even if the advice it received was ultimately erroneous.  State Farm Mut. Auto Ins. Co. v. Superior Court, 288 Cal. App. 3d 721, 725-26 (1991).  Here, Essex has not invoked that doctrine. An insurer who consults counsel as part of its claims analysis does not waive the attorney-client privilege.  See Aetna Casualty & Surety Co. v. Superior Court, 153 Cal. App. 3d 467, 475 (1984)(holding that where the attorney's advice or state of mind is not in issue, it has not impliedly waived its attorney-client privilege); Transamerica Title Ins. Co. v. Superior Court, 188 Cal. App. 3d 1047, 1053 (1987).  Essex is not proffering the Waxler letters to argue that its reasonable reliance upon the advice of Waxler shields it from Trustee's claim of bad faith.  Instead, it is proffering the Waxler letters to argue that it acted reasonably by retaining coverage counsel. Consulting with counsel was one piece of the entire claims review process.

30. Essex has repeatedly stated that it is not relying on advice of counsel as a defense. It is precluded from doing so now or at trial. It may, however, rely on the fact that in addition to the claims examiner's review, it was careful to also consult counsel to show it acted reasonably and did not simply automatically or deliberately deny coverage.

31. Trustee also asserts that Essex violated California Insurance Regulations by failing to certify written guidelines and standards to ensure that "claims agents have been trained regarding [California insurance] regulations and any revisions thereto." See Cal. Code Regs. tit. 10, §2695.6, subd. (b). Trustee's argument fails for two reasons. First, his only support for Essex's failure to abide by this regulation is Fisher's deposition testimony that he was unaware of any written procedure for claims handling. See Supplemental Decl. of Larry Gabriel, Ex. 1, Fischer Deposition, 29:12-30:4. Yet training and certification is not required for Fisher as he is a licensed attorney. See Id. ("licensees need not provide such training or certification to duly licensed attorneys.") Second, even if Essex failed to train or certify the other claims agents, this omission does not alone demonstrate deliberate behavior arising to the level of bad faith. Trustee simply has not presented enough evidence to show any failure to process the claim properly that may have violated these regulations.

32. Lastly, Trustee's argument that Essex should have reassessed its coverage when Scottsdale revoked its earlier denial of coverage is without merit. The Essex policy is different from the Scottsdale policy. No information has been presented to indicate Scottsdale was interpreting the same policy language.

33. Although an insurer's bad faith is a question of fact to be determined at trial as evidence of motive, intent, and state of mind, the question becomes one of law where only one reasonable inference can be drawn from the undisputed facts. Chateau Chamberay Homeowners, 90 Cal. App. 4th at 20 (citing Paulfrey v. Blue Chip Stamps, 150 Cal. App. 3d. 187, 196 (1983)). Essex's failure to defend the Rothmans may be a mistake in policy interpretation, but viewing the facts most favorable to Trustee, there is insufficient evidence to show that it was a "deliberate act" to frustrate the reasonable expectation of the Rothmans in the underlying insurance contract. See Chateau Chamberay Homeowners, 90 Cal. App. 4th at 18-19.

34. Whether Essex had a duty to defend was an issue of genuine dispute. It took adequate steps to investigate the claim, and it provided detailed reasoning in denying coverage under the Rothmans' D&O Policy. The facts cited by Trustee do not describe a situation where the insurer consciously disregarded its legal obligation. Essex's claims adjuster's handling of the case, from registering the claim in MSI's internal system to reviewing the allegations and policy language, to retaining coverage counsel to investigate the merits of Gabriel's arguments for coverage, evidences a defensible legal position of no coverage.

35. Thus, Essex's motion for partial summary judgment on the Breach of Implied Covenant of Good Faith and Fair Dealing will be granted.

        E.  Punitive Damages and "Brandt Fees"

36. Trustee argues that he is entitled to punitive damages totaling $15 million for Essex's refusal to offer coverage and failure to participate in settlement discussions. A plaintiff may recover punitive damages in connection with non-contractual claims if he proves "by clear and

convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code. §3294. An insured alleging that the insurer breached the implied covenant of good faith and fair dealing may seek punitive damages in connection with that claim. Kransco v. Am. Empire Surplus Lines Ins. Co., 23 Cal. 4th 390, 400, 97 (2000).

37. Trustee also argues that he is entitled to "Brandt fees" for fees incurred in his prosecution of this adversary action – totaling $284,911.44 ($280,000 in attorneys' fees plus $4,911.44 in costs).[2]

38. As discussed above, Essex's failure to defend the Rothmans did not rise to the level of bad faith and was insufficient to show oppression, fraud, or malice.

39. Even viewing the facts in light most favorable to Trustee, Essex's motion for summary judgment on the issue of punitive damages and "Brandt fees" is granted.

F. Duty to Indemnify

40. An insurer's duty to indemnify is recognized as narrower than its duty to defend. While an insurer has a duty to defend any claim that *potentially* falls within the terms of the underlying policy, it only has a duty to indemnify claims that are *actually* insured. Buss v. Superior Court, 16 Cal. 4th 35, 45-46 (1997). Although the Court found in the MOD that the duty to defend was breached, the issue is now what Essex actually must indemnify. The Settlement resolved all of Trustee's claims in the First Amended Complaint. That complaint, as discussed earlier, alleged mixed causes of action – containing both covered and uncovered claims. TSUF, ¶54, 56, and 57; See BTJ Ins. Servs., LLC. v. Rothman et al., 1:12-ap-10229-MT, ECF No. 305. Scottsdale paid $475,000 toward the Settlement, and the Rothmans paid $25,000. TSUF, ¶117. Trustee's indemnity claim is for the $3.8 million balance.

41. Essex requests the opportunity to contest the Settlement on the basis that it was unreasonable and collusive. Essex argues that the final $4.3 million settlement figure cannot possibly consist of only covered actions. It asserts that at most, C.M. Meiers suffered only $1.2 million in damages – the amount of the trust shortfall. It further argues the claims leading to this shortfall are not covered by the E & O Policy, such as: breach of the fiduciary duty for error and omissions – corporate waste, transfer of life insurance policy, over-market office space rental to Wen-Er Farms, LLC., the Kleid Stock Repurchase, and the adverse judgment from the Capitol Insurance Services lawsuit.

42. Trustee avers that Essex is precluded from litigating the issue of allocation based on a number of theories. First, he argues that the breach of the duty to defend proximately caused the settlement, so Essex is liable for the entire amount. Second, he argues that the "larger settlement rule" requires the entire amount be included. Third, he argues that challenge to the settlement is not permitted where the duty to defend was breached. Finally, even if Essex is permitted to litigate allocation, Trustee avers that the effort would be futile as the settling

---

[2] "Brandt fees" are predicated on an insurer's bad faith denial of coverage as explained in the Supreme Court decision in Brandt v. Superior Court, 37 Cal. 3d. 813, 815 (1985)(holding that "when an insurance company withholds policy benefits in bad faith, attorney fees reasonably incurred to compel payment of the benefits are recoverable as an element of the plaintiff's damages").

parties made no attempt at parsing between covered and uncovered claims.

43. This section discusses each of the parties' theories as to liability and concludes that summary judgment as to allocation should be denied on both cross motions. As discussed below, when an insurer fails to defend an action, the insured is entitled to make a reasonable settlement of the claim in good faith, and maintain an action against the insurer to recover the amount of the settlement. Issacson v. California Ins. Guarantee Assn., 44 Cal. 3d. 775, 791 (1988). A reasonable settlement made by the insured to terminate the underlying claim constitutes presumptive evidence of the insured's liability of the underlying claim and the amount of such liability. Id. at 791; Pruyn v. Agricultural Ins. Co., 36 Cal. App. 4th 500, 527 (1995). This is true even in mixed causes of action cases where the settlement was reasonable. The insurer then has a right to rebut this presumption by a preponderance of the evidence.

    i.   Essex's Breach of its Duty to Defend And Proximate Cause of the Settlement Damages

44. Trustee relies on Amato v. Mercury Insurance Casualty Co., 53 Cal. App. 4th 825, 829 (1997), where the insurer tortuously failed to defend Amato in a negligence action arising from a car accident. As a result, the insured was not able to afford his own counsel, resulting in a default judgment for the plaintiff. Id. at 830. The California Court of Appeal, in affirming the trial court, found that even where the negligence action was not covered under the insurance policy, the insurer was liable for the full amount of damages because the default judgment was a proximate cause of its failure to defend. Id. at 830-31. Trustee argues that Essex's breach proximately caused Rothman's need to settle because of the high costs of any defense, resulting in a $3.8 indemnity claim.

45. Trustee also relies on San Diego Apartment Brokers, Inc. v. California Capital Ins. Co., 2014 Cal. App. WL 1613449 (Cal. App. 4th Dist. April 22, 2014)(unpublished), where an insurer failed to defend the insured's suit for wrongful eviction and negligence and sought to contest the resulting settlement. Id. at 5. The court employed the Amato proximate cause test, and concluded that the insurer was liable for the full amount of the settlement as the insured's settlement was a *foreseeable consequence* of the insurer's tortious breach of its duty to defend as the insured had no choice but to settle because it did not have the resources to pay its defense. Id. at 6.

46. The Court may not rely on San Diego Apartment, as it is unpublished. See Hart v. Massanari, 266 F.3d 1155-80 (9th Cir. 2001)(upholding Ninth Cir. Rule 36-3(a)); see also Cal. Rules of Court, rule 8.1115(a). Even serving as a persuasive opinion, these cases do not support summary judgment on a proximate cause theory. Here, the Rothmans were represented by Scottsdale Insurance when they settled; the insureds in Amato and San Diego Apartments were not represented after being abandoned by the insurers. In addition to some representation, this was a sophisticated business dispute and not a consumer dispute.

47. One inference that may be drawn is that but for Essex's failure to defend the Rothmans in the underlying action, the Rothmans would not have settled with Trustee. Despite being represented by Scottsdale, the Scottsdale Policy had a limit of $1 million. For the deficiency, the Rothmans' only recourse was to defend the action with their own funds or enter into a settlement of the claim, and maintain an action against Essex. That conclusion may not be

drawn in this motion because it requires the resolution of inferences against Essex, so it can only be properly done at trial where the Rothmans would be subject to cross examination.

48. As such, the proximate cause analysis fails to resolve the summary judgment motion brought by the Trustee. The theory may be pursued at trial as part of the indemnification claim as Trustee may have inferences made in his favor.

            ii.  <u>Larger Settlement Rule</u>

49. Under the "larger settlement rule, "[a]llocation is appropriate only if, and only to the extent that, the defense or settlement costs of the litigation were, by virtue of the wrongful acts of uninsured parties, higher than they would have been had only the insured parties been defended or settled." <u>Safeway Stores, Inc. v. National Union Fire Insurance Co. of Pittsburg, PA.,</u> 64 F.3d 1282, 1287-88 (9th Cir. 1995). There, the Ninth Circuit overturned the district court's decision to allocate one-quarter of settlement costs to Safeway (the insured) and three-quarters of the settlement costs to National Union (the insurer). In reaching this conclusion, the Ninth Circuit stated, once an insured shows that a settlement cost is recoverable under an insurance policy, "the . . . costs [are] fully recoverable … unless the insurer [can] show that the corporation's liability had increased the amount of the settlement." <u>Safeway Stores</u>, 64 F.3d at 1288.  Applying this rule, Trustee argues that the existence of uncovered claims is irrelevant unless, and until, Essex can demonstrate with admissible evidence that the settlement was greater as a result of payments specifically on account of uncovered claims.

50. The "larger settlement rule" is not applicable here.  <u>Safeway Stores</u> allocates costs between covered and uncovered *parties* – not allocation between covered and uncovered *claims*.  <u>Id</u>. at 1286-87. The link between increased settlement costs because of an uncovered party is not the same as the link between increased settlement costs because of an uncovered claim.  <u>See</u> <u>Fed. Ins. Co. v. Hawaiian Elec. Indus.</u>, 1996 U.S. Dist. LEXIS 22804 (D. Haw. 1996).  The Seventh Circuit provides a clear policy rationale behind the "larger settlement rule":

> The point of the insurance policies plus the provision in Continental's charter for indemnifying the directors was to insure them against liability and then shift the liability for this insurance to Harbor and Allstate -- was, in other words, to eliminate the very solvency risk that is the premise of the argument we are evaluating. To allow the insurance companies an allocation between the directors' liability and the corporation's derivative liability for the directors' acts would rob Continental of the insurance protection that it sought and bought.

<u>Harbor Ins. Co. v. Continental Bank Corp.</u>, 922 F.2d 357, 368 (7th Cir. 1999); <u>see</u> <u>also</u> <u>Nordstrom, Inc. v. Chubb & Son, Inc.</u>, 54 F.3d 1424, 1432 (9th Cir. 1995).

Here, the need to protect the insured party's bargain does not apply.  C.M. Meiers did not purchase insurance to protect uncovered claims. This is not a situation where the insured is cheated out of its bargain because of a second wrongdoer's involvement in the settlement. Requiring allocation between covered and uncovered claims does not deprive them of the

"insurance protection it sought and bought." See Harbor, 922 F.2d at 368.

### iii.   Essex Was Not Required to Reserve its Right to Contest the Settlement

51. Trustee next contends that Essex's challenge is procedurally flawed. Relying on Buss v. Superior Court, 16 Cal. 4th at 50, and State v. Pacific Indemnity Co., 63 Cal. App. 4th 1535, 1550 (1998), Trustee argues that Essex is required to have expressly reserved its rights to contest allocation by providing a full defense and funding the entirety of the defense costs. Pacific Indemnity and Buss are duty to defend cases, where the insurer, after providing a defense, sought to be reimbursed for non-covered defense costs. While that approach is likely the easier route to contest a settlement, Pacific Indemnity and Buss's "defend now seek reimbursement later" theory is limited to reimbursement of defense costs and fees. See Id. at 1549-50. They do not stand for the proposition that defense and payment of defense costs are prerequisites to contesting a settlement. In an ordinary case, where an insurer provides counsel to defend the action, it waives its right to assert coverage defenses unless it adequately reserves its rights; in contrast, an insurer who breaches its duty to defend may contest coverage only "where the issues upon which coverage depends are not raised or necessarily adjudicated in the underlying action." Dewitt v. Monterey Ins. Co., 204 Cal. App. 4th, 233, 246-47 (2012)(citing Kaufman Board Communities Inc. v. Performance Plastering, Inc., 136 Cal. App. 4th 212-23 (2006) and Pruyn, 36 Cal. App. 4th at 514). Essex therefore, can contest the amount of the Settlement although only in a certain way detailed subsequently.

### iv.   Burden of Proof

52. Relying on Atmel Corp v. St. Paul Fire & Marine Ins. Co., Essex avers that the insured should bear the entire burden of proving coverage. 430 F. Supp. 2d 989, 993 (2006)(stating that courts have "repeatedly held that even if it is determined that an insurer breached its duty to defend, the insured still bears the burden of proving coverage"). Essex's reliance is unfounded as Atmel only refers to the burden of proof in *dicta* and there was only one type of injury at issue in the underlying claim. Atmel's discussion on burden is limited to the fact that the insurer was not *per se* precluded from challenging coverage. See Id. at 993. In fact, it cites authority that places the burden on the insurer. See Id (citing Everett Associates v. Transcon Ins. Co., 159 F. Supp. 2d 1196, 1209 (N.D. Cal. 2001), aff'd. 35 F. App'x 450 (9th Cir. 2002).

53. If an insurer wrongfully fails to provide coverage or a defense, and the insured then settles the claim, the insured is given the benefit of an evidentiary presumption. Issacson v. California Ins. Guarantee Assn., 44 Cal.3d at 792 (1988)("In a later action against the insurer for reimbursement based on a breach of its contractual duty to defend the action, a reasonable settlement made by the insured to terminate the underlying claim against him may be used as presumptive evidence of the insured's liability on the underlying claim, and the amount of such liability.")

54. To invoke the presumption, the insured bears the initial burden to show the "basic or foundational facts" by a preponderance of the evidence. The insured must show that: (1) the insurer wrongfully failed or refused to provide coverage or a defense, (2) the insured thereafter entered into a settlement of the litigation which was (3) reasonable in the sense that

it reflected an informed and good faith effort by the insured to resolve the claim. Pruyn, 36 Cal. App. 4th at 528 (citing Issacson, 44 Cal. 3d at 791, 793-94 and Xebec Development Partners, Ltd. v. National Union Fire Ins. Co., 12 Cal. App. 4th 501, 545 (1993).

55. Once the "basic or foundational facts" are established, the insured enjoys the presumption that the settlement accurately reflects the liability and amount of the liability for purposes of an action against the insurer. Xebec, 12 Cal. App. 4th at 545. The burden then shifts to the insurer to rebut that presumption. To do so requires a high evidentiary showing:

> Mere production of evidence *sufficient to support a finding* that the presumed facts were false would not have sufficed to dispel the presumption: upon proof of the foundational facts, [the insurer] would have been required to *persuade* the jury by a preponderance of the evidence that the settlement did not accurately reflect the existence or amount of [the insureds'] individual liability, as directors and officers, to [the company].

Id. at 546; see Issacson, 44 Cal. 3d at 791; see also Everett Associates, 159 F. Supp. 2d at 1209).[3]

This approach is pragmatically sound; the insured should bear the initial burden as he or she has access to information regarding the facts and events leading up to the settlement and the discussions during the settlement.

56. Having been abandoned, the insured should be free to protect his or her rights by electing to settle rather than risking an adverse judgment. See Pruyn, 36 Cal. App. 4th at 530 (agreeing with Xebec that the presumption is the only way the courts can give meaningful protection and some procedural due process to the abandoned insured). California insurance law is clear that an insurance company, having breached its obligations under an agreement, should be bound to its insured for all reasonable outcome of that breach. To permit an insurer to freely allocate without a presumption ignores the position the insurer may have caused for the insured. To preclude allocation entirely would be too harsh of a result where there may be a legitimate question of what claims are covered. To require the insurer to overcome this high presumption for allocation is the balance that is struck.

### v.   Trustee has Satisfied its Initial Burden

57. The first two elements have been satisfied in earlier rulings. The Court has already found that Essex breached the E & O policy by failing to defend the Rothmans, and the Rothmans and Trustee entered into the Settlement in resolution of Trustee's claims. The third requires discussion.

58. The third element considers whether the settlement was "reasonable in the sense that it reflected an informed and good faith effort by the insured to resolve the claim." Pruyn, 36 Cal. App. 4th at 528. "The insured can satisfy its prima facie burden of showing that the settlement was reasonable by presenting the same kind of evidence which would support a

---

[3] The Court is not relying on Peterson Tractor Co. v. Travelers Idem. Co., 156 F. App'x 21 (9th Cir. 2005)(unpublished).

determination of good faith under section 877.6". Id. at 528. Here, the Settlement was subject to two hearings: Motion for Good Faith Determination under Cal. Civ. Code §877.6 and Motion to Approve Settlement under Fed. R. Bankr. P. 9019.

### 1.    Cal. Civ. Code §877.6 Good Faith Determination Hearing

59. On January 17, 2014, Trustee filed the Motion for Good Faith Settlement Determination ("877.6 Motion"), moving for an order finding that the settlement agreement was entered into in good faith pursuant to Cal. Civ. Code §877.6(a)(1). In re C.M. Meiers, 1:12-bk-10229-MT, ECF No. 318. An order granting that motion was entered on February 12, 2014. Id. at ECF No. 328.

60. The California Supreme Court in Tech-Bilt Inc. v. Woodward-Clyde & Associates, 38 Cal. 3d 488, 499-500 (Cal. 1985) created a multi-factor test for a finding of "good faith," including "whether the settling parties colluded to hurt the non-settling defendant's interests." Trustee's memorandum in support of the 877.6 Motion discusses each of the Tech-Bilt factors in depth. Most notably, on the topic of collusion, it represented that the settlement was a result of "reasoned negotiation (including formal mediation)" and that the result was reasonable because of the complexity and uncertainty of the matters. 877.6 Motion, 3:27-28, 4:6-10.

61. Essex argues that regardless of the findings at the hearing, 877.6 determinations are not binding on Essex, because it did not have standing to contest the settlement and any objection to the Settlement could be construed as breaching its duty to its insured. In Diamond Heights Homeowners Assn. v. National American Ins. Co., 227 Cal. App. 3d. 563 (1991), an excess insurer who refused to assume the defense of the insured in a tort action objected to the good faith claims in the 877.6 hearing. The California Court of Appeals, First District, held that the insurer's failure to seek appellate review of the good faith determination barred the insurer's bad faith and collusion claims under principles of issue preclusion. Id. at 583. The court's reasoning was based on its conclusion that an insurer (in that case an excess insurer) "stands in the position of a 'co-obligor'" and therefore had standing to participate in the 877.6 hearing. Id. at 582.

62. The Diamond Heights conclusion was later rejected by the Court of Appeal, Second District, in Pacific Estates Inc. v. Superior Court, 13 Cal. App. 4th 1561, 1572-75 (1995). There, the court found that an insurer of an alleged tortfeasor cannot be considered a "co-obligor on a contract debt" under section 877.6 because "co-obligors" are defined in the statute as "parties to a contract dispute which itself is the subject of the underlying litigation" and therefore an insurer has no right to object at the 877.6 hearing. Id. at 1572-73. Pruyn also supports Pacific Estates and rejects Diamond Heights. 36 Cal. App. 4th at 515. It added that underlying this rule is the belief that if the insurer were allowed to object to the settlement, it might unfairly interfere with a settlement which could very well benefit the insured. Id. at 527. The Diamond Heights conclusion that an insurer is bound by the good faith determination as a "co-obligor" has generally been rejected, and subsequent cases clarified that the insurer is not conclusively barred by a good faith settlement determination in which it did not participate. See Fuller-Austin Insulation Co. v. Highlands Ins. Co., 135 Cal. App. 4th 958, 987, fn. 11 (2006).

63. As Essex is not bound by the 877.6 hearing, the Court's findings as to the <u>Tech-Bilt</u> factors are not binding on Essex.  We now turn to the effect of the Fed. R. Bankr. P. 9019 hearing.

               2.   <u>Fed. R. Bankr. P. 9019 Hearing</u>

64. On December 11, 2013, Trustee filed a Motion for Order Authorizing Trustee to Enter into and Consummate Settlement Agreement – under Fed. R. Bankr. P. 9019 ("9019 Motion"). ECF No. 305. Bankruptcy Rule 9019(a) empowers the bankruptcy court to approve a settlement on motion by the trustee after notice and a hearing is provided to all creditors. Although the bankruptcy court has great latitude in authorizing a compromise, it may only approve a proposal that is fair and equitable to the creditors.  <u>In re MGS Marketing</u>, 111 B.R. 264, 267 (B.A.P. 9th Cir. 1990)(quoting <u>In re Woodson</u>, 839 F.2d 610, 620 (9th Cir. 1988).[4] The court generally gives deference to a trustee's business judgment in deciding whether to settle a matter.  <u>Id.</u>

65. As opposed to the rigid standing restrictions of Cal. Civ. Code §877.6, Fed. R. Bankr. P. 9019 only requires that the insurer be a "party in interest" to object to a settlement.  11 U.S.C. §1109(b)("a party in interest, including the debtor, trustee […] a creditor […] may raise and may appear and be heard on any issue in a case under this chapter"). The 'party in interest' definition has generally been construed broadly. <u>In re Global Technologies, Inc.</u>, 645 F.3d 201, 211 (3d Cir. 2011)("The list of potential parties in interest in §1109(b) is not exclusive").

66. In <u>In re the Matter of Thorpe Insulations Co.</u>, 677 F.3d 869, 876 (9th Cir. 2012), <u>cert. denied</u>, 133 S. Ct. 119 (2012), the Ninth Circuit considered whether non-settling insurers had standing to object to the debtor's chapter 11 plan of reorganization. The plan sought to establish an asbestos trust to be funded by a $600 million settlement reached between the debtor and thirteen settling insurers. <u>Id.</u> at 878-79. The settling insurers, in return, would receive protection under 11 U.S.C. §524(g). <u>Id.</u> at 878. Two groups of insurers refused to settle and objected to the plan.  <u>Id.</u> The bankruptcy court overruled the objections based on lack of standing. <u>Id.</u>  In reversing, the Ninth Circuit concluded that the non-settling insurers had standing as "parties in interest" because the plan had "substantial economic impact" on the non-settling insurers.  <u>Id.</u> at 887 (holding that because the plan was not "insurance neutral," the non-settling insurers had party in interest standing under §1109(b)).

67. While the present case differs in that it is in the context of a 9019 hearing, Essex is a "party in interest" with a comparable level of pecuniary interest at stake and the Settlement was likewise not "insurance neutral."  Three interests identified in <u>Thorpe</u> are particularly relevant here. First, the determination of liability may have a preclusive effect on the non-settling insurers as to the indemnification amount. <u>Id.</u> at 886 ("possibility that the plan will have a preclusive effect in asbestos suits brought against them by claimants"). Second, the plan, if approved, "would not necessarily permit the insurer to challenge settlement amounts

---

[4] Judge Carlson provides a good discussion comparing the approval of settlement under Rule 9019 and Cal. Civ. P. 877.6. <u>In re Plant Insulations Co.</u>, 469 B.R. 843-884-86 (Bankr. N.D. Cal. 2012), *aff'd*, 4775 B.R. 203 (N.D.Cal. 2012), *rev'd on other grounds,* 2013 U.S. App. LEXIS 21962 (9th Cir. 2013).  The <u>Plant</u> court distinguished the Rule 9019 standard from Section 877.6, finding that 9019 "is actually more exacting than the section 877.6 standard, because under Rule 9019 the party proposing the settlement has the burden of proof, while under section 877.6 the party opposing the settlement has the burden of proof." <u>Id.</u> at 886.

as unreasonable." <u>Id</u>. Third, the terms of the plan permit the trust to file direct suits against the non-settling insurers for indemnification damages. <u>Id</u>. As Essex was properly noticed of the hearing and was aware of its potential liability under the Settlement, its absence cannot be excused by an assertion that it did not have standing to object to the settlement. While that argument applies to standing for 877.6 hearings, it does not apply to the broader standing standard of 9019 hearings.

68. Essex argues that had it objected at the 9019 hearing, it would have breached its duty to the Rothmans. This may be so, but, having been properly notified of its potential liability under the Settlement, it could have appeared at the hearing to reserve its right to challenge indemnification at a later date.  Trustee's Request for Judicial Notice, Ex. 7 (The Settlement Agreement language specifically states that Trustee would be entitled to right to assert an adversary proceeding against Essex for its "refusal […] to acknowledge its indemnity and/or settlement obligations [amounting to][…] $3,800,000.00"). The Court also could have considered the likelihood of indemnification or asked for more detail in the settlement agreement in terms of evaluating the reasonableness of the settlement had it heard Essex's arguments at the time the settlement was evaluated. Had Essex shown there was no duty to defend or coverage of any settled claims at that time, it would also not have been breaching any duty to its insured. Challenging the Settlement nearly three years after the 9019 hearing prejudices Trustee and creditors where all were given an opportunity to be heard. The duty to the insured has not been defined to outweigh these important estate interests, and the insurance coverage of the debtor must be evaluated in the context of all of the interests of the estate and the creditors.

69. Having found that Essex inopportunely failed to object at the 9019 hearing, we now look to the substance of Trustee's 9019 Motion to assess whether it contained sufficient findings to satisfy Trustee's initial burden of proof that the Settlement was "reasonable."

70. Trustee's 9019 Motion applied the Ninth Circuit's four-factor test: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."  <u>In re A&C Properties</u>, 784 F.2d 1377, 1381 (9th Cir. 1986), <u>citing</u> <u>In re Flight Transportation Corp. Securities Litigation</u>, 730 F.2d 1128, 1135 (8th Cir. 1984), <u>cert. denied</u>, 469 U.S. 1207, 105 S. Ct. 1169 (1985).

71. The Court's findings as to the 9019 hearing are sufficient to satisfy Trustee's initial burden of proof that the settlement was "reasonable." In reviewing Trustee's motion and approving the resulting order, the Court considered whether the settlement terms were "reasonable." <u>See</u> <u>A&C Properties</u>, 784 F.2d at 138; <u>see also</u> <u>In re Equity Funding Corporation of America</u>, 519 F.2d 1274, 1277 (9th Cir. 1975).  Trustee represented that he did not have a good chance of collecting anything more from the Rothmans, given their limited financial means.  9019 Motion, 11:12-14. There is also no question that litigating this dispute to conclusion would have been very expensive for both sides, with numerous forensic accountants and other experts. <u>Id</u>. at 11:16-20, 10:17-20. The parties appear to have chosen the best deal they could get under the circumstances and probability of success. <u>Id</u>. at 10:14-27. Trustee was up front in the settlement that he had to take his chances in seeing if the insurance would cover the settlement. <u>Id</u>. at 11:9-11. Creditors have been very active in this bankruptcy case and could

have objected had they believed the Trustee could have collected more of the settlement from the Rothmans.

72. The standard to establish the "basic and foundational facts" are met by a 9019 hearing where all impacted by a settlement have standing to be heard.  To require the insured to overcome a higher initial burden of proof would lead to a counterintuitive result: an insured who was abandoned must then bear the heavy burden of proving its indemnification claim against an insurer who breached its contractual duty to defend.  The insurance industry would have little incentive to honor its duty to defend as it would be permitted a second chance to challenge coverage at the indemnification stage. See generally, Pruyn, 36 Cal. App. 4th at 530 (describing the presumption as a "meaningful protection" to insureds.)

73. Trustee therefore enjoys the presumption that the Settlement accurately reflects the liability for a covered claim and the amount of the liability for purposes of an action against Essex. The burden now shifts to Essex to rebut the presumption.  Id.

   G.  Allocation Between Covered and Uncovered Claims

74. In rebutting this presumption, Essex seeks to show in this motion how none of the settlement amount can be for covered losses. It adds up the value of all the uncovered causes of action and concludes they total $4,167,434. Essex Memorandum in Support of Motion for Summary Judgment, ECF No. 135-1, 17.

75. Trustee argues that that Essex is per se precluded from challenging the Settlement's allocation and he seeks summary judgment based on the presumptions afforded him.  This argument conflates Essex's breach of the failure to defend and failure to settle to mean that Essex is now fully liable for the settlement outcome. This is only true where the failure to defend also violates the implied covenant of good faith and fair dealing. Everett, 159 F. Supp. 2d. at 1210 (citing Pershing Park Villas Homeowners Ass'n, 219 F.3d.  895, 902 (2000)("The distinction is a reasonable one. The insured is relieved of proving the extent of damages in a bad faith action in order to remove the insurer's incentive to strategically disavow responsibility for the insured's defense with everything to gain and nothing to lose.")

76. Where there are mixed covered and uncovered causes of action and no bad faith, there is no such bright line rule. In Everett Associates v. Transcon Ins. Co., a patent infringement case, the district court rejected a similar argument from the insured:

> When the issues upon which coverage depends are not raised or necessarily adjudicated in the underlying action, then the insurer is free to litigate those issues in the subsequent action and present any defenses not inconsistent with the judgment against its insured. Thus, the insurer may litigate whether the policy covered the liability underlying the settlement in the subsequent action, and damages paid pursuant to a settlement are recoverable if the insurance policy covered such damages.

159 F. Supp. 2d at 1209 (holding that the settlement is only presumptive evidence of the liability and the amount, but does not preclude the insurer from establishing that the damages were not covered under the policy in the first place).

77. An insurer who wrongfully refuses to defend is liable for failing to accept a reasonable settlement, only if the claim is in fact covered by the policy. Dewitt v. Monterey Ins. Co., 204 Cal. App. 4th at 252 (holding that an insurer can contest a good faith settlement even after it failed to defend the insured in a negligence suit). While Dewitt is not a "mixed action" case, it still supports the proposition that an insurer can contest a settlement of uncovered claims. Id. at 236 (citing Risely v. Interinsurance Exchange of Automobile Club, 183 Cal. App. 4th 196, 207-208 (2010)("A liability insurer's duty to defend its insured against third party claims applies to claims that are potentially within the scope of the insured's policy. The insurer's duty to indemnify applies only to claims that are covered by the policy.").

78. In Zurich Ins. Co. v. Killer Music Inc., 998 F.2d 674, 677-78 (9th Cir. 1993), the Ninth Circuit considered whether an insurer who breached its duty to defend a suit seeking damages for an "advertising injury" should be afforded the opportunity to demonstrate that some, if not all, of the settlement amount is allocable to the uncovered claims. While recognizing that the settlement is presumptive evidence of the insured's liability and amount of the liability, the Ninth Circuit ultimately decided that the insurer can contest the settlement because the settlement not only included a settlement of covered advertising injuries (copyright infringement), but also uncovered cash considerations for rights to a third party's songs. Id. at 679 (holding that a reasonable settlement may be used as presumptive evidence of the insured's liability, but that the insurer on remand will have the opportunity to demonstrate that "some portion, if not all, of the settlement amount is allocable" to uncovered claims.")

79. An insurer's right to contest uncovered claims even after a settlement is consistent with Supreme Court cases on the allocation of defense costs even after a default judgment. In Hogan v. Midland National Ins. Co., 3 Cal. 3d at 558-59, the Court held that an insurer who breached its duty to defend was liable only for damages covered in the policy, and that not all of the judgment recovered against the insured manufacturer by the purchasers of a defective commercial saw were recoverable, along with damages caused by that breach. In permitting the insurer's request to apportion particular items of damages, costs, and attorneys' fees, the Court reasoned that "[t]he insurer is not bound […] as to issues not necessarily adjudicated in the prior action and can still present any defenses not inconsistent with the judgment against the insured. Id. at 555. Hogan was litigated to its very end, thereby affording the subsequent court with full details of what was litigated and decided. This is a luxury not furnished in this case. In line with the high burden of proof approach in the present case, Hogan cautioned against allocation, stating, "any precise allocation of expenses in this context would be extremely difficult, and if ever feasible, could be made only if the insurer produces undeniable evidence of the allocability of specific expenses." Id. at 564 (requiring a finding that factual matters upon which the issue of coverage turns are expressly or implied determined in the prior action, only then, will it be binding on the insurer in the subsequent suit); distinguishing Gray v. Zurich Ins. Co., 65 Cal. 2d. 263, 266 (1966)(where the Court precluded the insurer from contesting the prior judgment because "the trial in the underlying

action involved a theory of recovery within the coverage of the policy and it was not clear whether the jury's verdict was based upon that theory").[5]

80. It is a "heavy burden" that the insurer must overcome where there is an "evidentiary presumption" that the insured enjoys in proving liability and the amount of that liability. See Buss, 16 Cal. 4th at 45 (describing the burden on insurers seeking reimbursement of defense costs as "if ever feasible" and "may be extremely difficult"); LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co., 156 Cal. App. 4th 1259, 1273 (2007)(placing the "heavy burden" established in Buss on the insurer in allocating covered versus non-covered settlement and defense costs in a reimbursement context).

81. The Settlement, which presumably covers all causes of action in the complaint, resolves claims of mismanagement of the Trust Account in rendering "Professional Services for others" (covered) as well as allegations of intentional looting and fraud (uncovered). Trustee's Request for Judicial Notice, Ex. 7, 2.

82. Inconsistency in Trustee's varying estimation of loss leaves an issue of material disputed fact as to what is covered by the settlement. Per Gabriel Declaration, Trustee estimates his claims against the Rothmans in excess of $10 million. See Declaration of Gabriel, ¶14 ("This [$4.3 settlement] amount was agreed to taking into consideration what I deemed to be the loss of the value of C.M. Meiers' business in the amount of $10,979,863.00 all of which can be directly attributable to the out of trust loss."). Yet this estimation is inconsistent with Trustee's previous estimation. In support of its 9019 Motion, Trustee asserted that he estimated the total exposure suffered by the estate to be between $2.5 million and $4 million. 9019 Motion, In re C.M. Meiers, 1:12-10229-MT, ECF No. 305, 11:19-25 ("The Total Settlement Amount ($500,000) […] is a fair settlement given the total exposure faced by the Defendants – between $2.5 million to $4 million.")

83. As this is a motion for summary judgment, the burden at this stage is for Essex to raise material disputed facts showing that either Trustee's evidence as to attribution of the Settlement is not possible or other facts showing the settlement was based on uncovered claims. The Court may not weigh the strength of the evidence at this stage. Because Essex's theory of how the settlement amount reached differs substantially from Trustee's declaration of how the settlement amount was calculated, reasonable inferences can be made in favor of both parties. In addition, the shifting burden of proof prohibits evaluating each of the theories at this stage. As there are still material disputed facts as to allocation, Trustee's motion for summary judgment must be denied on how to allocate the total amount. Essex's request to conclude that none of it is covered is also denied.

### H.  Collusion is an Issue for Trial

84. Essex has raised collusion as an affirmative defense and has the burden to show collusion. See Answer, ECF No. 16, 11:12-14; See Xebec, 12 Cal. App. 4th at 554 (holding that the "having elected to raise the narrow but potentially more significant issue of collusion [as an

---

[5] Buss held the burden of proof that the insurer must carry in order to obtain reimbursement for defense costs is proof by *a preponderance of the evidence*. 16 Cal. 4th at 56. The Court questioned Hogan's "undeniable evidence" language as *dictum* because it imposes a burden of proof that is "unknown to the law, and that is seemingly even heavier than proof beyond a reasonable doubt." Id.

1
2

affirmative defense], [the insurer] was properly required to bear the burden of proving the defense.").

3
4
5
6
7
8
9
10

85. Collusion has been variously defined as (1) 'a deceitful agreement or compact between two or more persons, for the one party to bring an action against the other for some evil purpose, as to defraud a third party of his right'; (2) 'a secret arrangement between two or more persons, whose interests are apparently conflicting, to make use of the forms and proceedings of law in order to defraud a third person, or to obtain that which justice would not give them, by deceiving a court or its officers'; and (3) 'a secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purposes.'" Span, Inc. v. Associated Int'l Ins. Co., 227 Cal. App. 3d 463, 484 (quoting Hone v. Climatrol Industries, Inc. 59 Cal. App. 3d 513, 522, fn. 4 (1976)).  Collusion requires a "deceitful agreement," "secret arrangement," or "a secret combination […] for fraudulent or deceitful purposes" supported by substantial evidence. Span, 227 Cal. App. 3d 463 at 484; Andrade v. Jennings, 54 Cal. App. 4th 307, 328 (1997)(quoting Redd v. Gonzales, 8 Cal. App. 4th 118, 123 (1992)(holding that a jury's finding of collusion will not be disturbed on appeal if supported by substantial evidence).

11
12
13
14

86. Essex argues that the settlement was collusive because (1) the Rothmans' counsel shared with Trustee's counsel communications between Essex and the Rothmans, notwithstanding the adversity of interest between the parties; (2) Essex was notified of the mediation at the 11th hour despite months of prior discussion with Scottsdale; and (3) the $4.3 million figure is a *post hoc* fabrication by Trustee's counsel.

15
16
17
18
19
20

87. Both Trustee and Essex agree that the discussions between Trustee and Rothmans leading to a settlement in September 2013 are privileged. Section 408 of the Federal Rules of Evidence bars the admission of settlement negotiations offered to prove liability; however, it does not require exclusion when the evidence is offered for another purpose. Fed. R. Evid. 408.  The rationale is (1) irrelevance, as an offer to compromise may not be an admission, but rather an attempt to purchase peace; and (2) policy, in that the admissibility of such evidence would discourage parties to enter into settlements. Bankruptcy Evidence Manual, West's Bankruptcy Series Art. 4, §408. (5th ed. 2005).[6] This protection extends to legal conclusions, factual statements, internal memoranda, and the work of non-lawyers and lawyers alike so long as the communications were intended to be part of negotiations toward compromise.

21
22
23
24

88. Recognizing that the settlement discussions are privileged, the undisputed facts that can be considered will be addressed. First, it was no secret that it was Trustee's intention to pursue insurance coverage with Essex. Trustee disclosed in the Settlement Agreement that as part of the consideration for Trustee's claims release, the Rothmans would be assigning their right to assert a lawsuit against "Essex Insurance Company in connection with and arising out of the

25
26
27
28

---

[6] The dispute being settled need not be the one being tried in the present case where the settlement is being offered in order for Rule 408 to bar its admission. See Lyondell Chem. Co. v. Occidental Chem. Corp., 608 F.3d 284, fn. 40 (5th Cir. 2010); see also Wright & Graham, Federal Practice & Procedure §5306 (Supp. 2010). Despite the fact that the present claim is separate from the claims resolved in the settlement between the Rothmans and Trustee, the general rule of inadmissibility holds true. See United States v. Contra Costa County Water Dist., 678 F.2d. 90, 92 (9th Cir. 1982)(precluding evidence related to the government's settlement with a defendant in its suit against a second defendant.)  The only requirement is that the different disputes arise out of the "same transaction" in order to trigger Rule 408.  Here, both disputes arose out of a common event – the Rothmans' purported breach of their fiduciary duties to C.M. Meiers.

Essex E&O Policy" for its "failure to defend," "any refusal […] to acknowledge its indemnity," and "settlement obligations owed Defendants." Trustee's Request for Judicial Notice, Ex. 6-7, Section 3.3. By definition, the deal between Trustee and the Rothmans is therefore not a "secret."

89. Second, Essex's claim that it was not notified of the mediation until the last minute is rebutted by the undisputed fact that it was notified on September 6, 2013 – five days before the mediation. ESUF, ¶43. This was unquestionably very short notice, but Essex was afforded the opportunity to participate or request a continuance so that it could attend. As the settlement terms specifically provided that it was not binding until court approval, Essex had the opportunity to contest the settlement on the grounds of collusion or lack of adequate notice of the mediation. Had it intervened, Essex would have been able to reserve its rights. The length of the notice of the mediation session is also somewhat irrelevant where Essex has made clear that it was not providing a defense anyway so would not be attending the mediation.

90. Third, the only communication the Rothmans gave Trustee was the letter from Essex's counsel regarding Essex's denial of coverage. Essex's Appendix of Exhibits, Ex. 18, "October 4, 2012 Email from Lawrence Jacobson to Larry Gabriel." One of primary duties of the chapter 11 trustee is to determine whether the cost of pursuing litigation is worth the recovery that can be made. See In re AFI Holdings, Inc., 530 F.3d 832, 845 (9th Cir. 2008); see also The Minoco Group of Companies, Ltd. V. First State Underwriters Agency of New England Reins. Corp., 799 F.2d 517, 519 (9th Cir. 1986), cert. denied, 547 U.S. 1159, 126 (2006)(holding that an insurance policy is property of the estate under 11 U.S.C. §541(a) because it protects against the diminution of the value of the estate). Given Sharp's duty to assess the value of litigating against the Rothmans, Trustee acted reasonably and not deceitfully in receiving information regarding Essex's denial of coverage. Principals of the debtor would have a duty to share insurance coverage information with Trustee. Trustee also did not single out Essex; it also received information regarding Scottsdale's denial of coverage. ESUF, ¶25.

91. Lastly, Essex points to Herbert Rothman's deposition to assert that the $4.3 million was never agreed upon in the mediation, and was only added after the fact. Essex relies on deposition testimony of Herbert Rothman where he stated that he did not know of the $4.3 figure until after the mediation. When pressed about when he became aware of that figure, Herbert Rothman responded, "I guess when Gabriel typed it up and sent it over to our counsel." ESUF, ¶53. The response may only show that Herbert Rothman was not aware of the figure, not that the figure was somehow concocted by the Rothmans and Trustee. Rothman's "guess" is not enough to show collusion. The Trustee has explained the basis for his damages calculation. It is also hard to believe that no estimates of likely damage awards were given in the course of an all-day mediation. No party or counsel may testify about the discussion they had on damages as those matters are subject to the mediation privilege. It is also not clear if Rothmans' counsel negotiated this figure on behalf of the Rothmans, but no inquiry is permitted because of the attorney-client privilege.

92. Essex has failed to show that there is no material disputed fact warranting summary judgment in its favor as to collusion. While the facts it cites in support of its theory do not

affirmatively show collusion on a motion for summary judgment, Essex may pursue this issue at trial where it bears the burden of proof and reasonable inferences may be made.

### I. Additional Discovery

93. Essex previously brought a motion to compel seeking a resolution of a dispute over the scope of discovery. Trustee argued that Essex could not inquire into any of the facts supporting the underlying complaint against the Rothmans. Essex argued that it could revisit all of the complaint's allegations because they could show no duty to indemnify. The Court required Trustee to answer Requests for Admission ("RFA") 13 through 18, and 35 – questions pertaining to the timing of C.M. Meiers' insolvency and Rothman's misuse of trust account funds.  Order on Defendant's Motion to Compel Responses to Discovery, ECF No. 125, 2:5. The Court ordered that Trustee is not required to answer RFA #1 through 6, 10, 11, 20 through 34, and 35 – questions pertaining to whether trust funds were negligently collected or paid and the coverage of Essex's policy. Id. at 2:3-4.  The Court further ordered that "the continued deposition of Herbert Rothman shall be limited to questions as framed by this Court's Order on the RFA[s] as set forth above." Id. at 5.

94. Essex seeks to show with additional discovery that controverting evidence may show that the $3.8 million settlement covers uncovered claims. Essex still seeks bank account records of C.M. Meiers' general accounts. While Trustee believed all account records he has were turned over, it is not entirely clear what records Essex actually obtained.  To support its argument that Trustee inflated a $1.2 million trust shortfall into a $4.3 million insurance claim, Essex has retained a forensic accountant to analyze the financial records of C.M. Meiers, including the records of the Trust Account. It proposes that with additional discovery of trust ledgers, it can show through large deviations in cash flow that any trust account shortfall was the result of intentional wrongdoing rather than mere error or mismanagement. Declaration of Hanifin, ¶10.

95. Because those records would not resolve either the Trustee's motion for summary judgment that Essex is liable for the entire settlement amount or Essex's motion that there is no indemnity coverage for any of the settlement, there is no need to postpone this summary judgment ruling while further discovery is conducted under Fed. R. Civ. P. 56(d).

96. To the extent that discovery not allowed in the earlier hearing is now relevant to the narrowed trial issues, the parties should raise specific inquires at the status conference. Most discovery is complete, but, after the parties meet and confer, the Court will discuss narrow and limited additional discovery, in addition to expert witness discovery and deadlines.

### J. Order of Proof at Trial

97. At trial, Essex must rebut the presumption that the Settlement is reasonable and fully enforceable against Essex.  As described in Xebec, mere production of evidence to show that the settlement is unreasonable is not enough to dispel the presumption; Essex must persuade by a preponderance of the evidence that the Settlement was collusive or that the claims resolved in the Settlement were not covered by the policy. See Xebec, 12 Cal. App. 4th at 546.

98. Even taking Essex's calculation of the shortfall and the amount of damages of each respective claim as true, the inquiry may be less about the actual damages suffered by C.M. Meiers, and more about what the parties considered in coming to a compromise. The parties are using different methods of calculating damages. In Sharp's version of the settlement discussion, the final figure focused on a proximate cause analysis of damages. Sharp, via his declaration, proffers two theories for damages proximately caused by the Rothmans' failure to provide "Professional Services" in the administration of the C.M. Meiers Trust Account: $10,979,863 (loss of value of C.M. Meiers' business)[7] and $7,860,647 (claims and costs of the C.M. Meiers' bankruptcy). Declaration of Sharp, 5:3-8.

99. Another crucial disputed detail that Essex must address is Trustee's contention that the settling parties did not parse the claims in covered and uncovered funds in reaching the $4.3 million figure. Sharp stated:

> I made no attempt to parse the damages agreed to as part of the settlement as between the claims which the court has determined to have been covered by the Essex's E & O Policy, and those claims in the FAC that would not be covered by the E &O Policy, which as I understand it, would be claims for fraud. In fact, it is my view that the damages that can be attributed to the errors and omissions in the management of the trust account far exceed the amount of damages agreed to *vis a vis* the
> Settlement Agreement.

Declaration of Sharp, 5:3-8.

### K.  Authority to Enter Ruling

100. The findings of fact and legal conclusions herein will constitute the court's findings under Fed. R Civ. P. 52(a), applicable in this bankruptcy proceeding under Fed. R. Bankr. P. 9014 once the ruling is complete.[8] Because of the denial of summary judgment as to certain claims, no final judgment is being entered. Because certain issues have been resolved in this and the earlier motion for summary judgment, this Memorandum is structured to make the findings on those issues clear for purposes of eventual review.

101. Where the Bankruptcy Court may not have authority to enter a final judgment in core matters to which a party does not give consent, the Bankruptcy Court is still directed to consider core claims and make findings of fact and conclusions of law and a recommendation to the district court if the district court should conclude that review is appropriate before trial is concluded on the remaining issues. Executive Benefits Ins. Agency v. Arkison, 134 S. Ct. 2165, 2172-73 (2014). As the Court may not have authority to hear this matter, this ruling will be deemed a report and recommendation to the district court. The findings of fact and conclusions of law herein may be considered by the district court under 28 U.S.C.

---

[7] Sharp arrived at this number by subtracting the amount necessary to cure the out of trust from the estimated market value of the company.

[8] To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

§157(c)(1). At the next status conference, the parties should address whether this Court should transmit this matter to the district court before or after the trial on the remaining claims.

## II. __CONCLUSION__

Trustee's motion for summary judgment is denied as to breach of the duty to indemnify, tortious breach of implied covenant of good faith and fair dealing, Brandt fees, and punitive damages. Trustee's motion is granted as to full costs of insured's defenses with a procedure to be established to evaluate the amount following resolution of all issues.

Essex's motion for summary judgment is granted as to the tortious breach of implied covenant of good faith and fair dealing. Essex's motion is denied as to the breach of the duty to indemnify.

Trustee and Essex should submit respective orders in accordance with this ruling.

### ###

Date: October 28, 2016

Maureen A. Tighe
United States Bankruptcy Judge